

**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed February 28, 2020**

**United States Bankruptcy Judge**

---

## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| THE LASALLE GROUP, INC., et al., 1 | § | Case No. 19-31484-sgj-11 |
| | § | |
| DEBTORS. | § | (Jointly Administered) |
| | § | |
| | § | |
| | § | |

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER
### CONFIRMING FIRST AMENDED JOINT PLAN OF LIQUIDATION OF
### CINCO RANCH MEMORY CARE, LLC AND PEARLAND MEMORY CARE, LLC

Came on for consideration confirmation of the *First Amended Joint Plan of Liquidation of Cinco Ranch Memory Care, LLC and Pearland Memory Care, LLC* [Docket No. 524] (as may be further amended, modified, or supplemented from time to time, the "**Plan**") and the *First Amended Disclosure Statement in Support of First Amended Joint Plan of Liquidation of Cinco Ranch Memory Care, LLC and Pearland Memory Care, LLC* [Docket No. 525] (the "**Disclosure**

---

1 A list of the Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, is attached hereto as **Schedule 1**.

**Statement**"), filed by Cinco Ranch Memory Care, LLC ("**Cinco Ranch**") and Pearland Memory Care, LLC ("**Pearland**," and collectively with Cinco Ranch, the "**Debtors**"), debtors and debtors-in-possession in the above-referenced cases (the "**Cases**"); and the Court having entered an Order, among other things, conditionally approving the Disclosure Statement and approving certain procedures for the sale of substantially all of the Debtors' Assets to a third party as well as the solicitation and tabulation of votes for the Plan (the "**Disclosure Statement Order**"); and upon the certification of John Burlacu, Senior Director at Donlin Recano & Company, Inc., the balloting and tabulation agent in the Cases; and the Court having reviewed the certification filed certifying the ballots accepting and rejecting the Plan; and the Court having held the hearing to confirm the Plan on February 19, 2020 ("**Confirmation Hearing**") after due notice to holders of Claims and Interests and other parties in interest in accordance with the Disclosure Statement, the Disclosure Statement Order, Title 11 of the United States Code (the "**Bankruptcy Code**"), the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and the Local Bankruptcy Rules for the United States Bankruptcy Court for the Northern District of Texas (the "**Local Rules**"); and the Court having reviewed all documents in connection with confirmation of the Plan and having heard all parties desiring to be heard at the Confirmation Hearing; and upon the record compiled in these Cases; and after due deliberation and consideration of all of the foregoing; and sufficient cause appearing therefore; the Court hereby makes the following findings of fact and conclusions of law:

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**THE COURT FINDS AND CONCLUDES THAT:**

A. <u>Capitalized Terms.</u> Capitalized terms used but not defined herein shall have the meanings given to them in the Plan.

B. <u>Findings and Conclusions.</u> The findings and conclusions set forth herein and in the record of the Confirmation Hearing constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014. To the extent any of the following findings of facts constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C. <u>Jurisdiction, Venue, Core Proceeding.</u> This Court has jurisdiction over these Cases pursuant to 28 U.S.C. §§ 157 and 1334(a). Venue is proper under 28 U.S.C. §§ 1408 and 1409. Confirmation of the Plan is a core proceeding under 28 U.S.C. § 157(b)(2).

D. <u>Disclosure Statement.</u> On December 13, 2019, the Debtors filed their original disclosure statement, which put parties on notice that the Debtors would seek authority in connection with confirmation of the Plan to sell substantially all of the assets of the Debtors to a third party ("Sale").

E. <u>Sale of Assets.</u> On December 31, 2019, the Debtors filed the Disclosure Statement, which included the bidding procedures as well as a form of sale agreement (attached as Exhibit B) ("<u>APA</u>") for the purchase of substantially all the assets of Cinco Ranch ("<u>Cinco Ranch Assets</u>") as identified in the APA for Cinco Ranch ("<u>Cinco Ranch APA</u>") and for the purchase of substantially all the assets of Pearland ("<u>Pearland Assets</u>") as identified in the APA for Pearland ("<u>Pearland APA</u>"), and such sale of the Cinco Ranch Assets and the sale of the Pearland Assets were to be approved under all applicable provisions of the Bankruptcy Code, including Sections 105(a), 363(b), 363(f), 363(m), 365(a), 365(b), and 365(f), 1123 and/or 1129.

The Disclosure Statement further put parties on notice that SH1 Houston LLC ("SH1"), the Debtors' secured lender, was allowed to participate in the Sale as a Qualified Bidder and credit bid up to the full amount of its Secured Claim (as defined in the Plan).

       F.     Disclosure Statement Order. On December 31, 2019, the Court entered an order conditionally approving the Disclosure Statement [Docket No. 526] in accordance with Section 105(d)(2)(vi) of the Bankruptcy Code (the "Disclosure Statement Order"), and establishing deadlines for the solicitation of votes for the confirmation of the Plan. The Disclosure Statement Order also conditionally approved the bid procedures included in the Disclosure Statement.

       G.     Notice of Bid Deadlines. On January 6, 2020, the Debtors filed a Notice of Supplement, which included the deadlines to submit bids in accordance with the bid procedures.

       H.     Adequacy of the Disclosure Statement. The information contained in the Disclosure Statement contained extensive material information regarding the Debtors so that parties entitled to vote on the Plan could make informed decisions regarding the Plan. Additionally, the Disclosure Statement contains adequate information within the meaning of Bankruptcy Code Section 1125 and complies with any additional requirements of the Bankruptcy Code, Bankruptcy Rules, and applicable non-bankruptcy law. The Debtors' use of the Disclosure statement to solicit votes to accept or reject the Plan was authorized by the Disclosure Statement Order and was appropriate. Solicitation of votes on the Plan was in compliance with the Disclosure Statement Order.

       I.     Solicitation. Votes for acceptance or rejection of the Plan were solicited in good faith and in compliance with Sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018, the Disclosure Statement, the Disclosure Statement Order, all other

applicable provisions of the Bankruptcy Code, and all other applicable rules, laws, and regulations.

J. <u>Voting.</u> As set forth in the record at the Confirmation Hearing, and by certification of John Burlacu, each impaired Class of Claims and Interests either (a) voted to accept the Plan under Section 1126 of the Bankruptcy Code and for purposes of Section 1129(a)(8)(A) of the Bankruptcy Code; or (b) is not impaired under Section 1124 of the Bankruptcy Code and for the purposes of Section 1129(a)(8)(B) of the Bankruptcy Code. Voting on the Plan and treatment thereunder are reflected on the *Declaration of John Burlacu, Senior Director at Donlin Recano & Company, Inc. Regarding the Tabulation of Ballots Accepting or Rejecting the Debtors' First Amended Joint Chapter 11 Plan of Liquidation* filed by the Debtors on February 18, 2020 [Docket No. 573]. The procedure by which ballots were received and tabulated was fair, properly conducted, and in accordance with the Bankruptcy Code, the Bankruptcy Rules, Local Rules, the Disclosure Statement and the Disclosure Statement Order.

K. <u>Successful Bidder.</u> SH1 ("<u>Buyer</u>")[2] was the only party to submit a qualifying bid for Cinco Ranch Assets and a qualifying bid for the Pearland Assets, and conditioned its bids on the purchase of the Cinco Ranch Assets and the Pearland Assets free and clear of any and all liens, claims, encumbrances, and other interests. SH1 was declared the successful bidder in accordance with the Bid Procedures. The winning bid was a credit bid in the amount of $4,972,333 plus cash equal to an amount necessary to satisfy all Allowed Administrative Expense Claims, all Secured Tax Claims, all Priority Tax Claims, the Allowed Administrative Convenience Claims, and $7,500 for funding the Liquidating Trust, estimated to be approximately $230,000 ("<u>Cinco Ranch Proceeds</u>") and $3,799,667 plus cash equal to an amount

---

2 "Buyer" shall be defined herein as SH1 or its designees.

necessary to satisfy all Allowed Administrative Expense Claims, all Secured Tax Claims, all Priority Tax Claims, the Allowed Administrative Convenience Claims, and $7,500 for funding the Liquidating Trust, estimated to be approximately $230,000 ("Pearland Proceeds").

L.      Compliance with the Bid Procedures.  The Debtors and the Buyer have complied with the Bid Procedures in all respects.

M.      Implementation of the Sale.  The Plan implements the sale of the Cinco Ranch Assets and the Pearland Assets to the Buyer and the receipt of the Cinco Ranch Proceeds and Pearland Proceeds, as applicable, shall fund the Plan payments for each respective debtor case.

N.      Settlement of TLG Administrative Expense Claim.  On August 13, 2019, TLG filed its *Application for Administrative Expense Claims* (the "TLG Admin Claim") to which certain parties, including the Debtors, objected.  In full settlement and release of the TLG Admin Claim and any claims related thereto, as well as the resolution of any objection TLG had to the Debtors' plan confirmation, the Debtors and TLG, as well as SH1 and other parties, have entered into that certain *Settlement Agreement* that is attached hereto as Exhibit "A" and incorporated herein by reference, whereby the TLG Admin Claim will be withdrawn.  The terms of the Settlement Agreement are hereby approved.

O.      Modifications to the Plan. The modifications and amendments in the Plan set forth on the record at the Confirmation Hearing, or made by this Confirmation Order, do not materially and adversely affect or change the treatment of any creditor who has not accepted such modifications. Accordingly, pursuant to Bankruptcy Rule 3019, such modifications do not require additional disclosure under Section 1125 of the Bankruptcy Code, or re-solicitation of acceptances or rejections under Section 1126 of the Bankruptcy Code, nor do they require that holders of Claims not accepting such modifications be afforded an opportunity to change

previously cast acceptances or rejection of the Plan. Disclosure of the modifications on the record at the Confirmation Hearing constitutes due and sufficient notice thereof under the circumstances of these Cases. Accordingly, pursuant to Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all holders of Claims that have accepted or are conclusively deemed to have accepted the Plan are deemed to have accepted such modifications to the Plan.

P.      Bankruptcy Rule 3016. In accordance with Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtors as proponents of the Plan. The Debtors appropriately filed the Disclosure Statement and the Plan with the Court, thereby satisfying Bankruptcy Rule 3016(b). Any discharge, release, injunction and exculpation provisions of the Plan are set forth in specific and conspicuous language, thereby complying with Bankruptcy Rule 3016(c).

Q.      Liquidating Trustee. On the Effective Date, the Liquidating Trustee shall be appointed. On February 12, 2020, the Debtors designated Karen G. Nicolaou as the Liquidating Trustee [Docket No. 564].

R.      Compliance with Bankruptcy Code Section 1129(a)(1). The Plan complies with any and all applicable provisions of the Bankruptcy Code and Bankruptcy Rules, thereby satisfying Section 1129(a)(1). The Court makes further findings below that the Plan complies with the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules. The omission or exclusion of a specific finding herein does not constitute a finding that the Debtors have not complied with any and all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules:

S.      Proper Classification Under Sections 1122 and 1123(a)(1). In addition to Administrative Expense Claims and Priority Tax Claims, which need not be classified, the Plan designates seven (7) Classes of Claims (Classes 1.1, 1.2, 2.1, 2.2, 2.3, 2.4, and 3) against the

each of the Debtors. The Claims placed in each Class are substantially similar to other Claims in each such Class, and such classification is therefore consistent with Bankruptcy Code Section 1122. Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims created under the Plan, and such Classes and the Plan's treatment thereof do not unfairly discriminate between holders in each Class of Claims. The Plan satisfies Bankruptcy Code Sections 1122 and 1123(a)(1).

T.    <u>Specification of Classes Not Impaired under the Plan Under Section 1123(a)(2).</u> Article 3 of the Plan specifies each particular Class of Claims or Interest that is not impaired under the Plan. The Plan satisfies Bankruptcy Code Section 1123(a)(2).

U.    <u>Specified Treatment of Impaired Classes – Section 1123(a)(3).</u> Article 5 of the Plan specifies the treatment of the impaired Classes of Claims thereby satisfying Bankruptcy Code Section 1123(a)(3).

V.    <u>No Discrimination – Section 1123(a)(4).</u> The Plan either provides the same treatment for each Claim in each respective Class or the holder of a particular Claim or Interest has agreed to a less favorable treatment of its particular Claim or Interest, thereby satisfying Bankruptcy Code Section 1123(a)(4).

W.    <u>Implementation of the Plan – Section 1123(a)(5).</u> Article 6 of the Plan provides adequate and proper means for implementing the Plan. Article 6 establishes the procedures for the sale of each Debtor's Assets to the Buyer. Article 6 also sets forth the establishment of the Liquidating Trust upon the Effective Date. The Liquidating Trustee will be authorized to pursue any and all Causes of Action on behalf of the Debtors and their Estates, including Chapter 5 Causes of Action.

X.    <u>Charters of the Debtors – Section 1123(a)(6).</u> The Plan is a liquidating plan. Equity holders are to receive no distributions under this Plan and Equity Interest Holders' equity interests in the Debtors equaling the total amount of such interests in each of the Debtors as of the Petition Date shall be extinguished as of the Effective Date. The Court therefore finds and concludes that Section 1123(a)(6) is inapplicable.

Y.    <u>Selection of Officers and Directors – Section 1123(a)(7).</u> The Plan as a liquidation plan provides for the designation of a Liquidating Trustee to liquidate remaining assets, make distribution to creditors, and wind up the Debtors' business. The Court finds the designation of a Liquidating Trustee consistent with the interests of holders of Claims or Interests against the Debtors.

Z.    <u>Additional Plan Provisions – Section 1123(b).</u> The Plan's provisions are appropriate and not inconsistent with the applicable provisions of the Bankruptcy Code.

AA.    <u>Compliance with Bankruptcy Code Section 1129(a)(2).</u> The Debtors have complied with the applicable provisions of the Bankruptcy Code, thereby satisfying Bankruptcy Code Section 1129(a)(2). Specifically, the Debtors offered the testimony stating that the Plan complies with all applicable provisions of the Bankruptcy Code.

BB.    <u>Plan Proposed in Good Faith – Section 1129(a)(3).</u> The Debtors have proposed the Plan in good faith and not by means forbidden by law, thereby satisfying Bankruptcy Code Section 1129(a)(3). The Court has examined the totality of the circumstances surrounding the formulation of the Plan. Based on the evidence presented at the Confirmation Hearing, the Court finds and concludes that the Plan has been proposed with the legitimate and honest purpose of liquidating the Debtors' assets in a fashion to maximize the recovery to the Debtors' creditors in accordance with the priorities set forth in the Bankruptcy Code.

CC.     <u>Payment for Services or Costs and Expenses – Section 1129(a)(4).</u> Any payments made or to be made by the Debtors for services or for costs and expenses in connection with these Cases have been approved by, or are subject to the approval of, the Court as reasonable, thereby satisfying Bankruptcy Code Section 1129(a)(4).

DD.     <u>Identification of Directors, Officers, and Insiders – Section 1129(a)(5).</u> The Plan proposes the appointment of the Liquidating Trustee. The identity of the proposed Liquidating Trustee was made known by the Debtors on February 12, 2020 [Docket No. 564]. The Plan does not propose the retention or employment of an insider of the Debtors. Therefore Bankruptcy Code Section 1129(a)(5) has been satisfied.

EE.     <u>No Rate Changes – Section 1129(a)(6).</u> The Plan does not provide for the change of any rate that is within the jurisdiction of any governmental regulatory commission after the occurrence of the Effective Date. Therefore, Bankruptcy Code Section 1129(a)(6) is inapplicable.

FF.     <u>Best Interest of Creditors – Section 1129(a)(7).</u> As set forth in the Liquidation Analysis and by evidence presented at the Confirmation Hearing, the "best interest" test is satisfied as to all Impaired Classes of Claims and Interests that have not accepted the Plan. As set forth in the Liquidation Analysis, a liquidation under Chapter 7 would adversely affect the ultimate proceeds available for distribution to holders of the Secured Claims due to: (i) increased costs, including administrative fees and costs payable to the chapter 7 trustee and professional advisors of the trustee; (ii) the inevitable foreclosure by SH1 on their secured debt, resulting in no cash available to satisfy any Administrative Claims; and (iii) limitations of Section 721 of the Bankruptcy Code. Confirmation of the Plan provides each rejecting creditor and interest holder

with a recovery that is not less than such holder would receive in a Chapter 7 liquidation of the Debtors' assets.

GG. Acceptance by Impaired Classes– Section 1129(a)(8). Bankruptcy Code Section 1129(a)(8) of the Bankruptcy Code has been satisfied.

HH. Treatment of Administrative, Other Priority Claims and Priority Tax Claims – Section 1129(a)(9). Consistent with Section 1129(a)(9)(A), Article 4 of the Plan provides that each holder of an Allowed Administrative Expense Claim shall be paid the total amount of such holder's Allowed Administrative Expense Claim as soon as reasonably practicable after the later of (a) the Effective Date, (b) payment in full of the DIP Administrative Claim, (c) the allowance of such Administrative Expense Claim, and (d) such other date agreed upon in writing by the applicable Debtor or the Liquidating Debtor and the holder of such Allowed Administrative Expense Claim. Notwithstanding the forgoing, Allowed Professional Claims shall be paid pursuant to Article 4 of the Plan. Consistent with Section 1129(a)(9)(C), Section 4.2 of the Plan provides that each holder of an Allowed Priority Tax Claim shall receive all Distributions under the Plan after the payment of the DIP Administrative Claim until such time as Allowed Priority Tax Claims are paid in full. No holder of an Allowed Administrative Expense Claim, Priority Tax Claim, or Priority Non-Tax Claim has objected to this treatment under the Plan and if they have, such objections have been withdrawn.

II. Acceptance by Impaired Class – Section 1129(a)(10). At least one Class of Claims that is impaired under the Plan has accepted the Plan thereby satisfying Bankruptcy Code Section 1129(a)(10).

JJ. Feasibility – Section 1129(a)(11). The Plan is a liquidating plan and the funding of which is dependent upon the successful liquidation of the Debtors' assets, and thus the feasibility requirement of Bankruptcy Code Section 1129(a)(11) is satisfied.

KK. <u>Payment of Fees – Section 1129(a)(12).</u> All fees payable under 28 U.S.C. §1930 on or before the Effective Date, as determined by the Court, have been paid or will be paid on the Effective Date pursuant to the Plan thus satisfying the requirements of Bankruptcy Code Section 1129(a)(12).

LL. <u>Continuation of Retiree Benefits – Section 1129(a)(13).</u> The Debtors do not have any retiree benefits to be continued under the Plan. Thus, Bankruptcy Code Section 1129(a)(13) is not applicable.

MM. <u>Domestic Support – Section 1129(a)(14)</u>. The Debtors are not required by a judicial or administrative order, or by statute, to pay a domestic support obligation. Thus, Bankruptcy Code Section 1129(a)(14) is not applicable.

NN. <u>Individual Debtor Cases – Section 1129(a)(15).</u> The Debtors are not individual debtors and thus Bankruptcy Code Section 1129(a)(15) is not applicable.

OO. <u>Transfers of Property – Section 1129(a)(16).</u> All transfers of property under the Plan will be made in accordance with any applicable provisions of non-bankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust. Thus Bankruptcy Code Section 1129(a)(16) is satisfied.

PP. <u>Only Plan - Section 1129(c).</u> The Plan is the only plan that has been filed in these Chapter 11 Cases and it has been found to satisfy the requirements of subsections (a) and (b) of section 1129 of the Bankruptcy Code. Accordingly, the requirements of section 1129(c) of the Bankruptcy Code have been satisfied.

QQ. <u>Not for Tax Avoidance - Section 1129(d).</u> No party in interest has requested that the Court deny Confirmation of the Plan on grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act, and the

principal purpose of the Plan is not such avoidance. Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

RR. <u>Satisfaction of Confirmation Requirements.</u> The Plan satisfies the requirements of confirmation set forth in Bankruptcy Code Section 1129.

SS. <u>Implementation of the Plan.</u> Article 6 of the Plan provides the means for implementing the Plan. The provisions of Article 6 of the Plan are consistent with and permissible under Section 1123(a)(5) of the Bankruptcy Code and are consistent with the interests of Creditors, holders of Interest, and public policy.

TT. <u>Preservation of Causes of Action.</u> The claims and Causes of Action referenced or listed in the Plan, the Disclosure Statement, and Article 3, Section E "Disposition of Causes of Action" of the Disclosure Statement are hereby specifically and unequivocally reserved and retained for the prosecution, enforcement, and pursuit by the Debtors and the Liquidating Trustee, who is designated as the representative of the Liquidating Debtors' Estates for such purposes, pursuant to Section 1123(b)(3)(B).

UU. <u>Releases, Exculpations, and Injunctions.</u> Any releases, exculpations, and injunctions provided in the Plan (a) are within the jurisdiction of the Court under 28 U.S.C. § 1334; (b) are the product of good faith, arm's-length negotiations, (c) are integral elements of the global settlement embodied in the Plan and are essential to the Plan's implementation, (d) confer material benefit on, and are in the best interests of the Debtors, their Estate and Creditors; and (e) are consistent with Sections 105, 524, 1123, 1129, and 1141 and other applicable provisions of the Bankruptcy Code.

VV. <u>Sale of Cinco Ranch Assets (as defined in the Cinco Ranch APA).</u>

i. The Plan is to be implemented by the sale of the Cinco Ranch Assets to the Buyer. Certain Plan payments are to be funded from the cash portion of the Cinco Ranch Proceeds.

ii. The Cinco Ranch APA was negotiated and entered into in good faith, without collusion and at arm's length. The Buyer is a "good faith" Buyer within the meaning of Section 363(m) of the Bankruptcy Code, and therefore, is entitled to all of the protections afforded thereby.

iii. Neither Cinco Ranch nor the Buyer has engaged in conduct that would cause or permit the sale to be avoided under Section 363(n) of the Bankruptcy Code.

iv. The Buyer is not a successor in interest or alter ego of Cinco Ranch and should not have any successor or transferee liability for any obligations or liabilities of Cinco Ranch as a result of the purchase of the Cinco Ranch Assets.

v. Upon entry of this Confirmation Order, the Cinco Ranch APA is a legal, valid and binding contract between Cinco Ranch and the Buyer and is enforceable according to its terms. All terms of the Cinco Ranch APA, specifically including, without limitation, the purchase price to be paid by the Buyer thereunder, are: (i) fair and reasonable, (ii) represent the highest and best offer for the purchase of the Cinco Ranch Assets, (iii) will provide the best prices obtainable for the Cinco Ranch Assets and assumed liabilities as identified in the Cinco Ranch APA and a greater recovery for the estate's creditors than would be provided by and other practical available alternative, and (iv) constitute reasonably equivalent and fair consideration for the sale of the Cinco Ranch Assets and assumed liabilities as identified in the Cinco Ranch APA.

vi. As of the closing date, the consummation of the Sale and the other transactions contemplated by the Cinco Ranch APA will be legal, valid and property authorized under all applicable provisions of the Bankruptcy Code, including Sections 105(a), 363(b), 363(f), 363(m), 365(a), 365(b), and 365(f), 1123 and/or 1129, and all of the applicable requirements of such sections have been complied with in respect of the transactions.

vii. Cinco Ranch has articulated sound business reasons for entering into the Cinco Ranch APA and for selling the Cinco Ranch Assets on the terms and conditions set forth in the Cinco Ranch APA, and it is a reasonable exercise of Cinco Ranch's business judgment to execute, deliver, and consummate the transactions contemplated by the Cinco Ranch APA. Cinco Ranch may sell the Cinco Ranch Assets to the Buyer free and clear of all liens, claims, and encumbrances, with all such liens claims, and encumbrances to attach to the Cinco Ranch Proceeds and to be satisfied from the Cinco Ranch Proceeds as set forth in section 6 of the Plan.

WW. <u>Sale of Pearland Assets (as defined in the Pearland APA)</u>.

    i.    The Plan is to be implemented by the sale of the Pearland Assets to the Buyer. Certain Plan payments are to be funded from the cash portion of the Pearland Proceeds.

    ii.    The Pearland APA was negotiated and entered into in good faith, without collusion and at arm's length. The Buyer is a "good faith" Buyer within the meaning of Section 363(m) of the Bankruptcy Code, and therefore, is entitled to all of the protections afforded thereby.

    iii.    Neither Pearland nor the Buyer has engaged in conduct that would cause or permit the sale to be avoided under Section 363(n) of the Bankruptcy Code.

    iv.    The Buyer is not a successor in interest or alter ego of Pearland and should not have any successor or transferee liability for any obligations or liabilities of Pearland as a result of the purchase of the Pearland Assets.

    v.    Upon entry of this Confirmation Order, the Pearland APA is a legal, valid and binding contract between Pearland and the Buyer and is enforceable according to its terms. All terms of the Pearland APA, specifically including, without limitation, the purchase price to be paid by the Buyer thereunder, are: (i) fair and reasonable, (ii) represent the highest and best offer for the purchase of the Pearland Assets, (iii) will provide the best prices obtainable for the Pearland Assets and assumed liabilities as identified in the Pearland APA and a greater recovery for the estate's creditors than would be provided by and other practical available alternative, and (iv) constitute reasonably equivalent and fair consideration for the sale of the Pearland Assets and assumed liabilities as identified in the Pearland APA.

    vi.    As of the closing date, the consummation of the Sale and the other transactions contemplated by the Pearland APA will be legal, valid and property authorized under all applicable provisions of the Bankruptcy Code, including Sections 105(a), 363(b), 363(f), 363(m), 365(a), 365(b), and 365(f), 1123 and/or 1129, and all of the applicable requirements of such sections have been complied with in respect of the transactions.

    vii.    Pearland has articulated sound business reasons for entering into the Pearland APA and for selling the Pearland Assets on the terms and conditions set forth in the Pearland APA, and it is a reasonable exercise of Pearland's business judgment to execute, deliver, and consummate the transactions contemplated by the Pearland APA. Pearland may sell the Pearland Assets to the Buyer free and clear of all liens, claims, and encumbrances, with all such liens, claims, and encumbrances to attach to

the Pearland Proceeds and to be satisfied from the Pearland Proceeds as set forth in section 6 of the Plan.

XX. Pursuant to section 1146 of the Bankruptcy Code, the issuance, transfer, or exchange of any security and the making or delivery of any instrument of transfer under the Plan (including, but not limited to, any instrument executed in furtherance of the transactions contemplated by the Plan, including the Cinco Ranch APA and the Pearland APA) shall be exempt and shall not be subject to tax under any law imposing sale tax or similar tax, in each case to the fullest extend provided by Section 1146 of the Bankruptcy Code and pursuant to Section 1142(b) of the Bankruptcy Code, the Confirmation Order shall direct any applicable government entity to record any recordable document executed in connection with the consummation of the Plan, without the payment of such taxes.

YY. <u>Objections.</u> All timely filed objections to final approval of the Disclosure Statement and/or to confirmation of the Plan were withdrawn, settled, or overruled.

## <u>DECREES</u>

ACCORDINGLY, THE COURT HEREBY ORDERS THAT:

1. <u>Adequacy of the Disclosure Statement.</u> The Disclosure Statement hereby is **APPROVED** on a final basis as containing adequate information within the meaning of Bankruptcy Code Section 1125 and contains sufficient information of a kind necessary to satisfy the disclosure requirements of any applicable non-bankruptcy laws, rules, and regulations.

2. <u>Confirmation of the Plan.</u> The Plan, which consists of the Plan and modifications set forth in this Confirmation Order or on the record at the Confirmation Hearing, is **APPROVED** and **CONFIRMED** under Bankruptcy Code Section 1129 in its entirety. The

terms of the Plan are incorporated by reference into and are an integral part of this Confirmation Order.

3.    <u>Objections.</u> Any objections that have not been withdrawn, waived, or settled, and all reservations of rights pertaining to confirmation of the Plan included therein, are overruled on the merits.

4.    <u>Approval of Plan Modifications.</u> The modifications and amendments in the Plan made by this Confirmation Order are hereby approved. Such modifications do not materially and adversely affect or change the treatment of any creditor who has not accepted such modifications. Accordingly, pursuant to Bankruptcy Rule 3019, such modifications do not require additional disclosure under Section 1125 of the Bankruptcy Code, or re-solicitation of acceptances or rejections under Section 1126 of the Bankruptcy Code, nor do they require that holders of Claims not accepting such modifications be afforded an opportunity to change previously cast acceptances or rejection of the Plan. Disclosure of the modifications on the record at the Confirmation Hearing constitutes due and sufficient notice thereof under the circumstances of these Cases.

5.    <u>Vesting of Cinco Ranch Assets.</u>

a.    The Cinco Ranch APA is approved, and Cinco Ranch is authorized and directed to sell the Cinco Ranch Assets to the Buyer and otherwise consummate the transactions contemplated by the Cinco Ranch APA. Except as otherwise provided in the Cinco Ranch APA and this Confirmation Order, upon the Closing, the Cinco Ranch Assets as set forth in the Cinco Ranch APA shall vest in Buyer free and clear of all liens, claims, encumbrances, or other interests claimed or held by any party (other than Buyer) in accordance with sections 363(f), 365 and/or 1123 and 1129 of the Bankruptcy Code,

which liens, claims, encumbrances, or other interests will attach to the Cinco Ranch Proceeds with the same validity, priority, force and effect and subject to the same defenses as existed prior to the Closing date. On the Closing date, any and all pre-existing liens, claims, and encumbrances or other matters affecting title to the Cinco Ranch Assets shall be deemed extinguished as of such date, with such liens and claims to attached to Cinco Ranch Proceeds as provided in the Plan and herein, including Exhibit A hereto. Without limiting the generality of the foregoing, all liens, encumbrances and claims against the Cinco Ranch Assets as of the Closing Date shall be unconditionally and irrevocably released, discharged and terminated as to the Cinco Ranch Assets by the Buyer under the Cinco Ranch APA.

b.      The Buyer is a "good faith" Buyer within the meaning of Section 363(m) of the Bankruptcy Code, and therefore, is entitled to all of the protections afforded thereby. In the absence of a stay pending appeal of this Order, if all or any of the provisions of this Order are hereafter reversed or modified on appeal, such reversal or modification shall not affect the validity and enforceability of any sale, transfer or assignment authorized by this Order, specifically including, the Sale of the Cinco Ranch Assets to the Buyer under the Cinco Ranch APA, and notwithstanding any reversal or modification on appeal, any sale transfer, or assignment, specifically including the Sale of the Cinco Ranch Assets to the Buyer under the Cinco Ranch APA, shall be governed in all respects by the original provisions of this Order.

c.      Neither Cinco Ranch nor the Buyer has engaged in conduct that would cause or permit the Cinco Ranch APA or the Sale of the Cinco Ranch Assets to the Buyer thereunder to be avoided under Section 363(n) of the Bankruptcy Code. The Buyer is not

a successor in interest or alter ego of Cinco Ranch and shall not have any successor or transferee liability for any obligations or liabilities of Cinco Ranch as a result of the purchase of the Cinco Ranch Assets.

       d.      Effective upon the Closing of the Sale of the Cinco Ranch Assets to the Buyer under the Cinco Ranch APA, all holders of liens, encumbrances and other claims are hereby barred and permanently enjoined from in any way asserting or pursuing such liens, encumbrances and other claims against the Buyer, the Buyer's successors or assigns, the Cinco Ranch Assets or its successors and assigns. Following the closing of the sale of the Cinco Ranch Assets to the Buyer under the Cinco Ranch APA, no holder of any liens, encumbrances and other claims shall in any way interfere with the Buyers' possession of, title to, or use and enjoyment of the Cinco Ranch Assets. The Buyer shall have no liability or responsibility of any nature, character or kind for any liability or other obligation of Cinco Ranch or any other party relating to the Cinco Ranch Assets or the operation of Cinco Ranch's business.

       e.      The provision of this Order authorizing the Sale of the Cinco Ranch Assets free and clear of liens, encumbrances and claims shall be self-executing, and neither Cinco Ranch nor the Buyer nor any other party shall be required to execute or file releases, termination statements, assignments, consents or other instruments to effectuate and/or implement the provisions of this Order; provided, however, that this paragraph shall not excuse any party from performing any of its respective obligations under the Cinco Ranch APA. Without in any way limiting the foregoing, Cinco Ranch and the Buyer are authorized and empowered to execute and file releases, termination statements, assignments, consents, or other instruments to effectuate and/or implement the provisions

of this Order. Without limiting any other terms and provisions of this Order, upon the request of either Cinco Ranch or the Buyer, the former holders of any liens, encumbrances and other claims held against the Cinco Ranch Assets prior to Closing (as such liens, encumbrances and other claims were automatically, unconditionally and irrevocably released, discharged and terminated as to the Cinco Ranch Assets upon the Closing Date by this Order and attached exclusively to the Cinco Ranch Proceeds from the Cinco Ranch Assets) shall execute and deliver to the Cinco Ranch and the Buyer a written, notarized release of lien, claim or other encumbrance against the Cinco Ranch Assets, in form and satisfaction to be determined in the commercially reasonable discretion of the Cinco Ranch and/or Buyer (whomever the requesting party), as a condition to payment of any Allowed Claim held by such creditor. Any and all of such release documents may be recorded with any governmental agency by the Cinco Ranch or the Buyer to evidence the liens, claims, and encumbrances released thereby.

6.      Vesting of Pearland Assets.

        a.      The Pearland APA is approved, and Pearland is authorized and directed to sell the Pearland Assets to the Buyer and otherwise consummate the transactions contemplated by the Pearland APA. Except as otherwise provided in the Pearland APA and this Confirmation Order, upon the Closing, the Pearland Assets as set forth in the Pearland APA shall vest in Buyer free and clear of all liens, claims, encumbrances, and interests claimed or held by any party (other than Buyer) in accordance with sections 363(f), 365 and/or 1123 and 1129 of the Bankruptcy Code, which liens, claims, encumbrances, and interests will attach to the Pearland Proceeds with the same validity, priority, force and effect and subject to the same defenses as existed prior to the Closing

date. On the Closing date, any and all pre-existing liens, claims, and encumbrances or other matters affecting title to the Pearland Assets shall be deemed extinguished as of such date, with such liens and claims to attached to Pearland Proceeds as provided in the Plan and herein, including Exhibit A hereto. Without limiting the generality of the foregoing, all liens, encumbrances and claims against the Pearland Assets as of the Closing Date shall be unconditionally and irrevocably released, discharged and terminated as to the Pearland Assets by the Buyer under the Pearland APA.

b. The Buyer is a "good faith" Buyer within the meaning of Section 363(m) of the Bankruptcy Code, and therefore, is entitled to all of the protections afforded thereby. In the absence of a stay pending appeal of this Order, if all or any of the provisions of this Order are hereafter reversed or modified on appeal, such reversal or modification shall not affect the validity and enforceability of any sale, transfer or assignment authorized by this Order, specifically including, the Sale of the Pearland Assets to the Buyer under the Pearland APA, and notwithstanding any reversal or modification on appeal, any sale transfer, or assignment, specifically including the Sale of the Pearland Assets to the Buyer under the Pearland APA, shall be governed in all respects by the original provisions of this Order.

c. Neither Pearland nor the Buyer has engaged in conduct that would cause or permit the Pearland APA or the sale of the Pearland Assets to the Buyer thereunder to be avoided under Section 363(n) of the Bankruptcy Code. The Buyer is not a successor in interest or alter ego of Pearland and shall not have any successor or transferee liability for any obligations or liabilities of Pearland as a result of the purchase of the Pearland Assets.

d.      Effective upon the Closing of the Sale of the Pearland Assets to the Buyer under the Pearland APA, all holders of liens, encumbrances and other claims are hereby barred and permanently enjoined from in any way asserting or pursuing such liens, encumbrances and other claims against the Buyer, the Buyer's successors or assigns, the Pearland Assets and/or any other assets of the Buyer or its successors and assigns. Following the closing of the sale of the Pearland Assets to the Buyer under the Pearland APA, no holder of any liens, encumbrances and other claims shall in any way interfere with the Buyers' possession of, title to, or use and enjoyment of the Pearland Assets. The Buyer shall have no liability or responsibility of any nature, character or kind for any liability or other obligation of Pearland or any other party relating to the Pearland Assets or the operation of Pearland's business.

e.      The provision of this Order authorizing the Sale of the Pearland Assets free and clear of liens, encumbrances and claims shall be self-executing, and neither Pearland nor the Buyer nor any other party shall be required to execute or file releases, termination statements, assignments, consents or other instruments to effectuate and/or implement the provisions of this Order; provided, however, that this paragraph shall not excuse any party from performing any of its respective obligations under the Pearland APA. Without in any way limiting the foregoing, Pearland and the Buyer are authorized and empowered to execute and file releases, termination statements, assignments, consents, or other instruments to effectuate and/or implement the provisions of this Order. Without limiting any other terms and provisions of this Order, upon the request of either Pearland or the Buyer, the former holders of any liens, encumbrances and other claims held against the Pearland Assets prior to Closing (as such liens, encumbrances and

other claims were automatically, unconditionally and irrevocably released, discharged and terminated as to the Pearland Assets upon the Closing Date by this Order and attached exclusively to the Pearland Proceeds from the Pearland Assets) shall execute and deliver to Pearland and the Buyer a written, notarized release of lien, claim or other encumbrance against the Pearland Assets, in form and satisfaction to be determined in the commercially reasonable discretion of Pearland and/or Buyer (whomever the requesting party), as a condition to payment of any Allowed Claim held by such creditor. Any and all of such release documents may be recorded with any governmental agency by Pearland or the Buyer to evidence the liens, claims, and encumbrances released thereby.

7.      This Confirmation Order, the Pearland APA, the Cinco Ranch APA, and all related agreements and documents necessary to implement the Plan shall be binding upon, and shall inure to the benefit of any, Cinco Ranch or Pearland and their estates, as applicable, their creditors, the Buyer, all third parties affected by this Confirmation Order (including but not limited to any third parties asserting liens, encumbrances, claims or other interests in or against the Cinco Ranch Assets and Pearland Assets, as applicable) and the respective successors and assigns of such parties. This Confirmation Order also shall be binding upon any subsequently appointed trustee, examiner or receiver under any chapter of the Bankruptcy Code or any other law and shall not be subject to rejection or avoidance by Cinco Ranch, Pearland, their estates, their creditors or any trustee, examiner or receiver.

8.      <u>Transfer Taxes: Recording and Filing Department</u>.

a.      Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any security and the making or delivery of any instrument of transfer in connection with or in furtherance of the Plan (including the Cinco Ranch APA

and the Pearland APA and any other instrument executed in furtherance of the transactions contemplated by the Plan), shall not be taxed under any law imposing stamp, transfer or similar tax.

b. The Court shall retain jurisdiction with respect to any disputes or controversies arising with respect to the above ordered paragraph.

c. From and after the Effective Date, pursuant to Section 1146(a) of the Bankruptcy Code, all state and local government agencies, entities, or authorities are jointly and severally restrained and enjoined from commencing or continuing any action to collect from Cinco Ranch, Pearland, the Cinco Ranch Assets, or the Pearland Assets, any stamp, transfer or similar tax within the meaning of section 1146(a) of the Bankruptcy Code with respect to the transactions contemplated or described in the Plan.

d. All applicable government entities shall record any recordable instrument or transfer with respect to the transfer of any asset pursuant to or in furtherance of the Plan, and any other related instruments contemplated under the Plan, specifically including, without limitation, a deed conveying ownership of the Cinco Ranch Assets under the Cinco Ranch APA and the Pearland Assets under the Pearland APA to the Buyer and any releases of liens, encumbrances and claims to the Cinco Ranch Assets or Pearland Assets, as applicable (collectively, the "Transfer Documents") without the payment of any state or local taxes to the fullest extent provided in section 1146(c) of the Bankruptcy Code.

e. Each and every federal, state, and local government agency or department is hereby directed to accept any and all documents and instrument necessary, contemplated by the Plan and this Confirmation Order.

   f.  All filing officers are directed to accept for recording or filing and to record or file the Transfer Documents immediately upon presentation thereof without payment of such taxes and without the presentation of any affidavits, instruments or returns otherwise required for recording, and the recording officer is directed to comply with the provisions of this Confirmation Order.

   9.  <u>Effects of Confirmation; Effectiveness; Successors and Assigns.</u> On the Effective Date, the stay contemplated by Bankruptcy Rule 3020(e) is waived and lifted in all respects. Notwithstanding any otherwise applicable law but subject to the occurrence of the Effective Date, upon entry of this Confirmation Order, the terms of the Plan (including the exhibits thereto and referenced herein, and all documents and agreements executed pursuant to the Plan) and the Confirmation Order shall be binding upon (a) the Debtors; (b) all holders of Claims against and Interest in the Debtors, whether or not impaired under the Plan, and whether or not, if impaired, such holder accepted the Plan; (c) any other party in interest; (d) any Person making an appearance in these Cases; and (e) each of the foregoing's respective heirs, successors, assigns, trustees, executors, administrators, affiliates, officers, directors, agents, representatives, attorneys, beneficiaries, or guardians.

   10.  <u>Classification and Treatment.</u> All Claims and Interests shall be, and hereby are, classified and treated as set forth in the Plan. The Plan's classification scheme shall be, and hereby is, approved. The treatment of all Claims and Interests as provided in the Plan shall be, and hereby is, approved.

   11.  <u>Administrative Expense Claims (Other than Professional Claims or the Claim on account of the DIP Loan).</u> The holder of any Administrative Expense Claim, other than holders of Professional Claims or the Claim of the DIP Lenders on account of the DIP Loan, must File

with the Court, and serve on the Liquidating Trustee and her counsel, an application for payment of such Administrative Expense ("**Administrative Expense Application**") on or before the Administrative Expense Claim Bar Date, which is thirty (30) days after the Effective Date. An Administrative Expense Application must include at a minimum: (a) the name of the holder of the Administrative Expense Claim; (b) the amount of the Claim; and (c) the basis of the Claim (including applicable support documentation). Failure to timely File and serve the Administrative Expense Application shall result in the Administrative Expense Claim being forever barred and discharged. A timely Filed and served Administrative Expense Claim shall become an Allowed Administrative Expense Claim if no objection is Filed within thirty (30) days after its Filing and service ("**Administrative Expense Objection Deadline**"). If an objection is Filed to an Administrative Expense Application by the Administrative Expense Objection Deadline, the Administrative Expense Claim shall become an Allowed Administrative Expense Claim only to the extent Allowed by Order of the Court.

12.   <u>Professional Claims.</u> On or prior to the Administrative Expense Claim Bar Date, each Professional who holds, or asserts a Professional Claim shall File with the Court its final fee application seeking final approval of all fees and expenses from the Petition Date through the Effective Date. Objections, if any, to Professional final fee applications must be filed and served on the Liquidating Trustee and the Professional to whose application the objections are addressed no later than twenty-four (24) days after the filing of the relevant final fee application. The Debtors shall pay any outstanding amounts owed to a Professional within ten (10) days after entry of a Final Order with respect to such Professional's final fee application.

13.     <u>Approval of Settlement Agreement</u>. Pursuant to Section 1123(b) of the Bankruptcy Code, the Settlement Agreement attached hereto as Exhibit A is approved as part of the Plan.

14.     <u>Enforceability of the Plan.</u> Pursuant to Sections 1123(a), 1141(a) and 1142 of the Bankruptcy Code and the provisions of this Confirmation Order, the Plan and all Plan-related documents shall be, and hereby are, valid, binding, and enforceable notwithstanding any otherwise applicable nonbankruptcy law. The modifications are enforceable and do not constitute material modifications that might otherwise require re-solicitation.

15.     <u>Authorization to Implement the Plan.</u> Upon entry of this Confirmation Order, and subject to the occurrence of the Effective Date, the Debtors and the Liquidating Trustee are authorized to take or cause to be taken all actions necessary or appropriate to implement all provisions of, and to consummate, the Plan and to execute, enter into, or otherwise make effective all documents arising in connection therewith, on and after the Effective Date. All such actions taken or caused to be taken shall be, and hereby are, authorized and approved by the Court such that no further approval, act, or action need to be taken under any applicable law, order, rule, or regulation. The approvals and authorizations specifically set forth in this Confirmation Order are not intended to limit the authority of the Debtors or the Liquidating Trustee to take any and all actions necessary or appropriate to implement, effectuate, and consummate any and all documents or transactions contemplated by the Plan or the Confirmation Order.

16.     <u>Payment of Fees and Expenses of the Liquidating Trustee.</u> The Liquidating Trustee may employ on behalf of himself, the Liquidating Debtors, and the Liquidating Estates, without Court order, professional persons, as such term is used in the Bankruptcy Code, to assist the Liquidating Trustee to carry out the duties under the Plan. The Liquidating Trustee and his

professionals shall be compensated at their respective standard hourly rates or such other fee structure as may be agreed to by the Liquidating Trustee, for time spent administering and implementing the Plan and the resolution of objections to Claims, if any are asserted, without further motion or application to the Court. Compensation to the Liquidating Trustee and his or her professionals, shall be made from the remaining assets of the Liquidating Debtors.

17. <u>Distributions Under the Plan.</u> The Liquidating Trustee is approved as the disbursing agent and shall have all powers, rights, duties, and protections afforded to the Liquidating Trustee to make Distributions under the provisions of the Plan. Pursuant to the terms and provisions of the Plan, the Liquidating Trustee shall make the Distributions specified under the Plan.

18. <u>Resolution of Claims.</u> Except as otherwise ordered by the Court, any Claim that is not an Allowed Claim shall be determined, resolved, or adjudicated in accordance with the terms of the Plan. All objections to Claims shall be Filed with the Court by the Claims Objection Deadline, which is one hundred-twenty (120) days from the Effective Date unless further extended by order of the Court, and a copy of the objection will be served upon the holder of the Claim to which such objection pertains and the United States Trustee. Nothing in the Plan or this Confirmation Order is intended to affect or modify the right of any party-in-interest to object to a Claim or Interest under Section 502(a) of the Bankruptcy Code.

19. <u>Comptroller Claims.</u> The Texas Comptroller of Public Accounts (the "Comptroller")'s priority tax claims will be paid in accordance with 11 U.S.C. § 1129 (a)(9)(C).

20. <u>Secured Claims of Taxing Authorities.</u> Brazoria County Tax Office, Cinco Municipal Utility District, and Willow Fork Drainage District shall be treated as Secured Taxing Authorities under Class 1.2 Claim Treatment.

21. <u>Tax Claim Treatment</u>. Notwithstanding any provisions of any final orders pertaining to post-petition financing, use of cash collateral or plan confirmation, or any agreements validated by any such orders, the liens currently held by the Tax Authorities (Fort Bend County, Montgomery County Cypress-Fairbanks ISD, Brazoria County Tax Office, Willow Fork Drainage District, and Cinco Municipal Utility District) shall neither be primed by nor subordinated to any liens granted or acknowledged thereby or pursuant to this order. With respect to the Tax Authorities' pre-petition secured claims for ad valorem property taxes for tax years 2018 and 2019: To the extent such claims are allowed, the Debtors shall pay the Tax Authorities' pre-petition claims with interest from the petition date through the Effective Date and from the Effective Date through the date of payment in full at the applicable state statutory rate of 1% per month pursuant to 11 U.S.C. §§ 506(b), 511, and 1129. Until the sale of the Debtors' property is completed, these claims shall be paid in quarterly payments over a term of months calculated to pay the taxes in full no later than the fifth anniversary of the Petition Date. These payments shall commence no later than the first day of the first month which is thirty (30) days after the entry of the Confirmation Order. In the event of a claim objection, the Tax Authorities' claims shall be entitled to interest that accrues while the claim objection is pending. The Tax Authorities shall receive payment of their administrative expense claims for year 2020 ad valorem property taxes in the ordinary course of business prior to the state law delinquency date without being required to file and serve an administrative expense claim and request for payment as a condition of allowance pursuant to 11 U.S.C. Section 503(b)(1)(D). The Tax Authorities shall retain their prepetition and postpetition liens until all taxes and related interest, penalties, and fees (if any) have been paid in full. In the event of a default under the plan, the Tax Authorities shall send notice of default to counsel for the

Debtors/Reorganized Debtors via facsimile or electronic mail, and the Debtors shall have 15 days from the date of such notice to cure the default. In the event of failure to cure the default timely, the Tax Authorities shall be entitled to pursue collection of all amounts owed pursuant to applicable nonbankruptcy law without further recourse to the Bankruptcy Court. At the closing of the sale of the Debtors' property, the Tax Authorities shall receive payment in full from the sale proceeds, with the liens that secure all amounts that are not paid at the sale closing remaining attached to the property sold. In event of a credit bid, the liens that secure all amounts owed shall remain attached to the assets and become the responsibility of the creditor.

22. <u>No Effect on Governmental Regulatory Authority.</u> Notwithstanding anything in the Plan or this Order to the contrary, nothing in the Plan or this Order or related documents discharges, releases, precludes, or enjoins: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit") that is not a "claim" as defined in 11 U.S.C. § 101(5) ("Claim"); (ii) any Claim of a Governmental Unit arising on or after the Confirmation Date; (iii) any liability to a Governmental Unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the Confirmation Date; or (iv) any liability to a Governmental Unit on the part of any Person other than the Debtors or Reorganized Debtors. Nor shall anything in the Plan or this Order enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside this Court, any liability described in the preceding sentence. Further, nothing in the Plan or this Order or related documents authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in the Plan or this Order shall relieve any entity from any

obligation to address or comply with information requests or inquiries from any Governmental Unit. Nothing in the Plan or this Order shall affect any setoff or recoupment rights of any Governmental Unit. Nothing in the Plan or this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret the Plan or this Order or to adjudicate any defense asserted under the Plan or this Order.

23.     <u>Rejection of Executory Contracts.</u> Pursuant to Section 7.1 of the Plan, on the Effective Date, all executory contracts and unexpired leases to which the Debtors are a party that had not otherwise been assumed or rejected pursuant to a Final Order of the Court shall be deemed rejected as of the Petition Date.

24.     <u>Rejection Damage Claims.</u> Pursuant to Section 7.3 of the Plan, if the rejection of an executory contract or unexpired lease pursuant to the Plan gives rise to a Rejection Claim, any such Rejection Claim shall be forever barred and shall not be enforceable against the Debtors or their Estates (or the Liquidating Debtors or the Liquidating Debtors' Estates) unless a proof of Rejection Claim is Filed by the Rejection Damages Bar Date, which shall be thirty (30) days after the Effective Date. The Liquidating Trustee shall file any objection to a Rejection Claim on or before the Claims Objection Deadline.

25.     <u>Payment of U.S. Trustee Fees.</u>  All fees payable pursuant to 28 U.S.C. § 1930 after the Effective Date shall be paid on a quarterly basis until the Cases are closed, converted, or dismissed. The Debtors shall be liable for the payment of all quarterly fees due and payable pursuant to 28 U.S.C. §1930(a)(6) prior to the Effective Date. The Debtors and Liquidating Debtors shall be jointly and severally liable for the payment of all quarterly fees due pursuant to 28 U.S.C. § 1930 after the Effective Date, and for any unpaid quarterly fees incurred by the Debtors prior to the Effective Date. The Liquidating Debtors through the Liquidating Trustee

shall provide the United States Trustee with post-confirmation quarterly reports that shall include all disbursements for that quarter.

26. Retention of Causes of Action.

(a) Except as otherwise provided in the Plan and this Confirmation Order, all Causes of Action shall be retained for the benefit of the Debtors and their Estates as set forth in the Plan, the Disclosure Statement (including all appendices thereto), and modifications. These Causes of Action include, without limitation, all claims and Causes of Action listed in, referenced in, or attached as an appendix to the Disclosure Statement or the Schedules. The Liquidating Trustee is hereby designated as the Liquidating Debtors Estates' representative for purposes of prosecuting and enforcing all Causes of Action, and the Liquidating Trustee has standing to bring all Causes of Action. Except as otherwise provided in the Plan and this Confirmation Order, the Liquidating Trustee's right to commence, pursue, prosecute, enforce, or settle such Causes of Action on behalf of the Liquidating Debtors shall be, and hereby is, preserved.

(b) No Person or Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors, or the Liquidating Trustee on behalf of the Liquidating Debtors, will not pursue all available Causes of Action. The Debtors and the Liquidating Trustee on behalf of the Liquidating Debtors' Estates expressly reserve, specifically and unequivocally, all rights to prosecute and enforce and all Causes of Action against any Person or Entity, except as otherwise specifically and expressly provided in the Plan. Unless any Causes of Action against a Person or Entity is specifically and expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or an Order, the Debtors and the Liquidating Trustee on behalf of the Liquidating Debtors expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including without

limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), standing, or laches, shall apply to such Cause of Action upon or after the confirmation or consummation of the Plan by reason of entry of the Confirmation Order.

27.     <u>Releases, Injunction and Exculpations.</u> The release, injunction and exculpation provisions set forth in Article 12 of the Plan shall be, and hereby are, approved, and shall be effective without further action upon the occurrence of the Effective Date.

28.     <u>Release of the Debtors.</u> Except as otherwise specifically provided by the Plan and this Confirmation Order, the Distributions and rights that are provided in the Plan shall be in complete satisfaction and release, effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, of (a) all Claims and Causes of Action against, liabilities of, liens on, obligations of and Interests in, the Debtors and the assets and properties of the Debtors, whether known or unknown; and (b) all Causes of Action (whether known or unknown, either directly or derivatively through the Debtors) against, Claims (as defined in Section 101 of the Bankruptcy Code) against, liabilities (as guarantor of a Claim or otherwise) of, Liens on the direct or indirect assets and properties of, and obligations of successors and assigns of, the Debtors and their successors and assigns based on the same subject matter as any Claim or Interest or based on any act or omission, transaction, or other activity or security, instrument, or other agreement of any kind or nature occurring, arising, or existing prior to the Effective Date that was or could have been the subject of any Claim or Interest, in each case regardless of whether a proof of Claim or Interest was Filed, whether or not Allowed and whether or not the holder of the Claim or Interest has voted on the Plan. Notwithstanding anything herein to the contrary, nothing in the Plan shall constitute a satisfaction and release of any Claim or Cause of

Action preserved in Article 3, Section E "Disposition of Causes of Action" of the Disclosure Statement, including but not limited to Causes of Action against (a) any of the Debtors' current or former officers and directors of Claims arising prior to the Petition Date, or (b) any Non-Debtor guarantor or Non-Debtor obligor on any Claim against the Debtors.

29.    Nothing in the Confirmation Order or the Plan releases, discharges, precludes, or enjoins: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit") that is not a "claim" as defined in 11 U.S.C. § 101(5), (ii) any Claim of a Governmental Unit arising on or after the Confirmation Date, or (iii) any exercise of a Governmental Unit's police or regulatory powers.

30.    <u>Retention of Jurisdiction.</u> Pursuant to Section 105(a) and 1142 of the Bankruptcy Code, the Court shall retain and shall have exclusive jurisdiction over any matter: (a) arising under the Bankruptcy Code; (b) arising in or related to the Cases or the Plan; (c) that relates to the matters set forth in Article 9 of the Plan.

31.    <u>Specific Jurisdiction.</u> The Court specifically retains jurisdiction pursuant to and for purposes set forth in Sections 105 and 1127 of the Bankruptcy Code and the Plan, including without limitation, to determine whether or not any claim or right has been affected by the Plan or this Confirmation Order, and for such other purposes as may be necessary or useful to aid in the enforcement or implementation of the Plan or this Confirmation Order.

32.    <u>Automatic Stay Under Section 362(a).</u> The stay in effect in the Cases pursuant to Section 362(a) of the Bankruptcy Code shall continue to be in effect until the Effective Date, and at that time shall be dissolved and of no further effect, subject to the injunction set forth in the Confirmation Order, Article 10 of the Plan and/or Sections 524 and 1411 of the Bankruptcy Code.

33.    <u>Designation of Liquidating Trustee.</u> As of the Effective Date, Karen G. Nicolaou is hereby designated as the Liquidating Trustee. The Liquidating Trustee is hereby vested with full power and authority on behalf of the Debtors to take any and all actions deemed necessary or appropriate to carry out the duties contemplated under the Plan and all other provisions of the Plan. The Liquidating Trustee shall have full and unqualified authority to delegate any or all of these powers to any of her authorized agents.

34.    <u>Notice of Confirmation Order.</u> The Debtors shall serve a copy of this Confirmation Order pursuant to Bankruptcy Rules 2002(f)(7), 2002(k), and 3020(c) on all creditors, the United States Trustee, and entities that requested notice in these Cases, by first-class mail, postage prepaid.

35.    <u>Notice of Effective Date.</u> Within one (1) business day after the day selected by the Debtors to be the Effective Date, the Debtors shall File a notice of the occurrence of the Effective Date and serve a copy of same on (a) all creditors, (b) the United States Trustee, and (c) entities that have requested notice in these Cases. "Substantial Consummation" of the Plan, as defined in Bankruptcy Code Section 1101(2), shall be deemed to occur on the Effective Date.

36.    <u>Reference to Plan Provisions.</u> The failure to specifically include or reference any particular provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Plan be confirmed in its entirety. Each provision of the Plan shall be deemed authorized and approved by this Order and shall have the same binding effect of every other provision of the Plan, whether or not mentioned in this Order. If any inconsistencies occur between the Plan and this Order, this Order shall govern.

37. <u>Calculation of Time Period.</u> All time periods set forth in this Confirmation Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

38. <u>Reversal.</u> If any or all of the provisions of this Confirmation Order are hereafter reversed, modified, or vacated by subsequent Order of this Court or any other court, such reversal, modification, or vacatur shall not affect the validity of the acts or obligations incurred or undertaken under or in connection with the Plan prior to the Debtors' receipt of written notice of such order; nor shall such reversal, modification, or vacatur of the Confirmation Order affect the validity or enforceability of such act or obligation. Notwithstanding any such reversal, modification, or vacatur of this Confirmation Order, any such act or obligation incurred or undertaken pursuant to, and in reliance on, this Confirmation Order prior to the effective date of such reversal, modification, or vacatur shall be governed in all respects by the provisions of this Confirmation Order and the Plan, and all documents, instruments, and agreements related thereto or any amendments or modifications thereto.

39. <u>Waiver of the Stay.</u> The requirements under Bankruptcy Code Rule 3020(e) that an order confirming a plan is stayed until expiration of 14 days after entry of the order are hereby waived. The Order shall take effect immediately and shall not be stayed pursuant to Bankruptcy Rules 3020(e), 6004(h), 6006(d), or 7062 or otherwise.

### END OF ORDER ###

Prepared by:

*/s/ Vickie L. Driver*
Vickie L. Driver
State Bar No. 24026886
Christina W. Stephenson
State Bar No. 24049535
**Crowe & Dunlevy, P.C.**
2525 McKinnon St., Suite 425
Telephone: 214.420.2163
Facsimile: 214.736.1762
Email: vickie.driver@crowedunlevy.com
Email: christina.stephenson@crowedunlevy.com

**COUNSEL FOR THE DEBTORS**

**EXHIBIT A**

Settlement Agreement

# SETTLEMENT AGREEMENT

This *Settlement Agreement* (the "Settlement Agreement") is entered into by and between Cinco Ranch Memory Care, LLC ("Cinco Ranch"), Pearland Memory Care, LLC ("Pearland"), TLG Family Management, LLC ("TLG"), Melvin W. Warren Jr. ("Melvin Warren"), Mitchell W. Warren ("Mitchell W. Warren"), SH1 Houston LLC ("SH1"), and Jerry Erwin Associates, LLC, d/b/a JEA Senior Living ("JEA"). Cinco Ranch, Pearland, TLG, Melvin Warren, Mitchell W. Warren, SH1, and JEA may be referenced herein collectively as the "Parties" and/or each as a "Party."

# BACKGROUND

WHEREAS, Cinco Ranch is a memory care facility located at 24024 Westheimer Parkway, Katy, TX 77494;

WHEREAS, Pearland is a memory care facility located at 11200 Discovery Bay Drive, Pearland, TX 77584;

WHEREAS, on May 2, 2019, Cinco Ranch filed a voluntary bankruptcy petition under Chapter 11 of Title 11 of the Bankruptcy Code, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division ("Cinco Ranch Bankruptcy Court") in Case No. 19-31486 (the "Cinco Ranch Bankruptcy Case") creating the Cinco Ranch bankruptcy estate;

WHEREAS, on May 2, 2019, Pearland filed a voluntary bankruptcy petition under Chapter 11 of Title 11 of the Bankruptcy Code, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Pearland Bankruptcy Court")[1] in Case No. 19-31488 (the "Pearland Bankruptcy Case") creating the Pearland bankruptcy estate, which case is jointly administered with the Cinco Ranch Bankruptcy Case (collectively, the "Bankruptcy Cases");

WHEREAS, SH1 is the successor-in-interest to Veritex Community Bank ("Veritex"), who was the successor-in-interest to Green Bank, N.A. ("Green Bank"), with regards to that certain *Construction Promissory Note* dated December 17, 2010 in favor of Green Bank in the original principal amount of $6,812,242.00 maturing on December 17, 2015 (as amended, the "Pearland Note"). The Pearland Note is secured by the real and personal property described in that certain *Construction Deed of Trust and Security Agreement* recorded in the real property records of Brazoria County at Document No. 2010053744 (as amended, the "Pearland Deed of Trust");

WHEREAS, SH1 is the successor-in-interest to Veritex, who was the successor-in-interest to Green Bank, with regards to that certain *Construction Promissory Note* in favor of Green Bank in the original principal amount of $8,166,654.00 maturing on May 19, 2018 (as amended, the "Cinco Ranch Note"). The Cinco Ranch Note is secured by the real and personal property described in that certain *Deed of Trust, Security Agreement, Assignment of Rents, and Financing*

---

[1] The Cinco Ranch Bankruptcy Court and the Pearland Bankruptcy Court will be referred to collectively as the "Bankruptcy Court").

*Statement* was recorded in the real property records of Fort Bend County at Document No. 2013065783 (as amended, the "Cinco Ranch Deed of Trust");

WHEREAS, Melvin Warren guaranteed the Pearland Note and the Cinco Ranch Note;

WHEREAS, Mitchell W. Warren guaranteed the Cinco Ranch Note and the Pearland Note;

WHEREAS, SH1 also is the assignee of that certain Order Granting Plaintiff's Motion for Summary Judgment: (i) in the amount of $6,643,322.40 plus interest and costs entered against Melvin Warren and Mitchell Warren, jointly and severally, (ii) in the amount of 8,594,523.21 plus interest and costs against Melvin Warren, and (iii) $40,870.00 in attorneys' fees plus interest and costs against Melvin Warren and Mitchell Warren, jointly and severally, on August 26, 2019 ("State Court Judgment") in Cause No. 2018-52293-A, Green Bank v. Cinco Ranch Memory Care, LLC, et al., (pending in the 151st Judicial District Court of Harris County, Texas ("State Court Lawsuit");

WHEREAS, TLG was the manager of Pearland pursuant to that certain management agreement and a marketing and accounting agreement to provide management services for the day-to-day operations of the facilities (collectively the "Pearland TLG Agreements"), and asserts that it has prepetition claims against Pearland in the amount of at least $456,000 as general unsecured claims, additional amounts for contract rejection damages as general unsecured claims, and asserted at least $43,000 pursuant to 11 U.S.C. § 503 by Pearland's bankruptcy estate as administrative expenses (collectively, the "TLG Pearland Claims").

WHEREAS, TLG was the manager of Cinco Ranch pursuant to that certain management agreement and a marketing and accounting agreement to provide management services for the day-to-day operations of the facilities (collectively the "Cinco Ranch TLG Agreements"), and asserts that it has claims against Pearland in the amount of at least $225,000 as general unsecured claims, additional amounts for contract rejection damages as general unsecured claims, and asserted at least $43,000 pursuant to 11 U.S.C. § 503 by Cinco Ranch's bankruptcy estate as administrative expenses (collectively, the "TLG Cinco Ranch Claims").

WHEREAS, Cinco Ranch and Pearland each assert that TLG owes money to them due to amounts paid for various fees and expenses after the Petition Date and various asserted breaches of the Cinco Ranch TLG Agreements and the Pearland TLG Agreements (the "Debtors' Counterclaims").

WHEREAS, Cinco Ranch and Pearland entered into new management agreements with JEA who took over management of Cinco Ranch and Pearland as of December 1, 2019;

WHEREAS, TLG agreed to assist JEA with certain accounting services during December 2019 during which time TLG also transitioned accounting and other records to JEA for Cinco Ranch and Pearland;

WHEREAS, the Parties are engaged in various disputes regarding the State Court Judgment, the Pearland TLG Agreements, TLG Pearland Claims, the Cinco Ranch TLG

Agreements, the TLG Cinco Ranch Claims, the Debtors' Counterclaims and other matters related to the Cinco Ranch Bankruptcy Case and the Pearland Bankruptcy Case;

WHEREAS, rather than proceed with litigation concerning the State Court Judgment, the Pearland TLG Agreements, the TLG Pearland Claims, the Cinco Ranch TLG Agreements, the TLG Cinco Ranch Claims, the Debtors' Counterclaims and other matters related to the Cinco Ranch Bankruptcy Case and the Pearland Bankruptcy Case, the Parties engaged in good faith, arms' length negotiations to resolve such claims[2] as set out below.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree that:

1. **Recitals.** The recitals set forth above are incorporated herein by reference.

2. **Transition of Records.** TLG shall confirm in writing that it has transitioned all accounting information and other related records of Cinco Ranch and Pearland to JEA.

3. **Payments and Bank Account Transfer.**

a. No later than 5:00 p.m. on February 24, 2020, one or some combination of TLG, Mitchell W. Warren or Melvin Warren shall cause a payment of $22,500 to be paid to Cinco Ranch and a separate payment of $22,500 to be paid to Pearland in accordance with the wire instructions on Exhibit 1 hereto;

b. No later than 5:00 p.m. on February 24, 2020, TLG shall cause all bank accounts open under the tax identification number of either Cinco Ranch or Pearland to be closed, wiring the balance to the accounts detailed in Exhibit 2 hereto;

c. TLG shall provide a list of any outstanding or cancelled checks from that account as of its closure to JEA; and

d. TLG confirmed that it had reimbursed the management fees paid by Cinco Ranch and Pearland in October 2019 to each debtor on February 18, 2020, and Cinco Ranch and Pearland acknowledge receipt of the reimbursements.

4. **Settlement Effective Date.** The effective date of this Settlement Agreement and all of its terms shall be the first date upon which all of the following have occurred: (a) the order of the Bankruptcy Court approving this Settlement Agreement as attached to the Debtors' order confirming their First Amended Joint Plan of Liquidation is entered; and (b) the payments listed in paragraph 3.b. have been received by Cinco Ranch and Pearland.

5. **State Court Judgment**.  As soon as reasonably practicable after the Settlement Effective Date, SH1 shall file a Release of Judgment in the State Court Lawsuit.

---

[2] Certain claims are specifically excluded from this Settlement Agreement as identified herein.

6. **TLG's Release of Cinco Ranch and Pearland.** Effective on the Settlement Effective Date, TLG shall be deemed to have irrevocably and unconditionally, fully, finally, and forever waived and released Cinco Ranch and Pearland from any and all claims, manner of actions, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature, whether known or unknown, suspected or unsuspected, in law or equity, which TLG has, has had, may have or may claim to have against Cinco Ranch and Pearland relating to the Cinco Ranch Bankruptcy Case or the Pearland Bankruptcy Case, including the Pearland TLG Agreements, the TLG Pearland Claims, the Cinco Ranch TLG Agreements, and the TLG Cinco Ranch Claims.

7. **Cinco Ranch and Pearland's Release of TLG.** Effective on the Settlement Effective Date, Cinco Ranch and Pearland shall be deemed to have irrevocably and unconditionally, fully, finally, and forever waived and released TLG from any and all claims, manner of actions, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature, whether known or unknown, suspected or unsuspected, in law or equity, which Cinco Ranch and/or Pearland has, has had, may have or may claim to have against TLG, including, without limitation, the Debtors' Counterclaims. Notwithstanding the preceding sentence, this waiver and release by Cinco Ranch and Pearland **does not apply to and specifically excludes** any claims that Cinco Ranch or Pearland may have against its officers and directors.

8. **TLG's Release of SH1 and JEA**. Effective on the Settlement Effective Date, TLG shall be deemed to have irrevocably and unconditionally, fully, finally, and forever waived and released SH1 and JEA, and their attorneys, accountants, advisors, directors, employees, and officers, and the successors and assigns of any of them and their respective attorneys, from any and all claims, manner of actions, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature, whether known or unknown, suspected or unsuspected, in law or equity, which TLG has, has had, may have or may claim to have against SH1 and JEA relating to the Cinco Ranch Bankruptcy Case or the Pearland Bankruptcy Case.

9. **Melvin Warren's Release of SH1 and JEA.** Effective on the Settlement Effective Date, Melvin Warren shall be deemed to have irrevocably and unconditionally, fully, finally, and forever waived and released SH1 and JEA, and their attorneys, accountants, advisors, directors, employees, and officers, and the successors and assigns of any of them and their respective attorneys, from any and all claims, manner of actions, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature, whether known or unknown, suspected or unsuspected, in law or equity, which Melvin Warren has, has had, may have or may claim to have against SH1 and JEA relating to the Cinco Ranch Bankruptcy Case, the Pearland Bankruptcy Case, and the State Court Judgment.

4812-2732-2546.1

10. **Mitchell W. Warren's Release of SH1 and JEA.** Effective on the Settlement Effective Date, Mitchell W. Warren shall be deemed to have irrevocably and unconditionally, fully, finally, and forever waived and released SH1 and JEA, and their attorneys, accountants, advisors, directors, employees, and officers, and the successors and assigns of any of them and their respective attorneys, from any and all claims, manner of actions, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature, whether known or unknown, suspected or unsuspected, in law or equity, which Melvin Warren has, has had, may have or may claim to have against SH1 and JEA relating to the Cinco Ranch Bankruptcy Case, the Pearland Bankruptcy Case, and the State Court Judgment.

11. **SH1 and JEA's Release of Melvin Warren, Mitchell W. Warren and TLG.** Effective on the Settlement Effective Date, SH1 and JEA shall be deemed to have irrevocably and unconditionally, fully, finally, and forever waived and released Melvin Warren, Mitchell W. Warren, and TLG, and their attorneys, accountants, advisors, directors, employees, and officers, and the successors and assigns of any of them and their respective attorneys from any and all claims, manner of actions, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature, whether known or unknown, suspected or unsuspected, in law or equity, which SH1 or JEA has, has had, may have or may claim to have against TLG, Melvin Warren and Mitchell W. Warren relating to the Cinco Ranch Bankruptcy Case, the Pearland Bankruptcy Case, or the State Court Judgment.

12. **No Admissions**. This Settlement Agreement is not and shall not in any way be construed as an admission by the Parties of any allegations made in connection with Cinco Ranch Bankruptcy Case, the Pearland Bankruptcy Case, and the State Court Lawsuit.

13. **Expenses.** The Parties shall bear their own costs, expenses, and attorneys' fees incurred to date in connection with this Settlement Agreement. In the event of any dispute in connection with the enforcement of this Settlement Agreement, the prevailing Party shall be entitled to its reasonable attorneys' fees, costs, and all necessary disbursements and out-of-pocket expenses, whether statutorily approved or non-approved costs, incurred in connection with such action or proceeding, as determined by a court of competent jurisdiction.

14. **Severability.** The Parties agree that if any provision of this Settlement Agreement is determined by a court of competent jurisdiction to be illegal, invalid, or unenforceable, that provision shall not be a part of this Settlement Agreement. The legality, validity, and enforceability of the remaining provisions shall not be affected by a provision of this Settlement Agreement that is illegal, invalid, or unenforceable.

15. **Miscellaneous.**

(a) Neither this Settlement Agreement, nor any statement made or action taken in connection with the negotiation of this Settlement Agreement, shall be offered or received in

evidence or in any way referred to in any legal action or administrative proceeding among or between the Parties hereto, other than as may be necessary (i) to obtain approval of and to enforce this Settlement Agreement (including the mutual releases contained herein) or (ii) to seek damages or injunctive relief in connection therewith.

(b)     Each of the Parties hereto shall execute and deliver any and all additional papers, documents, and other assurances, and shall do any and all acts and things reasonably necessary or appropriate in conjunction with the performance of each of the Parties' respective obligations hereunder.

(c)     No provision of this Settlement Agreement is intended to confer any rights, benefits, remedies, obligations, or liabilities hereunder upon any person other than the Parties hereto and their respective successors.

(d)     This Settlement Agreement shall be governed by and construed in accordance with the law of the state of Texas without regard to any choice of law provisions.

(e)     This Settlement Agreement may be signed in counterpart originals and delivered by facsimile or email, which, when fully executed, shall constitute a single original.

(f)     The United States Bankruptcy Court for the Northern District of Texas, Dallas Division shall retain exclusive jurisdiction (and the Parties consent to such retention of jurisdiction) with respect to any disputes arising from or related to, or other actions to interpret, administer, or enforce the terms and provisions of, this Settlement Agreement.

(g)     Each person or entity who executes this Settlement Agreement on behalf of another person or entity represents and warrants that he, she, or it is duly authorized to execute this Settlement Agreement on behalf of such person or entity, has the requisite authority to bind such person or entity, and such person or entity has full knowledge of and has consented to this Settlement Agreement.  The representations and warranties set forth in this paragraph shall survive execution of this Settlement Agreement.

(h)     In executing the Settlement Agreement, each of the Parties represents and warrants, for itself, that (i) it does so with full knowledge of its available rights, (ii) it is not relying and has not relied upon any representations made by any person with regard to the Settlement Agreement, other than any written representations and agreements contained herein, (iii) it has had available to it such information as it or its counsel considered necessary to making an informed judgment concerning the Settlement Agreement, and (iv) it has conducted such investigation as it or its counsel deemed appropriate regarding the settlement and its rights and asserted rights in connection with the matters that are the subject of the Settlement Agreement.

(i)     The Parties acknowledge that this Settlement Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, and all prior agreements, negotiations and understandings with respect to the subject matter hereof are canceled and superseded by this Settlement Agreement.

(j)     This Settlement Agreement shall not be modified, altered, amended, or vacated without the written consent of all parties hereto or order of the Court.

(k)     This Settlement Agreement shall inure to the benefit of and be binding upon the successors and assigns of the Parties hereto.

(l)     The Parties each agree to indemnify the other for any and all costs incurred as a result of any breach of any representation, warranty, or covenant set forth in this Settlement Agreement, including, without limitation, court costs and reasonable attorneys' fees and expenses.

(m)     The headings of all sections of this Settlement Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

16.    **Non-Disparagement.**  None of the Parties shall make any oral or written statement about another Party which is intended or reasonably likely to disparage the other Party, or otherwise degrade the other Party's reputation in the business or legal community or in the adult memory care industry, with respect to the Cinco Ranch Bankruptcy Case, the Pearland Bankruptcy Case, and the State Court Lawsuit.

*[SIGNATURE PAGE FOLLOWS]*

7

IN WITNESS WHEREOF, this Settlement Agreement is hereby executed as of the date(s) set forth below:

ACCEPTED AND AGREED TO BY:

CINCO RANCH MEMORY CARE, LLC

By: _John Barbee_____        February __, 2020
Name: John Barbee
Title:

PEARLAND MEMORY CARE, LLC

By: _John Barbee_____        February __, 2020
Name: John Barbee
Title:

TLG FAMILY MANAGEMENT, LLC

By:_____        February __, 2020
Name:
Title:

MELVIN W. WARREN JR.

By:_____        February __, 2020
Name:
Title:

MITCHELL W. WARREN

By:_____        February __, 2020
Name:
Title:

4812-2732-2546.1

IN WITNESS WHEREOF, this Settlement Agreement is hereby executed as of the date(s) set forth below:

ACCEPTED AND AGREED TO BY:

CINCO RANCH MEMORY CARE, LLC

By:_____ February ___, 2020
Name:
Title:


PEARLAND MEMORY CARE, LLC

By:_____ February ___, 2020
Name:
Title:

TLG FAMILY MANAGEMENT, LLC

By:_____ February 25, 2020
Name: MITCHELL W. WARREN
Title: CEO

MELVIN W. WARREN JR.

By:_____ February 26, 2020
Name: MELVIN W. WARREN, Jr
Title:

MITCHELL W. WARREN

By:_____ February 25, 2020
Name: MITCHELL W. WARREN
Title:

SH1 HOUSTON LLC

By: *Micah Gerber*      February 25, 2020
Name: Micah Gerber
Title: Authorized Person


JERRY ERWIN ASSOCIATES, LLC, D/B/A JEA SENIOR LIVING

By: *Micah Gerber*      February 25, 2020
Name: Micah Gerber
Title: Authorized Person

9

EXHIBIT 1

Capital One Incoming Wire Instructions

Bank Name:    Capital One, N.A.
Bank Address: 275 Broadhollow Road, Melville, NY 11747
ABA: █████████
SWIFT Code: ████████████████████

Account Name: SH1 ██████████████████
Account Number: ███████████

EXHIBIT 2

Capital One Incoming Wire Instructions

Bank Name:    Capital One, N.A.
Bank Address: 275 Broadhollow Road, Melville, NY 11747
ABA: █████████
SWIFT Code: █████████████████

Account Name: SH1 ███████████████████████
Account Number: ███████████

**EXHIBIT B**

Form of Sale Agreement

---

**PURCHASE AGREEMENT**

**by and between**

**CINCO RANCH MEMORY CARE LLC**

("*Seller*")

**And**

**SH1 HOUSTON LLC**

("*Buyer*")

**February \_\_, 2020**

---

**Property: Cinco Ranch**

## PURCHASE AGREEMENT

**THIS PURCHASE AGREEMENT** (this "*Agreement*"), is made as of the ___ day of February, 2020 (the "*Effective Date*"), by and between **CINCO RANCH MEMORY CARE LLC,** a Delaware limited liability company, having an address at 545 E. John Carpenter Freeway, Suite 500, Irving, Texas 75062 ("*Seller*"), and **SH1 HOUSTON LLC,** a Delaware limited liability company, having such address as provided in Section 21.4 of this Agreement ("*Buyer*").

## RECITALS

**A.** Seller is the owner of that certain forty-two (42) unit, forty-six (46) bed adult assisted living residential facility located at 24024 Westheimer Parkway, Katy, Texas 77494, known as "Cinco Ranch" (the "*Facility*"). The Facility is operated by Jerry Erwin Associates, LLC (d/b/a JEA Senior Living), a Washington limited liability company ("*Current Manager*"), pursuant to the terms of that certain Management Agreement dated December 1, 2019, by and between Seller and Current Manager.

**B.** On May 2, 2019, (the "**Petition Date**"), Seller commenced a voluntary case (the "**Bankruptcy Case**") under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

**C.** Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, the Facility and the Assets (as that term is defined below) on the terms and conditions hereinafter set forth.

**D.** The Parties intend to effectuate the transactions contemplated by this Agreement through a sale of the Assets pursuant to Sections 105(a), 363(b), 363(f), 363(m), 365(a), 365(b), and 365(f), 1123 and/or 1129 of the Bankruptcy Code; and

**E.** Seller's ability to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the foregoing and the respective promises, representations, warranties and covenants herein contained, the parties hereto, intending to be legally bound hereby, do agree as follows:

## ARTICLE I
## DEFINITIONS

1.1 <u>Definitions</u>**.** For purposes of this Agreement the following terms shall have the meanings ascribed below:

"*Affiliate*" shall mean with respect to any Person, any Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person.

"***Agreement***" shall mean this Purchase Agreement including all Exhibits and Schedules attached hereto or referred to herein.

"***Approved Claims***" shall mean all Allowed Administrative Expense Claims, all Secured Tax Claims, all Priority Tax Claims, the Allowed Administrative Convenience Claims and $7,500 for funding the Liquidating Trust, as each such term is defined in the Confirmation Order.

"***Assets***" shall have the meaning set forth in Section 3.1.

"***Assigned Personal Property***" shall have the meaning set forth in Section 7.2(c).

"***Assigned Service Contracts***" shall mean those certain Contracts that Buyer elects to assume pursuant to and in accordance with Section 4.1, excluding Occupancy Agreements.

"***Assignment of Contracts***" shall have the meaning set forth in Section 7.2(f).

"***Assumed Liabilities***" has the meaning set forth in Section 3.3.

"***Bankruptcy Code***" means Title 11 of the United States Code, Sections 101 *et seq.*

"***Bankruptcy Court***" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

"***Bill of Sale***" shall have the meaning set forth in Section 7.2(c).

"***Broker***" shall have the meaning set forth in Section 19.1.

"***Building Service Equipment***" shall have the meaning set forth in Section 3.1(c).

"***Business***" shall have the meaning set forth in Section 2.1.

"***Business Day***" shall mean any day other than a Saturday or Sunday, or other day recognized as a holiday by the U.S. Government or the government of the State of Texas, or on which banks or similar financial institutions in the State of Texas are generally closed.

"***Buyer***" shall have the meaning set forth in the Recitals.

"***Buyer Parties***" shall have the meaning set forth in Section 20.2(b).

"***Cash Balance***" means the amount by which the Closing Balance is greater than the amount of the Credit Certificate.

"***Close of Escrow***" shall have the meaning set forth in Section 5.1.

"***Closing***" shall have the meaning set forth in Section 5.1.

"***Closing Balance***" shall have the meaning set forth in Section 6.1(a).

"*Closing Date*" shall have the meaning set forth in Section 5.1.

"*Condemnation Act*" shall have the meaning set forth in Section 16.2.

"*Confirmation Order*" means that certain Findings of Fact, Conclusions of Law and Order Confirming First Amended Joint Plan of Liquidation of Cinco Ranch Memory Care, LLC and Pearland Memory Care, LLC [Docket No. ____], approving the sale of substantially all the assets of Seller to Buyer or Buyer's designee under all applicable provisions of the Bankruptcy Code, including Sections 105(a), 363(b), 363(f), 363(m), 365(a), 365(b), and 365(f), 1123 and/or 1129.

"*Contract*" shall mean any contract, lease, sublease, indenture, agreement, commitment or other legally binding arrangement to which Seller is a party that relates to the use, operation, maintenance, repair or title to the Assets, including the Service Contracts and the Occupancy Agreements.

"*Credit Amount*" shall have the meaning set forth in Section 6.1.

"*Credit Certificate*" shall have the meaning set forth in Section 15.2(b).

"*Curative Objection*" shall have the meaning set forth in Section 7.2(a).

"*Cure Costs*" means all monetary Liabilities, including pre-petition monetary Liabilities, of Seller that must be paid or otherwise satisfied to cure all of Seller's monetary and other defaults under the Assigned Service Contracts pursuant to Section 365 of the Bankruptcy Code at the time of the assumption thereof and assignment of the Assigned Service Contracts to Buyer as provided hereunder as such amounts are determined by the Bankruptcy Court or approved pursuant to the assignment and assumption procedures provided for in the Confirmation Order.

"*Current Manager*" shall have the meaning set forth in Paragraph A of the Recitals.

"*Damage*" shall have the meaning set forth in Section 16.1.

"*Deed*" shall have the meaning set forth in Section 7.1.

"*Discharge*" shall have the meaning set forth in Section 7.2(a).

"*Effective Date*" shall have the meaning set forth in the Recitals.

"*Environmental Laws*" means all federal, state, or local laws, ordinances, requirements and regulations relating to waste disposal or protecting the environment, including without limitation. (i) the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. §§ 9601 et seq.), as amended ("CERCLA"); (ii) the Solid Waste Disposal Act (42 U.S.C. §§ 6901 et seq.), as amended; (iii) the Clean Air Act (42 U.S.C. §§ 7401 et seq.), as amended; (iv) the Clean Water Act (33 U.S.C. § 1251), as amended; (v) the Hazardous Materials Transportation Act (49 U.S.C. §§ 1801 et seq.), as amended; (vi) the Federal Insecticide,

Fungicide and Rodenticide Act (7 U.S.C. § 136 et seq.), as amended; (vii) the Safe Drinking Water Act (41 U.S.C. § 300f et seq.), as amended; (viii) the Federal Water Pollution Control Act (33 U.S.C. § 125, et seq.) and (ix) the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.).

"*Equipment*" shall have the meaning set forth in Section 3.1(d).

"*Escrow*" shall have the meaning set forth in Section 5.1.

"*Escrow Account*" shall have the meaning set forth in Section 6.1(a).

"*Escrow Agent*" shall mean Crowe & Dunlevy.

"*Escrow Instructions*" shall have the meaning set forth in Section 5.2.

"*Exception Documents*" shall have the meaning set forth in Section 7.2(a).

"*Excluded Assets*" shall have the meaning set forth in Section 3.2.

"*Excluded Contracts*" means all Service Contracts of Seller's other than the Assigned Service Contracts.

"*Excluded Liabilities*" has the meaning set forth in Section 3.4.

"*Excluded Records*" means (a) the general corporate files and records of Seller, insofar as they relate to the business generally and are not required for the future ownership or operation of the Assets, (b) all legal files and records (other than title opinions with respect to any of the Assets and files exclusively related to Assumed Liabilities), (c) Seller's Income Tax files and records, (d) employee files, (e) records relating to the sale of the Assets, including competing bids, (f) proprietary data, (g) copies of records stored for archival and/or back up purposes, and (h) any other files or records to the extent relating to any Excluded Assets or expressly excluded from the Assets pursuant to Section 3.2.

"*Facility*" shall have the meaning set forth in Paragraph A of the Recitals to this Agreement.

"*FIRPTA Affidavit*" shall have the meaning set forth in Section 14.1(h).

"*Governmental Authority*" shall mean any federal, state or local government or any court of competent jurisdiction, administrative agency or commission or other governmental or quasi-governmental authority or instrumentality, domestic or foreign.

"*Healthcare Licenses*" shall mean the Memory Care Facility License and all other licenses, permits, certifications, consents and approvals issued by a Governmental Authority to Seller relating to the assisted living, "Memory Care" facility or other health care goods or services provided at the Facility, other than certificates of need or similar approvals.

"***Intangible Property***" shall have the meaning set forth in Section 3.1(l).

"***Inventory***" shall have the meaning set forth in Section 3.1(h).

"***Knowledge***" shall mean (a) in the case of Seller, the actual knowledge of Seller, after reasonable inquiry of the manager of the Facility, and (b) in the case of Buyer, the actual knowledge of Buyer after reasonable inquiry with Buyer's management team.

"***Land***" shall have the meaning set forth in Section 3.1(a).

"***Law***" or "***Laws***" shall mean any applicable law (including decisional law), statute, regulation, code, ordinance or interpretation of any Governmental Authority.

"***Leased Assets***" shall have the meaning set forth in Section 7.2(d).

"***Liability***" means any and all debts, indebtedness, liens, losses, damages, adverse claims, liabilities, fines, penalties, duties, responsibilities, taxes, obligations and expenses (including reasonable attorneys' fees and reasonable costs of investigation and defense) of any kind, character, or description, whether known or unknown, direct or indirect, fixed, absolute or contingent, matured or unmatured, accrued or unaccrued, asserted or unasserted, ascertained or ascertainable, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, vested or unvested, executory, determined, determinable, in contract, tort, strict liability, or otherwise, or otherwise due or to become due.

"***material***" as used solely in (a) Article XI and (b) Sections 17.2 and 17.3, shall mean, respectively, (i) the breach of a representation or warranty by Seller or Buyer or failure to perform or comply under the Agreement by Seller or Buyer, as the case may be, or (ii) default by Buyer or Seller, as the case may be, which would or is reasonably likely to cause, individually or in the aggregate with similar matters, a Party to suffer a loss which is in excess of $50,000.

"***Memory Care Facility License***" shall mean a license or certification to operate the Facility as a "Memory Care" facility.

"***Monetary Objection***" or "***Monetary Objections***" shall have the meaning set forth in Section 7.2(a).

"***New Operator***" shall have the meaning set forth in Section 2.2.

"***Objection Notice***" shall have the meaning set forth in Section 7.2(a).

"***Obligations***" shall mean any claim, debt, liability, judgment, commitment or obligation of any nature, whether secured, recourse, non-recourse, liquidated, unliquidated, accrued, absolute, fixed, contingent, ascertained, unascertained, known, unknown or otherwise.

"***Occupancy Agreements***" shall mean all rental or occupancy agreements and/or leases affecting the Property or any space therein, and the rents payable thereunder to the extent accruing after the Closing Date;

"***Party***" shall mean either Buyer or Seller, as the case may be, and "***Parties***" shall mean both Buyer and Seller.

"***Permits***" shall have the meaning set forth in Section 3.1(k).

"***Permitted Encumbrances***" shall have the meaning set forth in Section 7.1.

"***Person***" shall mean any individual, firm, corporation, partnership, limited liability company, trust, joint venture, Governmental Authority or other entity whatsoever.

"***Promissory Note***" means that certain Promissory Note dated May 29, 2013, in the original principal amount of Eight Million One Hundred Sixty-Six Thousand Six Hundred Fifty-Four and No/100 Dollars ($8,166,654.00), as amended from time to time, executed by Seller, as Borrower, to and in favor of Green Bank, N.A., and payable to Buyer as successor by assignment to Green Bank, N.A. and Veritex Community Bank.

"***Program***" shall mean any payor or reimbursement program of any Governmental Authority, insurance company or health plan organization (including so-called "HMO" and "PPO" health insurance programs and disability insurance plans) in which Seller or the Facility participates.

"***Property***" shall have the meaning set forth in Section 3.1(b).

"***Property Information***" shall mean copies of each of the following, that, to Seller's Knowledge are in the possession of or are available to Seller or Current Manager: (a) each then-effective certificate of occupancy and any other license issued by any Governmental Authority covering the Facility or Property (including any current licenses necessary for memory care and/or assisted living operations for the Property); (b) all, if any, of Seller's or Current Manager's operating reports and income and expense reports, including accounts payable and accounts receivable reports, of the Facility or Property for the current calendar year, year to date, and for the past three (3) years; (c) all plans and specifications for the Facility; (d) all, if any, guarantees or warranties then in effect and covering the Assets; (e) all, if any, Contracts relating to the Facility to which Seller or Current Manager is a party; (f) an example of an Occupancy Agreements; (g) the most recent survey for the Property; and (h) any written citations and/or violation notices issued by any Governmental Authority to Seller or Current Manager within the one-year period preceding the Effective Date; *provided, however*, in no event shall Property Information include any documents, materials or information which are subject to attorney/client, work product or similar privilege, which constitute attorney communications with respect to the Assets and/or Seller, or which are subject to a confidentiality agreement that prohibits or restricts disclosure of such documents, materials or information by Seller to Buyer.

"***Purchase Price***" shall have the meaning set forth in Section 6.1.

"**_Qualified New Operator_**" shall mean any entity selected by Buyer that is an affiliate of a company which is currently managing and operating a memory care facility licensed by and in good standing with the appropriate governmental agency having jurisdiction over the Facility.

"**_Records_**" shall mean all files, charts and other Resident information in Seller's or Current Manager's possession or control relating to all Residents occupying or using the Facility on the Closing Date (excluding the Occupancy Agreements and any medical or health records), litigation records, maintenance records, employment records (excluding any medical or health records, but including and all non-medical records including evaluations, etc.), administrative compliance records, including, but not limited to, all state surveys and plans of correction, correspondence and any other material written records, files or data which was utilized in connection with the operation of the Facility or the Business.

"**_Rent Roll_**" shall have the meaning set forth in Section 11.1(h).

"**_Resident_**" shall mean an individual residing at the Facility pursuant to an Occupancy Agreement.

"**_Sale Order_**" shall mean a final, non-appealable Confirmation Order entered by the Bankruptcy Court authorizing the sale of the Assets as contemplated herein.

"**_Seller_**" shall have the meaning set forth in the Recitals.

"**_Seller Parties_**" shall have the meaning set forth in Section 20.1.

"**_Seller's Information_**" shall have the meaning set forth in Section 20.3.

"**_Service Contracts_**" shall mean all vendor, equipment leases, service and other Contracts (other than the Occupancy Agreements), including any provider agreements related to any Program, if applicable, in each case related to the Assets and to which Seller is a party as of the date hereof.

"**_Survey_**" shall have the meaning set forth in Section 7.2(a)

"**_Title Commitment_**" shall have the meaning set forth in Section 7.2(a).

"**_Title Insurer_**" shall mean the title company selected by Buyer.

"**_Title Policy_**" shall have the meaning set forth in Section 7.2(a).

"**_Transaction_**" shall have the meaning set forth in Section 2.1.

"**_Transfer Notices_**" shall have the meaning set forth in Section 15.1(i).

"**_Warranties_**" shall have the meaning set forth in Section 3.1(g).

## ARTICLE II
## SALE AND PURCHASE OF ASSETS

2.1     Agreement to Sell and Purchase**.**  Subject to the terms and conditions of this Agreement and in consideration of the Purchase Price, on the Closing Date, Seller shall sell, transfer, convey and assign to Buyer and Buyer shall purchase from Seller all of the  assets and properties of Seller (other than the Excluded Assets), which are owned, used or held for use by Seller to conduct, or in connection with, the assisted living business currently being conducted by Seller and/or Current Manager at the Facility (the "***Business***") (whether or not located on the Property), including without limitation all of the assets and properties set forth in Section 3.1 hereto (collectively, the "***Assets***"), free and clear of any and all liens, claims, charges, pledges, security interests or other encumbrances of any kind or nature whatsoever, except for the Permitted Encumbrances (the "***Transaction***").

2.2     Assignability of Certain Assets**.**  The rights of Buyer to acquire the Assets may be assigned, in whole or in part, to a newly formed Affiliate of, and/or service provider to, Buyer as the licensed operator of the Facility (such assignee, the "***New Operator***"); and, to the extent so assigned by Buyer on or prior to the Closing, shall be acquired by the New Operator.  If Buyer changes the New Operator prior to the Closing Date, then (i) it must be a Qualified New Operator and (ii) Buyer shall give Seller written notice of the name of the replacement New Operator, as well as the name of the business organization that is the sponsor of such New Operator, within three (3) Business Days after making the change in New Operator.  Subject to the foregoing provisions of this Section 2.2 and the provisions of Section 21.15, this Agreement shall be binding on and inure to the benefit of the parties and their respective successors and assigns in interest hereunder.

## ARTICLE III
## ASSETS AND EXCLUDED ASSETS

3.1     Assets**.**  Without limiting the generality of Section 2.1, the Assets to be purchased by Buyer (or New Operator) at the Closing include all of Seller's right, title and interest in all assets and properties owned by Seller and used by Seller or Current Manager in connection with the Business, including without limitation the following (other than the Excluded Assets):

(a)     The real property described with particularity on **Schedule 3.1(a)** attached hereto, together with all of Seller's right, title and interest in any real property contiguous thereto which lies within the dedicated area of any public road or alley, open or closed, to the center line there at, and all rights of ways, use rights, easements, appurtenances, privileges, water, mineral, air, development, advantages and other rights incidental thereto, in each case belonging to the above described real property, all strips and gores, if any, between such real property and any abutting properties, all alleys, roadways, and passages in, on, across, abutting, or adjacent to such real property and all rights of ingress and egress thereto (collectively, the *"Land"*);

(b)      All buildings and other improvements and fixtures in, on or to the Land (collectively, the *"Improvements"* and together with the Land, the *"Property"*);

(c)      All apparatus, computer equipment and software and hardware, machinery, furniture, fixtures, equipment and other items of personal property whether or not located on the Property which is utilized for the operation and maintenance of the Facility (other than any personal property of a Resident), including, but not limited to, all interior and exterior window treatments and floor, wall and ceiling coverings; partitions, doors and hardware; elevators, heating, plumbing and ventilating apparatus; gas, electric and steam fixtures; chutes, ducts and tanks; heaters, incinerators and boilers; air-cooling and air-conditioning equipment; lavatory fixtures; tools, building supplies, salon equipment, lobby decorations, and kitchen appliances owned by Seller on the Closing Date (collectively, the "*Building Service Equipment*");

(d)      All medical apparatus, furniture, fixtures, equipment owned by Seller on the Closing Date (the "*Medical Equipment*", and collectively with the Building Service Equipment, the "*Equipment*");

(e)      All Occupancy Agreements as provided on **Schedule 3.1(e)** attached hereto;

(f)      All Assigned Service Contracts;

(g)      All assignable or transferable warranties and guaranties presently in effect from contractors, suppliers or manufacturers of personal property installed in or used in connection with the Property or the Equipment or any work performed or improvements included as a part of the Property (to the extent assignable) (collectively, the *"Warranties"*);

(h)      All consumable inventories of every kind and nature whatsoever, including, but not limited to, all pharmacy supplies, medical supplies, prescription and non-prescription drugs or equipment, office supplies, other supplies and foodstuffs, which are located at the Facility and owned by Seller or Current Manager on the Closing Date (collectively, the "*Inventory*");

(i)      all cash and cash equivalents and accounts and trade receivables of the Seller (including any refunds due to Residents);

(j)      Except for Excluded Liabilities, all claims, causes of action and other legal rights and remedies of Seller, whether or not known as of the Closing Date, relating to or in connection with Seller's ownership of the Assets or necessary to preserve the benefit of Buyer full rights to the Assets, but excluding causes of action and other legal rights and remedies of Seller (i) against Buyer with respect to the transactions contemplated by this Agreement or (ii) relating exclusively to the Excluded Assets;

(k)      All Records;

P a g e |

(l)　　All permits, certificates of occupancy, Healthcare Licenses or other licenses, authorizations and governmental approvals held by Seller in connection with the use, ownership, or operation of the Property, excluding the Memory Care Facility License (collectively, the "***Permits***"), to the extent that either (i) the same are assignable by Seller without consent of or fee payable to any third party, or (ii) all required consents are actually obtained and any required fee is actually paid by Seller or Buyer at their respective election, without obligation;

(m)　　All goodwill, other intangible personal property relating to the ownership and operation of the Facility and the Business, including all intellectual property used in connection with the Business, including, but not limited to, any patents, trade secrets, mailing lists, customer lists, vendor lists, and Seller's rights that are transferable without consent from or fee payable to a third party, including any telephone facsimile numbers associated with the Facility, on-site management or leasing operations, software, and website(s) and internet address(es) dedicated to the Facility (collectively, the "***Intangible Property***"); and

(n)　　All other assets of the Facility and the Business owned by Seller on the Closing Date, subject to Section 3.2 below.

3.2　　<u>Excluded Assets</u>**.**　Notwithstanding the foregoing, nothing herein will be deemed to constitute an agreement to sell, transfer, assign or convey the Excluded Assets to Buyer, and Seller will retain all right, title and interest to, in and under the Excluded Assets.  The term "***Excluded Assets***" means all of the assets of the Seller described below:

(a)　　any amounts (including the Purchase Price) paid or payable to the Seller pursuant to this Agreement;

(b)　　any shares of capital stock or other equity interest of the Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of the Seller;

(c)　　all minute books, stock ledgers, corporate seals and stock certificates of the Seller;

(d)　　all Excluded Records;

(e)　　all Excluded Contracts, including all rights thereunder;

(f)　　all insurance policies and rights to proceeds thereof to the extent related to the Excluded Assets, to the Excluded Liabilities or the operation of the Excluded Assets;

(g)　　all rights, claims or causes of action by or in the right of the Seller against any current or former director or officer of the Seller;

(h)      all avoidance actions or similar causes of action arising under sections 544 through 553 of the Bankruptcy Code, including any proceeds thereof, except to the extent related to the Assets;

(i)      any rights, claims or causes of action of the Seller under this Agreement, any other transaction document or confidentiality agreement;

(j)      (i) any attorney-client privilege and attorney work-product protection of the Seller or associated with the Business as a result of legal counsel representing the Seller or the Business, including in connection with the transactions contemplated by this Agreement; (ii) all documents subject to the attorney-client privilege and work-product protection described in the foregoing clause (i); and (iii) all documents maintained by the Seller relating to the drafting, negotiation, execution, delivery and performance of this Agreement, any other transaction document or any agreements with any other bidder in connection with any sale process previously conducted by or in which the Seller was previously involved, including the sale process leading to the entry into this Agreement;

(k)      all bank accounts, safety deposit boxes, lock boxes and securities accounts of the Seller and the contents thereof;

(l)      all outside of the ordinary course of business deposits made or required to be made by the Seller to suppliers or residents after the Petition Date as a result of the filing of the Bankruptcy Case (collectively, the "***Bankruptcy Deposits***"); and

(m)      Seller benefit plans related to the employees of Seller.

3.3      <u>Assumed Liabilities</u>.      Upon the terms and subject to the conditions of this Agreement, at the Closing, Buyer will assume and agree to discharge, when due (in accordance with their respective terms and subject to the respective conditions thereof), the following Liabilities (collectively, the "***Assumed Liabilities***"):

(a)      *Generally*.      All Liabilities arising from the ownership or operation of the Assets by Buyer at and after the Closing (including all Liabilities for Taxes arising from the ownership or operation of the Assets by Buyer on or after the Closing Date, as determined pursuant to Section 6.3(a);

(b)      *Assigned Contract*s.      All of Seller's Liabilities under the Assigned Contracts to the extent arising at or after the Closing or arising prior to the Closing to the extent requiring performance at or after the Closing;

(c)      *Occupancy Agreements*.      All of Seller's Liabilities under the Occupancy Agreements, to the extent arising at or after the Closing or arising prior to the Closing to the extent requiring performance at or after the Closing;

(d)      *Cure Costs*.      All Cure Costs required to be paid by Buyer pursuant to the Assigned Contracts.

(e)      *Other Assets*.  To the extent not already described in 3.3(a) through Section 3.3(d) above, all Liabilities arising from, related to or associated with the ownership or operation of Assets at or after the Closing.

3.4      Excluded Liabilities.  Seller shall retain, and Buyer will not assume and will not be obligated to assume or be obliged to pay, perform or otherwise discharge, any and all Liabilities of Seller other than the Assumed Liabilities (such Liabilities, collectively, the "***Excluded Liabilities***").  Without limiting the generality or effect of the foregoing, Buyer shall not assume, pursuant to this Agreement or otherwise, any of the following:

(a)      any indebtedness of Seller;

(b)      any Liability to the extent arising out of or related to the breach, performance or non-performance by Seller prior to the Closing (in each case, regardless of when any claims arising therefrom or relating thereto mature or are asserted) of any Assigned Service Contract or any Permit;

(c)      any Liability in respect of the pending or threatened proceedings set forth (or that should have been set forth) on **Schedule 3.4(c)** or **Schedule 11.1(f)** and the facts and circumstances relating to such matters;

(d)      any income and franchise tax of Seller and any taxes relating to the Excluded Assets;

(e)      all Liabilities arising out of, relating to or with respect to the employment or performance of services for or termination of employment or services for, or potential employment or engagement for the performance of services for, Seller or any predecessor thereof, of any employee for periods on or prior to Closing, including but not limited to, Liabilities arising under the Consolidated Omnibus Budget Reconciliation Act (COBRA);

(f)      all Liabilities under, relating to or with respect to any employee benefit plan with respect to Seller and its Affiliates;

(g)      all Liabilities, including cure costs, arising out of, under or in connection with Contracts that are not Assigned Contracts, and with respect to Assigned Contracts that are Assets, Liabilities in respect of (i) a breach by or default by Seller (or event that with notice or lapse of time would constitute a breach or default) accruing under such Contracts, as applicable, with respect to any period prior to Closing, or (ii) any violation of Applicable Law by Seller;

(h)      any Liability to the extent relating to any Excluded Asset or other asset that is not an Asset and the ownership, operation and conduct of any business in connection therewith or therefrom; and

(i)     any Liability arising from the gross negligence or willful misconduct of Seller prior to, at or after the Closing.

## ARTICLE IV
## OBLIGATIONS

4.1     <u>Assigned Service Contracts</u>**.**  Set forth on **<u>Schedule 4.1</u>** is a list of all Assigned Service Contracts which the Buyer or New Operator agrees to assume, or cause New Operator to assume.

4.2     <u>Cure Costs.</u>

(a)     Any cure costs related to Occupancy Agreements shall be handled in accordance with Sections 6.3(d) and (e) of this Agreement.

(b)     Any cure costs related to the Assigned Contracts shall be handled in accordance with Section 6.1(c) of this Agreement.

## ARTICLE V
## CLOSING

5.1     <u>Closing</u>**.**  The ***"Closing"*** or ***"Close of Escrow"*** means the exchange of the Purchase Price and documents as described herein, including the transfer and conveyance of the Assets as provided herein, and will be deemed to have occurred when all conditions precedent to Closing shall have been satisfied or waived and all instruments and documents described in Sections 15.1 and 15.2 shall have been delivered to the other Party or Escrow Agent (as applicable) and released, in each case in accordance with the terms and conditions of this Agreement.  The Escrow Agent is to hold such instruments and documents in escrow (the ***"Escrow"***) and deliver them at Closing to the Parties as provided in Section 15.3.  The Closing shall take place at such time or place as may be mutually agreed upon by the Parties but within three (3) days of entry of the Sale Order by the Bankruptcy Court (the ***"Closing Date"***).

5.2     <u>Escrow Instructions</u>**.**  The Escrow Agent's escrow instructions are as stated in this Agreement.  Upon request of the Escrow Agent, Buyer and Seller, as applicable, shall promptly execute and deliver to the Escrow Agent such additional escrow instructions as may reasonably be required by the Escrow Agent to consummate the transactions contemplated by this Agreement and that are not inconsistent with this Agreement.  The escrow instructions as set forth in this Agreement, as may be supplemented by any further instructions, are called the "***Escrow Instructions***".  Buyer, Seller and Escrow Agent shall be bound by such Escrow Instructions, except that if there is a conflict between such escrow instructions and the remaining provisions of this Agreement, the remaining provisions of this Agreement shall govern and control.  **NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN SUCH ESCROW INSTRUCTIONS, TIME IS OF THE ESSENCE OF EACH PROVISION OF THIS AGREEMENT.**

**ARTICLE VI**
**PURCHASE PRICE; ALLOCATION; RECORDATION COSTS; PRORATIONS**

6.1 <u>Purchase Price</u>**.** Buyer shall pay Seller a credit in the amount of Four Million Nine Hundred Seventy-Two Thousand Three Hundred Thirty-Three and No/100 Dollars ($4,972,333.00) against the amount owed by Seller to Buyer pursuant to the Promissory Note (the "***Credit Amount***"), subject to adjustment as expressly set forth in this Article VI, as the purchase price for the Assets (the "***Purchase Price***"). The Purchase Price shall be paid as follows:

(a) At Closing, Buyer shall pay Seller the Purchase Price as a credit against the amounts owed by Seller to Buyer pursuant to the Promissory Note, subject to adjustments as elsewhere expressly set forth in this Article VI (as so adjusted, the "***Closing Balance***"). To the extent the adjustments expressly set forth elsewhere in this Article VI result in an increase in the Purchase Price in excess of the Credit Amount at Closing, the amount of the Cash Balance, excluding any Cure Costs paid prior to the Closing Date and amounts paid or to be paid by Buyer directly to taxing authorities as part of the Approved Claims, shall be paid by Buyer to Seller by wired funds received by the Escrow Agent not later than the Closing Date in accordance with the written wiring instructions provided to Buyer by the Escrow Agent.

(b) Buyer will pay the Cure Costs by wired funds received by the Escrow Agent not later than the Closing Date, or such earlier date as is required to effectuate the Closing on the Closing Date, in accordance with written wiring instructions provided to Buyer by the Escrow Agent; *provided* that, for the avoidance of doubt, Buyer will pay the Cure Costs in cash and in addition to the Purchase Price.

6.2 <u>Recordation and Closing Costs</u>**.** Buyer shall pay for the Title Commitment and the premium associated with Buyer's Title Policy. Except with respect to any title curative matters that Seller has elected or is obligated to satisfy pursuant to the express terms of this Agreement, which will be Seller's responsibility to the extent provided herein, Buyer shall pay for ALTA coverage and any endorsements Buyer requests. Buyer shall pay for any cost of updating the Survey and/or any revisions, modifications or re-certifications thereto. Buyer shall pay the cost of any escrow fee charged by Escrow Agent for conducting the Closing. Buyer shall pay the costs for any documentary transfer taxes. Buyer shall pay all fees for recording the Deed in the real property records of Harris County. Any real estate sales commissions payable to any real estate broker, agent, finder or consultant shall be paid in accordance with Section 19.1. Seller and Buyer shall each be responsible for its own legal fees and the amount of net adjustments (as described below), if any, and Buyer shall be responsible for the cost of any appraisers engaged by Buyer.

6.3 <u>Prorations</u>**.** The following prorations shall be made between Seller and Buyer at the Closing, computed as of the Closing Date, with the Buyer being treated as the owner of the Assets on the Closing Date. To the extent required to give effect to the prorations and provisions set forth herein, this Section 6.3 shall survive the Closing.

(a)     <u>Insurance Premiums</u>.   All insurance policies relating to the Property currently maintained by Seller shall be terminated on the Closing Date and Buyer shall thereafter maintain its own policies on the Property.  If and to the extent Seller is entitled to any refund on the premiums paid by Seller, such refunds shall be paid to and remain the property of Seller.

(b)     <u>Rents</u>.  Rents and other payments received from or on behalf of the Residents shall be prorated as of the day immediately preceding the Closing Date. Unapplied deposits received from or on behalf of the Residents under Occupancy Agreements in effect at Closing shall be transferred or credited to Buyer at Closing.  If applicable, Buyer shall receive from Seller a credit for any rent under an Occupancy Agreement that is paid from Residents or from any Program to or on behalf of Seller and collected by or on behalf of Seller before the Closing the extent that same applies to any period from and after the Closing.  With respect to any rents or any payments under any Program, if applicable, or otherwise due prior to the Closing but unpaid as of the Closing Date, Buyer shall from and after the Closing use commercially reasonable efforts to collect such amounts, and Buyer shall remit to Seller such rents when received.

(c)     <u>Post-Closing Rents</u>.  To the extent that Seller or any Person acting for or on behalf of Seller receives after the Closing any rent or other payment payable under or pursuant to an Occupancy Agreement, including without limitation from any Program, if applicable, that relates to the period after the Closing Date, Seller shall immediately pay such amount (to the extent applicable to the period occurring after the Closing Date) to Buyer or Buyer's designee.

(d)     <u>Adjustment to Prorations</u>.  In the event that any prorations, apportionments or computations made under Sections 6.3(a) through (c) above shall require final adjustment, then the Parties shall use good faith and diligent efforts to make the appropriate adjustments promptly when accurate information becomes available and either Party shall be entitled to an adjustment to correct the same provided that it makes written demand on the one from whom it is entitled to such adjustment within six (6) months of the Closing Date.

6.4     <u>Adjustments to Purchase Price</u>.  The Purchase Price shall be increased by the amount necessary to satisfy the Approved Claims.  Forty-five (45) days after the Closing Date, Buyer and the Liquidating Trustee (as identified in the Confirmation Order) shall reconcile any amounts related to the Approved Claims.

## ARTICLE VII
## TITLE AND POSSESSION

7.1     <u>Deed</u>**.**  At Closing, Seller shall convey the Property to Buyer in fee simple, by a Special Warranty Deed in the form attached to this Agreement as **Schedule 7.1** hereto (the "***Deed***"), subject only to the operation and effect of the following:

(a)    Any restrictions or regulations affecting the Property by virtue of any zoning, or other law or regulation of any Governmental Authority having jurisdiction over the same, whether now or hereafter in effect;

(b)    Liens securing payment of any real estate taxes and assessments not yet due and payable as of the Closing Date, subject to adjustment as herein provided; and

(c)    Matters that are or become Permitted Encumbrances pursuant to the terms of Section 7.2 hereof.

The items listed in clauses (a) through (c) are, collectively, the *"Permitted Encumbrances."*

7.2    <u>Title</u>.

(a)    <u>Title Commitment</u>.  Buyer acknowledges receipt from Seller of its existing survey for the Property, which Buyer shall have the right at its expense to update or replace with a current ALTA survey of the Property (the *"Survey"*).  Within two (2) days after the Effective Date Buyer shall obtain and cause Title Insurer to issue (with a copy provided to Seller), an ALTA title insurance commitment for the Property, issued by the Escrow Agent on behalf of Title Insurer (a *"Title Commitment"*) committing the Title Insurer to issue to Buyer a title insurance policy (*"Title Policy"*) insuring in Buyer the fee simple interest in the Property subject only to the Permitted Encumbrances, in the amount of not less than the Purchase Price.  The Title Commitment shall be delivered with legible copies of all recorded exceptions to title referred to therein to the extent reasonably available (collectively, the *"Exception Documents"*).  Buyer shall have the right to review and approve or disapprove the Title Commitment and the Survey, and give Seller written notice of any disapproved exception or other matter in the Title Commitment or the Survey (an *"Objection Notice"*) specifying the Exception Documents or other matters to which Buyer objects, provided such Objection Notice is issued to Seller on or before the date that is three (3) Business Days after receipt of the Title Commitment.  Buyer's failure to disapprove any Exception Document or other matter reflected in the Title Commitment or the Survey by a timely issued Objection Notice shall be deemed approval by Buyer thereof.  Notwithstanding the foregoing, Buyer shall not have the right to disapprove in an Objection Notice any matters created by, through, under or at the direction of Buyer.  Notwithstanding anything to the contrary contained in this Agreement, Seller shall be obligated to obtain entry of the Sale Order ordering the sale of the assets free and clear of any of Monetary Objections (collectively, *"Discharge"*) prior to Closing.  *"Monetary Objection"* or *"Monetary Objections"* shall mean (a) any mortgage, deed of trust, assignment of rents or leases, security agreement, UCC financing statement or similar security instrument executed, assumed or otherwise authorized by Seller encumbering all or any part of Seller's interest in the Assets, (b) any mechanic's, materialman's or other statutory lien filed against or otherwise encumbering any of the Assets to the extent arising from a matter contracted for by Seller, Current Manager or any of their Affiliates or agents, (c) the lien of ad valorem real or personal property taxes, assessments or governmental charges affecting all or any portion of the Assets that are

delinquent, and (d) any judgment of record against Seller that has resulted in a lien binding upon title to the Assets in the applicable jurisdiction in which the Property or Seller is located. Except only for any Monetary Objection and any Objection Notice matter that Seller has expressly elected in a written notice to Discharge on or before the Closing (a "***Curative Objection***"), all other title insurance exception matters disclosed in or by the Title Commitment and/or the Survey shall be deemed a Permitted Encumbrance to the extent Buyer does not elect timely to terminate this Agreement.

(b) <u>Title</u>. Seller shall transfer fee simple, good and marketable title to the Property to Buyer, subject only to the Permitted Encumbrances, which title shall be insurable by the Title Insurer. Seller shall Discharge all Monetary Objections and Curative Objections at or prior to Closing, or extend the Closing Date one time for such time as is reasonably necessary to Discharge all Monetary Objections and Curative Objections, not to exceed thirty (30) days.

(c) <u>Bill of Sale</u>. At Closing, Seller shall sell, assign, convey, transfer, and set over to Buyer (or New Operator) good and marketable title to all of the following assets (subject to any leases thereof as herein disclosed to Buyer): the Equipment, Warranties, Inventory, Permits, Intangible Property, Records and other Assets being sold hereunder (other than the Property, the Occupancy Agreements, the Assigned Service Contracts and the Excluded Assets) (the "***Assigned Personal Property***") by a bill of sale in substantially the form attached hereto as **Schedule 7.2(c)** (the ***"Bill of Sale"***).

(d) <u>Leased Assets</u>. All Assets which Seller or its Affiliates lease and use in the conduct of the operations of the Facility will be provided by Seller after the Effective Date (the "***Leased Assets***"). Seller shall not assign any Leased Assets to Buyer at Closing without Buyer's written approval prior as part of the Assigned Service Contracts.

(e) <u>Possession and Burden of Risk.</u> At Closing, possession of the Assigned Personal Property shall be delivered in substantially the same condition as the condition on the date hereof. Subject to Article XVI, until Closing, Seller shall bear the risk of any damage to or destruction of any Assigned Personal Property.

(f) <u>Assignment of Contracts</u>. At Closing, Seller and/or Current Manager (on the one hand) and Buyer and/or New Operator (on the other hand) shall execute and deliver an Assignment of Contracts substantially in the form attached hereto as **Schedule 7.2(f)** (the "***Assignment of Contracts***"), by which Seller shall assign to Buyer or New Operator all of Seller's right, title and interest in and to the Occupancy Agreements and the Assigned Service Contracts.

## ARTICLE VIII
## INTENTIONALLY OMITTED

## ARTICLE IX
## CHANGE OF OWNERSHIP OF THE FACILITY

9.1     Licensure Approvals.  Seller has advised Buyer that Seller currently maintains all valid and unexpired Healthcare Licenses (if any)  required to operate the Business at the Facility in accordance with all Laws.

## ARTICLE X
## INTENTIONALLY OMITTED

## ARTICLE XI
## REPRESENTATIONS AND WARRANTIES

11.1     Seller's Representations.  To induce Buyer to enter into this Agreement, Seller hereby represents and warrants to Buyer as of the date of this Agreement and re-states as of the Closing Date, as follows:

(a)     Seller has been duly organized, and is validly existing as a limited liability company, is in good standing in the State of Delaware, and is qualified, to the extent necessary, to do business in the State of Texas.

(b)     Seller has full power and authority to enable it to own, license, possess, lease or otherwise hold its properties and assets and to carry on the Business at the Facility and, with respect to Seller and Current Manager, to operate the Facility, as presently conducted.

(c)     (i) Seller has the full right, power and authority to execute this Agreement and to consummate the sale of the Assets as contemplated by this Agreement, (ii) the Person executing this Agreement on behalf of Seller is authorized to do so, and (iii) Seller has duly executed and delivered this Agreement, and this Agreement constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, subject to Laws relating to bankruptcy, insolvency and creditor's rights.

(d)     Except as disclosed in the Title Commitment or provided to Seller with the Property Information, to Seller's Knowledge, Seller has not received (i) any written notice from any Governmental Authority that any special assessments are pending, contemplated or levied, in each case against the Property nor (ii) any written notice of any proposed reassessments of the Property from the local taxing agencies that would, in the reasonable judgment of Seller, materially increase real property taxes or assessments against the Property.

(e)     To Seller's Knowledge, Seller has received all Healthcare Licenses required to operate the Facility.

(f)     To Seller's Knowledge, Seller has not received any written notice from any Governmental Authority of any litigation, action, proceeding, claim, investigation, injunction, decree or violation of Environmental Laws, rules, regulations and other requirements relating to the Assets, including, without limitation, any notice that hazardous or toxic substances, materials or wastes, pollutants or contaminants (including, without limitation, mold, fungus, radon, petroleum and petroleum products, asbestos and PCBs) have been released, spilled, leaked, discharged, disposed of, pumped, poured, emitted, emptied, dumped or allowed to escape or threaten to release on, at, under or from the Property in violation of Environmental Laws, except as set for on **Schedule 11.1(f)** attached hereto.

(g)     Seller is not a "disregarded entity" as defined in Income Tax Regulation § 1.1445-2(b)(2)(iii), nor is Seller a "foreign person" within the meaning of Sections 1445(f)(3) and 7701(a)(30) of the Internal Revenue Code of 1986, as amended.

(h)     The Resident roll attached hereto as **Schedule 11.1(h)** the ("*Rent Roll*") is (in all material respects) a complete and accurate schedule of all Residents and Occupancy Agreements, including all rents and other payments owed and deposits paid pursuant to their respective Occupancy Agreements as of the date indicated. Except as noted on the Rent Roll, Seller has not accepted any advance payment of more than thirty (30) days from any Resident.

(i)     Except for the Occupancy Agreements and the Assigned Service Contracts, there are no Contracts, subcontracts, licenses, agreements or other contracts affecting the Property that will be binding upon Buyer or the Property after Closing. There are no tenants, subtenants, residents or other occupants of the Property other than the Residents identified on the Rent Roll. The Occupancy Agreements are in full force and effect and constitute legally valid and binding obligations of Seller and, to Seller's Knowledge, of the Residents under such Occupancy Agreements. Seller and any other party thereto is not in breach or default under any one or more of the Occupancy Agreements in any material respect (other than rent delinquencies shown on the rent delinquency report Seller has delivered to Buyer) and, to Seller's Knowledge, no event has occurred nor circumstance exists, which with notice or lapse of time, or both, would constitute a material breach or default under any one or more of the Occupancy Agreements. All obligations of Seller which are to be performed on or before the Closing Date and all tenant improvement work required with respect to the Occupancy Agreements have been (or shall have been as of Closing) performed and completed and paid for in full by Seller. No right or claim of set-off against rent has been asserted in writing by any of the Residents which remains outstanding.

(j)     To Seller's knowledge, Seller has filed all tax returns that it was required to file for any taxable period beginning before the Closing Date for which the statutory period of limitations for the assessment of tax, interest, penalties or other charges has not yet expired ("*Tax Returns*") and all taxes or other amounts owed by Seller for such

taxable periods (whether or not shown as due on such Tax Returns) which could give rise to a lien or claim against any of the Assets, Buyer or New Operator have been paid.

(k)     To Seller's Knowledge, there is no suspension, ban or limitation upon the admission of residents to the Facility (i) by any Governmental Authority having jurisdiction over the licensure of the Facility or (ii) pursuant to Law.

11.2   Buyer's Representations.  To induce Seller to enter into this Agreement, Buyer hereby represents and warrants to Seller as of the date of this Agreement and the Closing Date, as follow:

(a)     Buyer has been duly organized and is validly existing in the state of its organization, is in good standing in the state of its organization and it, or any assignee of Buyer that will acquire title to any of the Assets, will be qualified to do business, and will be in good standing, in its state of formation, and will be qualified to do business and in good standing in the State of Texas at the time of Closing.  Buyer has the full right and authority to consummate or cause to be consummated the sale and purchase of the Assets, and to make or cause to be made the transfers and assignments contemplated herein.  The person signing this Agreement on behalf of Buyer is authorized to do so.

(b)     Buyer has the full right, power and authority to execute this Agreement and to consummate the acquisition of the Assets and the other transactions contemplated by this Agreement.  Buyer has duly executed and delivered this Agreement, and this Agreement constitutes the legal, valid and binding obligation of Buyer, enforceable against it in accordance with its terms, subject to Laws relating to bankruptcy, insolvency and creditor's rights.  The execution and delivery by Buyer of this Agreement and the other documents contemplated hereby do not, and the consummation of transactions contemplated by this Agreement and compliance by Buyer with the terms hereof, do not, and will not, conflict with, or result in any violation of or default under (with or without notice or lapse of time, or both), or result in the creation of any lien or encumbrance upon any of the assets or properties of Buyer under, any provision of (i) the organizational documents of Buyer, or (ii) any contract to which Buyer is a party or by which any of its assets or properties is bound.  Except as provided for in **Schedule 11.2(b)**, no consent of, or registration, declaration or filing with any Governmental Authority or other Person, is required to be obtained or made by or with respect to Buyer, in connection with the execution, delivery and performance of this Agreement or the consummation of the transactions contemplated hereby.

(c)     To Buyer's Knowledge, there is no agreement to which Buyer is a party or which is binding upon Buyer which is in conflict with this Agreement.

(d)     There is no action or proceeding pending, or, to Buyer's Knowledge, threatened against Buyer which would challenge or have a negative effect upon Buyer's ability to perform its obligations under this Agreement.

11.3 <u>Representations and Warranties</u>. All representations and warranties made by each Party in this Agreement shall be true and accurate to the best of Buyer and Seller's knowledge as of the time of Closing; *provided, however*, that if up until two (2) Business Days prior to the Closing Date Buyer or any Buyer Party obtains actual knowledge of any breach of or the inaccuracy of any representation or warranty made by Seller and with such knowledge Buyer proceeds to close the Transaction, then Buyer shall be deemed to have waived at Closing any right to claim a breach thereof.

## ARTICLE XII
## INTERIM OPERATIONS AND UNDERTAKINGS

12.1 <u>Conduct of Business Pending Closing</u>. From the date of this Agreement until the Closing Date, Seller shall:

(a) Maintain the Assets in compliance with all Laws;

(b) Maintain the general character of the Facility and conduct its business at the Facility in the ordinary and usual manner consistent with its current operations;

(c) Maintain the License and the Permits in the ordinary and usual manner consistent with its current operations;

(d) Maintain the Assets substantially in their present condition (ordinary wear and tear and casualty excepted) and in a manner consistent with Seller's maintenance of the Assets during Seller's period of ownership;

(e) Maintain in full force and effect substantially the same liability and casualty insurance coverage that Seller now maintains in effect with respect to the Property and its operations thereat;

(f) Subject to Article XVI, subject to the Seller's ability to fund such repairs, make all necessary repairs to, and replacement of the Assets as are reasonably necessary for the continued operation of the Business and of the Facility;

(g) Continue to operate the Business in a manner substantially similar to the manner in which Seller operates the Business as of the Effective Date;

(h) Maintain food and medical supplies and other inventory at the Facility as required by any Law and consistent with its current operations;

(i) Intentionally omitted;

(j) Comply with all Laws applicable to the Property; and

(k) Continue to perform in all material respects all Obligations of Seller under all Occupancy Agreements.

12.2 <u>Prohibited Actions Pending Closing</u>. Unless otherwise expressly provided for herein or approved by Buyer in writing, from the date of this Agreement until the Closing Date, Seller shall not, directly or indirectly:

(a) Induce, solicit or entice in any targeted respect (excluding general advertising to the public) any Residents to transfer or discontinue any relationships with Seller prior to the Closing Date or with New Operator after the Closing Date (provided that the foregoing shall not restrict Seller from enforcing any applicable terms of any Occupancy Agreement, including any that would result in a discontinued relationship);

(b) Intentionally omitted;

(c) Induce, solicit or entice any Person to terminate or discontinue a relationship with Seller or Current Manager prior to the Closing Date or with New Operator after the Closing Date.

(d) Except for the Excluded Assets, remove any material item (equal to or greater than $25,000) of Assigned Personal Property from the Facility unless the same is replaced by property of substantially equal or greater value, or unless the removal is authorized by Buyer, in the exercise of its reasonable discretion, or pursuant to the provisions of this Agreement;

(e) Interfere with or disrupt Buyer's or New Operator's relationship with any Resident following the Closing;

(f) Except as reflected on the Rent Roll, accept any advance payment for more than thirty (30) days in advance of the date payable under an Occupancy Agreement, any rent or Residents' occupancy fees under any Occupancy Agreement unless such amount will be paid by Seller to Buyer or, at Buyer's option, New Operator, at Closing;

(g) Make any capital improvements to the Property in excess of $25,000 in the aggregate or incur any future obligations impacting the Property in excess of $25,000 in the aggregate without Buyer's written consent;

(h) Sell or otherwise dispose of, or agree to sell or dispose of any of the Assets, except in the ordinary course of business as permitted by this Agreement;

(i) Enter into, renew, extend, terminate, or modify any material Contracts (equal to or greater than $25,000), that relate to the Assets without the consent of Buyer, provided that the forgoing shall not limit Seller's right to exercise remedies for any breach of the subject Contract by a party thereto; and

(j) Take any action prior to the Closing Date that would breach any of the representations and warranties contained in this Agreement.

12.3    Notice. From the date of this Agreement to the Closing Date, after Seller's receipt of written notice of (i) any default under any material Contract (equal to or greater than $25,000), (ii) any violation or non-compliance with any Law related to the Assets, (iii) any legal action by any Governmental Authority with respect to the Assets, or (iv) any claim made by any Governmental Authority or third party in writing relating to any violation of Environmental Laws in connection with the Property, Seller shall deliver to Buyer a copy of all non-privileged correspondence, notice or legal pleading in connection therewith, together with a certificate of Seller specifying the nature  and period of the existence thereof and what actions Seller has taken and proposes to take with respect thereto.

12.4    Access. From the date of this Agreement until the Closing, subject to compliance with the privacy rights of Residents with respect to the Facility, Seller shall afford Buyer and its independent certified public accountants, counsel and other representatives, access at all reasonable times on Business Days, upon forty-eight (48) hours prior notice to Seller, to the Property in order that Buyer may have full opportunity to make such investigations as it shall reasonably desire concerning the Assets and the Business; *provided however*, that such investigation (i) shall not affect or diminish the representations and warranties of Seller contained in this Agreement, (ii) shall be conducted in a manner to limit interference with the business or operations of Seller or Current Manager; (iii) and shall not include any invasive testing or sampling of any element of the Property without the prior written consent of Seller, other than a Phase One Environmental level of sampling and testing.  Buyer's agents and employees shall notify Seller by email in accordance with Section 21.4 hereof at least forty-eight (48) hours before accessing the Property.  Notwithstanding the foregoing provisions of this Section, in no event shall Buyer or New Operator have a right (x) to access any documents, materials or information which are subject to attorney/client, work product or similar privilege, which constitute attorney communications with respect to the Assets and/or Seller, or which are subject to a confidentiality agreement that prohibits disclosure of such documents, materials or information by Seller to Buyer or (y) to question, interview or meet with any Resident without the prior written approval of Seller (which approval may not be unreasonably denied, conditioned, or delayed).

## ARTICLE XIII
## INTENTIONALLY OMITTED

## ARTICLE XIV
## CONDITIONS PRECEDENT

14.1    Conditions Precedent to Buyer's Obligations. The obligation of Buyer under this Agreement to Close is subject to the fulfillment or satisfaction, prior to or at the Closing, of each of the following conditions precedent (any of which may be waived in writing in whole or in part by Buyer in its sole discretion):

(a)     Seller's representations and warranties contained in this Agreement shall be true in all material respects on and as of the Effective Date and on the Closing Date,

except for those representations and warranties that are already qualified by materiality which shall be true in all respects;

(b)     Seller shall have performed and compiled in all material respects with all agreements and conditions contained in this Agreement that are required to be performed or complied with by it prior to or at the Closing;

(c)     Buyer or Escrow Agent shall have received all of Seller's deliveries described in Section 15.1;

(d)     Buyer shall have received all of the Property Information and other documents required to be delivered by Seller hereunder within the time periods required herein;

(e)     Except for the disclosures on **Schedule 11.1(f)**, no suit, action, proceeding, or investigation shall have been instituted or threatened by any Governmental Authority, and no injunction shall have been issued and then outstanding, that in each case, seeks to or does restrain, prohibit or otherwise challenge the legality or validity of the transactions contemplated by this Agreement;

(f)     Buyer shall have received an updated Rent Roll, dated no later than as of Closing;

(g)     On the Closing Date, Title Insurer shall deliver to Buyer the Title Policy, together with any available endorsements thereto that Title Insurer, prior to the Closing Date, confirmed in writing that it would issue without condition or requirement other than the satisfaction of any condition or requirement that is otherwise expressly required by this Agreement;

(h)     Buyer shall have received an affidavit in the form attached hereto as **Schedule 14.1(h)** (the "***FIRPTA Affidavit***"), executed by Seller;

(i)     Seller shall have obtained entry of the Sale Order in form acceptable to the Buyer; and

(j)     Buyer shall not have terminated this Agreement prior to the Closing Date.

14.2    <u>Conditions Precedent to Seller's Obligations</u>.  The obligation of Seller under this Agreement to Close is subject to the fulfillment or satisfaction, prior to or at the Closing, of each of the following conditions precedent (any of which may be waived in writing in whole or in part by Seller in its sole discretion):

(a)     Buyer's representations and warranties contained in this Agreement shall be true in all material respects on and as of the Effective Date and on the Closing Date, except for those representations and warranties that are already qualified by materiality which shall be true in all respects;

(b)     Buyer shall have performed and complied in all material respects with all agreements and conditions contained in this Agreement that are required to be performed or complied with by it prior to or at the Closing;

(c)     Seller or Escrow Agent shall have received all of Buyer's deliveries described in Section 15.2; and

(d)     Seller or Escrow Agent shall have received the balance of the Purchase Price required under Section 6.1(b).

14.3    <u>Waiver of Conditions Precedent</u>.  Except as otherwise provided herein, so long as a Party is not in default under this Agreement (in which case the terms of Section 17 shall apply), if any condition to that Party's obligations to proceed with the Closing has not been satisfied as of the Closing Date, then (x) the Seller shall have a one-time right to extend the Closing Date for up to thirty (30) days in order to allow additional time and effort for the satisfaction of such condition, by giving written notice of such extension to Buyer before the Closing Date, and (y) if Seller fails to so extend the Closing Date or the condition remains unsatisfied after such extension of the Closing Date by Seller, then the Party having the benefit of such condition may, in its sole discretion, and as it sole remedy either: (i) terminate this Agreement by delivering written notice to the other Party on or before the Closing Date, and the Parties shall have no further obligations to one another except those that specifically survive Closing as provided in this Agreement, or (ii) elect to proceed with the Closing on the Closing Date or such other date as mutually agreed upon by the Parties, notwithstanding the non-satisfaction of such condition. If the Party having the benefit of such condition elects to proceed with the Closing notwithstanding the non-satisfaction of such condition, then the non-satisfied condition shall be deemed to have been waived by the Party having the benefit of said condition.

## ARTICLE XV
## DELIVERIES AT CLOSING

15.1    <u>Seller's Deliveries</u>.  Prior to the Closing, Seller shall deliver duly executed (as applicable) copies (or in the case of 15.1(a), an original)) of the following to the Escrow Agent for delivery to Buyer or New Operator (as applicable) pursuant to Section 15.3:

(a)     the Deed referenced in Section 7.1 conveying the Property;

(b)     the Bill of Sale referenced in Section 7.2(c);

(c)     the Assignment of Contracts referenced in Section 7.2(e);

(d)     an updated Rent Roll and a schedule of rent or Resident occupancy payment arrearages, each certified by Seller as being true and correct in all material respects as of Closing;

(e)     a closing statement setting forth the prorations and adjustments to be made pursuant to the provisions of this Agreement, in a form prepared by Escrow Agent that is consistent with the terms of this Agreement;

(f)     the FIRPTA Affidavit;

(g)     the originals or copies of the Occupancy Agreements and Assigned Service Contracts, to the extent in Seller's possession or control and not already provided to Purchaser or Current Manager;

(h)     copies of any and all keys, locks and safe combinations in Seller's possession, custody or control;

(i)     a written notice of the sale by Seller and acquisition by Buyer of the Property, which shall be transmitted to all Residents and to other parties affected by the sale and purchase of the Assets (the "*Transfer Notices*") (such notice shall (i) inform the addressees of the sale and transfer of the Property to Buyer and contain appropriate instructions relating to the payment of future rentals and the giving of future notices; (ii) specify that unapplied security deposits under the Occupancy Agreements have been delivered to the Buyer and that the Buyer is responsible for the refund thereof and such notice shall be in form and substance adequate under local law to relieve Seller of all liability for return of such deposits);

(j)     evidence of the authority of any individuals to execute any instruments executed and delivered by Seller at Closing to the extent reasonably required by the Title Insurer;

(k)     written evidence, reasonably satisfactory to Buyer, of Seller's notification to the Texas Health and Human Services Commissioner of Buyer's purchase of the Facility and the transactions contemplated hereunder; and

(l)     any and all other customary materials and documents anticipated to be signed and delivered by Seller at the Closing or which are reasonably requested by Buyer or Escrow Agent and consistent with this Agreement.

15.2   Buyer's Deliveries.   Prior to the Closing, Buyer shall (or shall cause New Operator to) deliver duly executed (as applicable) copies of the following to the Escrow Agent for delivery to Seller pursuant to Section 15.3:

(a)     the Assignment of Contracts referenced in Section 15.1(c);

(b)     the Closing Balance, consisting of a certificate executed by Buyer evidencing the credit of the Credit Amount against the amount owed by Seller pursuant to the Promissory Note (the "*Credit Certificate*") and, to the extent there is a Cash Balance, a cash payment equal to the Cash Balance;

(c)    a Preliminary Change of Ownership form executed by Buyer or New Operator (as applicable);

(d)    a closing statement setting forth the prorations and adjustments to be made pursuant to the provisions of this Agreement in a form prepared by Escrow Agent that is consistent with the terms of this Agreement;

(e)    the Transfer Notices;

(f)    evidence of the authority of any individuals to execute any instruments executed and delivered by Buyer or New Operator at Closing to the extent reasonably required by the Title Insurer; and

(g)    any and all other customary materials and documents anticipated to be signed and delivered by Buyer at the Closing or which are reasonably requested by Seller or Escrow Agent and consistent with this Agreement.

15.3    <u>Close of Escrow</u>.    Provided that all conditions to Closing set forth in this Agreement have been satisfied or, as to any condition not satisfied, waived by the Party or Parties intended to be benefited thereby, on the Closing Date, the Escrow Agent shall conduct the Closing by recording or distributing the following documents and funds in the following order and manner:

(a)    Record the Deed in the Official Records after calculating and inserting the amount for the documentary transfer tax in the Deed (provided Buyer, at its discretion, may authorize a "gap closing" in which event the Deed shall be required to be insured by the Title Insurer prior to its recordation);

(b)    Deliver to Seller the Credit Certificate and any Cash Balance pursuant to written wire transfer instructions delivered by Seller to the Escrow Agent;

(c)    Disburse and deliver the remaining funds in accordance with the closing statements approved by the Parties; and

(d)    Deliver one complete set of signed counterparts of the documents described in Section 15.1 to Buyer and one complete set of signed counterparts of the documents described in Section 15.2 to Seller, and deliver to Buyer and Seller, respectively, such other documents that have been deposited in Escrow for delivery to the applicable Parties at Closing pursuant to this Agreement.

15.4    <u>Termination of Escrow</u>.    If the Closing does not take place on or before the Closing Date or such later or other date as the Parties may agree upon in writing, then the Escrow shall terminate, and all funds (provided that if the Closing does not take place due to a default by or failure of Buyer to Close, then the terms of Article XVII shall apply) and documents deposited into Escrow shall be returned to the respective Parties; *provided, however*, that each of the Parties reserves and retains all rights and remedies arising out of a breach of this

Agreement by the other Party, subject to the other terms and limitations contained in this Agreement, including those set forth in Article XVII of this Agreement.

## ARTICLE XVI
## CASUALTY AND CONDEMNATION

16.1     Casualty.  If, prior to Closing, all or any portion of the Property or the Assets is damaged by a casualty event ("***Damage***"), then the following procedures shall apply:

(a)     $150,000 or Less.  If the estimated aggregate cost to repair the Damage or replace the Property or Asset(s) so damaged is equal to or less than $150,000, then Buyer shall: (1) proceed with the Closing and take the Property without any adjustment of the Purchase Price, other than a credit from Seller for any deductible or other uninsured loss applicable to an insurance claim for property damage restoration costs arising from such Damage that is reasonably expected to be suffered by Buyer from and after the Closing; and (2) receive an assignment from Seller of all insurance proceeds payable to Seller in connection with such Damage, less all actual reasonable costs of protecting or repairing the Property from such Damage incurred by Seller prior to the Closing.

(b)     Greater than $150,000.  If the estimated aggregate cost to repair the Damage or replace the Property or Asset(s) so damaged is greater than $150,000 then Buyer may elect to either:  (1) terminate this Agreement by written notice to Seller within ten (10) Business Days after first receiving notice of such Damage, and the parties hereto shall have no further rights or obligations under this Agreement, except those obligations by their terms survive the termination of this Agreement, or (2) proceed with the purchase of the Property without any adjustment of the Purchase Price, other than a credit from Seller for any deductible or other uninsured loss applicable to an insurance claim for property damage restoration costs arising from such Damage that is reasonably expected to be suffered by Buyer from and after the Closing, by giving written notice to Seller within ten (10) Business Days after first receiving notice of such Damage, in which case Buyer shall receive an assignment from Seller of all insurance proceeds payable to Seller in connection with such Damage, less all actual reasonable costs of protecting or repairing the Property from such Damage incurred by Seller prior to the Closing.  If Buyer fails to make an election within the time periods stated in this Section 16.1(b), Buyer shall be deemed to have elected the option in clause (2) above.  If necessary or appropriate (as reasonably determined by Buyer) for Buyer to evaluate its options or enforce its rights under this Section 16.1(b), Seller shall provide to Buyer, on written request, a copy of Seller's property insurance policy(ies) (or other applicable insurance policy(ies)) with respect to the Property.

16.2     Condemnation.  If any portion of the Property shall be taken or appropriated or threatened in writing to be taken or appropriated by a public or quasi public authority exercising the power of eminent domain (a "***Condemnation Act***"), then Seller shall promptly notify Buyer thereof and the following procedures shall apply:

(a)     For the purposes of this Section 16.2, "material adverse effect" shall include, but not be limited to, any reduction in the number of rentable Units or amount of any of the rentable square footage of the Facility, or the reduction in the number of parking spaces at the Property below that required by Law, or the material and adverse restriction or impediment to a public road that provides access to the Property as of the Effective Date.

(b)     $150,000 or Less and No Material Adverse Effect.  If the value of the portion of the Property that is to be taken pursuant to such Condemnation Act is equal or less than $150,000 and if the Condemnation Act will not result in a material and adverse effect, each as reasonably determined by Buyer, then Buyer shall: (1) proceed with the Closing and take the Property without any adjustment of the Purchase Price and (2) receive an assignment from Seller of all awards or payments made in connection with such Condemnation Act, less all actual reasonable costs incurred by Seller in the processing and collection thereof.

(c)     Greater than $150,000 or Otherwise Materially Adverse.  If the value of the portion of the Property that is to be taken pursuant to such Condemnation Act is greater than $150,000 or if the Condemnation Act will result in a material and adverse effect, each as reasonably determined by Buyer, then Buyer may elect to either:  (1) terminate this Agreement by written notice to Seller within ten (10) Business Days after first receiving notice of such Condemnation Act, and the parties hereto shall have no further rights or obligations under this Agreement, except those obligations which, by their terms, survive the termination of this Agreement, or (2) proceed with the purchase of the Property without any adjustment of the Purchase Price by giving written notice to Seller within ten (10) Business Days after first receiving notice of such Condemnation Act, in which case Buyer shall receive an assignment from Seller of all awards or payments made in connection with such Condemnation Act, less all actual reasonable costs incurred by Seller in the processing and collection thereof.  If Buyer fails to make an election within the time periods stated in this Section 16.2(c), Buyer shall be deemed to have elected the option in clause (2) above.

## ARTICLE XVII
## DEFAULT

17.1    Rights.  On any default by a Party prior to Closing, the non-defaulting Party may, by notifying the defaulting Party, either postpone Closing for as long as is necessary for such default to be cured (but not beyond the 15th day following the original scheduled Closing Date), or declare such default and exercise its rights under this Article XVII.

17.2    Buyer Default.  IF BUYER FAILS TO CONSUMMATE THE PURCHASE OF THE PROPERTY PURSUANT TO THIS AGREEMENT OR OTHERWISE DEFAULTS IN A MATERIAL WAY ON ITS OBLIGATIONS HEREUNDER AT OR PRIOR TO CLOSING FOR ANY REASON EXCEPT A SELLER DEFAULT (AND WITH RESPECT TO ANY SUCH DEFAULT BY BUYER THAT OCCURS PRIOR TO THE DATE OF CLOSING,

SELLER PROVIDES NOTICE OF SUCH DEFAULT TO BUYER AND SUCH DEFAULT REMAINS UNCURED ON THE EARLIER TO OCCUR OF THE CLOSING DATE AND THE DATE THAT IS FIVE DAYS AFTER BUYER'S RECEIPT OF NOTICE OF SUCH DEFAULT FROM SELLER), THEN SELLER SHALL BE ENTITLED, AS ITS SOLE AND EXCLUSIVE REMEDY (EXCEPT AS PROVIDED IN THIS SECTION 17.2 OR THE ENFORCEMENT OF ANY OBLIGATIONS OF BUYER THAT EXPRESSLY SURVIVE TERMINATION OF THIS AGREEMENT) TO TERMINATE THIS AGREEMENT IN FULL SATISFACTION OF CLAIMS AGAINST BUYER HEREUNDER WITH RESPECT TO SUCH DEFAULT.  NOTWITHSTANDING THE FOREGOING, NOTHING CONTAINED IN THIS SECTION 17.2 SHALL LIMIT OR BE DEEMED OR CONSTRUED TO LIMIT BUYER'S OBLIGATIONS UNDER SECTIONS 17.4, 19.1 AND 21.13 OF THIS AGREEMENT.

17.3   Seller Default.  IF SELLER FAILS TO CONSUMMATE THE SALE OF THE PROPERTY PURSUANT TO THIS AGREEMENT OR OTHERWISE DEFAULTS IN A MATERIAL WAY ON ITS OBLIGATIONS HEREUNDER AT OR PRIOR TO CLOSING FOR ANY REASON EXCEPT A BUYER DEFAULT (AND WITH RESPECT TO ANY SUCH DEFAULT BY SELLER THAT OCCURS PRIOR TO THE DATE OF CLOSING, BUYER PROVIDES PROMPT WRITTEN NOTICE OF SUCH DEFAULT TO SELLER AND SUCH DEFAULT REMAINS UNCURED ON THE EARLIER TO OCCUR OF THE CLOSING DATE AND THE DATE THAT IS FIVE DAYS AFTER SELLER'S RECEIPT OF NOTICE OF SUCH DEFAULT FROM BUYER), THEN BUYER SHALL ELECT, AS ITS SOLE AND EXCLUSIVE REMEDY (EXCEPT AS PROVIDED IN THIS SECTION 17.3, INCLUDING SECTIONS 17.4, 19.1 AND 21.13 HEREOF) EITHER TO (A) TERMINATE THIS AGREEMENT OR (B) WAIVE SAID FAILURE OR BREACH AND PROCEED TO CLOSING WITHOUT ANY REDUCTION IN THE PURCHASE PRICE. NOTWITHSTANDING THE FOREGOING, NOTHING CONTAINED IN THIS SECTION 17.3 SHALL LIMIT OR BE DEEMED OR CONSTRUED TO LIMIT SELLER'S OBLIGATIONS UNDER SECTIONS 17.4, 19.1 AND 21.13 OF THIS AGREEMENT.

17.4   Other Expenses.  If this Agreement is terminated due to the default of a Party, then the defaulting Party shall pay Escrow Agent any escrow cancellation fees or charges and any fees or charges due to Title Insurer for preparation and/or cancellation of the Title Commitment.

## ARTICLE XVIII
## FURTHER ASSURANCES

18.1   Further Assurances.  From and after the Closing, Seller, on the one hand, and Buyer, on the other hand, agree to execute and deliver such further documents and instruments and to do such other acts and things (including the making of filings and reprorating items covering pre-Closing periods but which become available after Closing), as Buyer or Seller, as the case may be, may reasonably request in order to effectuate the transactions contemplated by this Agreement.

18.2    Access to the Records.  From and after the Closing Date, subject to applicable privacy rights of Residents, Buyer shall allow Seller and its agents and representatives to have reasonable access to (upon reasonable prior notice and during normal business hours), and to make copies of the Records, to the extent reasonably necessary to enable Seller to among other things investigate and defend malpractice, employee or other claims, to file or defend cost reports and tax returns, to complete/revise, as needed, any patient assessments which may be required for Seller to seek reimbursement for services rendered prior to the Closing Date, to verify accounts receivable collections due Seller, and to enable Seller to complete, in accordance with Seller's policies and procedures, any and all post-Closing Date accounting, reconciliation and closing procedures, including, but not limited to, a month end close out of all accounts, including but not limited to accounts payable and billing.  Seller agrees not to use or disclose any of the information obtained from Buyer except solely for the purposes described herein and further agree to maintain this information confidential.  Likewise, from and after the Closing Date, Seller shall allow Buyer and its agents reasonable access to the Records, to the extent Buyer reasonably requires such access in connection with, without limitation, accounting, billing, tax filings or securities filings, and other filings, and appeals.  Buyer agrees not to use or disclose any of the information obtained from Seller except solely for the purposes described herein and further agrees to maintain this information as confidential.

18.3    Survival.  The provisions of this Article XVIII shall survive Closing without limitation.

**ARTICLE XIX**
**COMMISSIONS**

19.1    Commissions.  Each Party represents to the other that, in connection with the Transaction, the Party so representing has not dealt with any real estate broker, agent, finder or consultant.  Each Party shall indemnify and hold harmless the other against and from any inaccuracy in such Party's representation.  Each Party shall be responsible for the fees of their respective advisors and consultants.

19.2    Survival.  The provisions of this Article XIX shall survive Closing.

**ARTICLE XX**
**DISCLAIMERS AND RELEASE**

20.1    Disclaimers by Seller.  Except as expressly set forth in this Agreement (and then, subject to the applicable limitations set forth in this Agreement), it is understood and agreed that Seller and its respective agents, representatives, beneficiaries, trustees and heirs (collectively, with Seller, the "***Seller Parties***") have not at any time made and are not now making, and they specifically disclaim, any warranties, representations or guaranties of any kind or character, express or implied, with respect to the Assets, including, but not limited to, warranties, representations or guaranties as to (1) matters of title, (2) environmental matters relating to the Property or any portion thereof, including, without limitation, the presence of hazardous materials in, on, under or in the vicinity of the Property, (3) geological conditions, including,

4841-4936-2850.5

without limitation, subsidence, subsurface conditions, water table, underground water reservoirs, limitations regarding the withdrawal of water, and geologic faults and the resulting damage of past and/or future faulting, (4) whether, and to the extent to which the Property or any portion thereof is affected by any stream (surface or underground), body of water, wetlands, flood prone area, flood plain, floodway or special flood hazard, (5) drainage, (6) soil conditions, including the existence of instability, past soil repairs, soil additions or conditions of soil fill, or susceptibility to landslides, or the sufficiency of any undershoring, (7) the presence of endangered species or any environmentally sensitive or protected areas, (8) zoning or entitlements to which the Property or any portion thereof may be subject or the extent to which building or other entitlements for the Property or any portion thereof may be obtained or any conditions that may be imposed in connection therewith, (9) the availability of any utilities to the Property or any portion thereof including, without limitation, water, sewage, gas and electric, (10) usages of adjoining property, (11) access to the Property or any portion thereof, (12) the value, compliance with the plans and specifications, size, location, age, use, design, quality, description, suitability, structural integrity, operation, title to, or physical or financial condition of the Assets or any portion thereof, or any income, expenses, charges, liens, encumbrances, rights or claims on or affecting or pertaining to the Assets or any part thereof, (13) the condition or use of the Assets or compliance of the Assets with any or all past, present or future federal, state or local ordinances, rules, regulations or laws, building, fire or zoning ordinances, codes or other similar laws, (14) the existence or non-existence of underground storage tanks, surface impoundments, or landfills, (15) any improvements made to the Property, (16) any other matter affecting the stability and integrity of the Property, (17) the potential for further development of the Property, (18) the merchantability of the Assets or fitness of the Property for any particular purpose, (19) the truth, accuracy or completeness of any information relating to the Assets, (20) tax consequences, (21) requirements or conditions of approval applicable to the Assets or any requirements or conditions for the development, use, sale or occupancy of the Property, or (22) any other matter or thing with respect to the Assets.

20.2 Sale "As Is, Where Is". Buyer (on behalf of itself and the Buyer Parties) acknowledges and agrees that upon Closing, Seller shall sell and convey to Buyer and Buyer shall accept the Assets "**AS IS, WHERE IS, WITH ALL FAULTS**" except to the extent expressly provided otherwise in this Agreement. Except as expressly set forth in this Agreement, Buyer has not relied and will not rely on, and the Seller Parties have not made and are not liable for or bound by, any express or implied warranties, guarantees, statements, representations or information pertaining to the Assets or relating thereto (including, specifically, information packages distributed with respect to the Assets) made or furnished by Seller, any of the other Seller Parties or any operator, property manager, broker (including, but not limited to, Broker), agent or third party representing or purporting to represent Seller, to whomever made or given, directly or indirectly, orally or in writing. The Parties agree that all understandings and agreements heretofore made between them or their respective agents or representatives are merged in this Agreement, which alone fully and completely expresses their agreement, and that this Agreement has been entered into after full investigation, or with the Parties satisfied with the opportunity afforded for full investigation, neither party relying upon any statement or representation by the other unless such statement or representation is specifically embodied in this Agreement, and then, subject to the limitations in this Agreement applicable thereto.

(a)  <u>Buyer's Investigation</u>.  Buyer represents that it is a knowledgeable, experienced and sophisticated buyer of real estate, facilities and assets similar to the Property, Facility and other Assets and that, it is relying solely on its own expertise and that of Buyer's consultants in purchasing the Assets and shall make an independent verification of the accuracy of any documents and information provided by Seller, including any information relating to the Assets.  Buyer will conduct such inspections and investigations of the Assets as Buyer deems necessary, including, but not limited to, any requirements or conditions for the development, sale, use or occupancy of the Property and the physical and environmental conditions thereof, and shall rely upon same.  Buyer acknowledges that Seller has afforded Buyer a full opportunity to conduct such investigations of the Assets as Buyer deemed necessary to satisfy itself as to such requirements and conditions, the condition of the Assets and the existence or non-existence with respect to any hazardous materials on or discharged from the Property, and, Buyer will rely solely upon same and not upon any information provided by or on behalf of Seller or any other Seller Parties with respect thereto, other than such representations, warranties and covenants of Seller as are expressly set forth in this Agreement (and then, subject to the limitation in this Agreement applicable thereto).  Upon Closing, Buyer shall assume the risk that adverse matters, including, but not limited to, adverse physical or construction defects or adverse environmental, health or safety conditions, may not have been revealed by Buyer's inspections and investigations.  Buyer waives any and all rights or remedies it may have or be entitled to, to the extent deriving from disparity in size or from any significant disparate bargaining position in relation to Seller.

(b)  <u>BUYER'S ACKNOWLEDGEMENT</u>.  WITHOUT LIMITATION, BUYER (FOR ITSELF, NEW OPERATOR AND THEIR RESPECTIVE AGENTS, EMPLOYEES, OFFICERS, CONTRACTORS, SUCCESSORS AND ASSIGNS, COLLECTIVELY, THE "***BUYER PARTIES***"), ACKNOWLEDGES AND AGREES THAT, EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT, THE ASSETS WILL BE PURCHASED BY BUYER AND SOLD AND DELIVERED BY SELLER IN AN "AS IS" CONDITION AND ON A "WHERE-IS" BASIS "WITH ALL FAULTS INCLUDING, BUT NOT LIMITED TO, BOTH LATENT AND PATENT DEFECTS."  BUYER ON BEHALF OF ALL BUYER PARTIES, ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NO WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, OF ANY KIND WHATSOEVER, HAVE BEEN, ARE OR AT ANY TIME WILL BE MADE BY THE SELLER PARTIES OR ANY OTHER PERSON, AND BUYER ON BEHALF OF ALL BUYER PARTIES WAIVES ALL SUCH WARRANTIES, OTHER THAN AS SET FORTH EXPRESSLY IN THIS AGREEMENT, INCLUDING WITH RESPECT TO THE CONDITION (PHYSICAL OR OTHERWISE) AND USE OF THE ASSETS INCLUDING, BUT NOT LIMITED TO, (i) WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, (ii) WARRANTIES WITH RESPECT TO THE CONDITION OF THE ASSETS, THEIR COMPLIANCE WITH ANY ZONING OR OTHER RULES, REGULATIONS, LAWS OR STATUTES APPLICABLE TO THE ASSETS, (iii) WARRANTIES WITH

RESPECT TO THE USES PERMITTED ON, THE DEVELOPMENT REQUIREMENTS OR CONDITIONS FOR, OR ANY OTHER MATTER OR THING RELATING TO THE PROPERTY OR ANY PORTION THEREOF, INCLUDING SOIL, COMPACTION, DRAINAGE, SEISMIC, HAZARDOUS MATERIALS, COMPLIANCE WITH ENVIRONMENTAL REQUIREMENTS, UTILITIES, ACCESS, COMPLIANCE WITH RENT CONTROL ORDINANCES, AND THE ECONOMIC OR OTHER RETURN THAT MAY BE DERIVED FROM OWNERSHIP, DEVELOPMENT, IMPROVEMENT OR USE OF THE PROPERTY, OR (iv) WARRANTIES WITH RESPECT TO ANY IMPROVEMENTS TO THE PROPERTY OR ANY WORK THERETO. BUYER ON BEHALF OF ALL BUYER PARTIES ALSO ACKNOWLEDGES THAT SOME DEFECTS MAY NOT BECOME APPARENT TO BUYER, THE BUYER PARTIES OR SELLER PRIOR TO THE CLOSING DATE AND HEREBY RELEASES THE SELLER PARTIES FROM BLAME AND ALL LIABILITY FOR SUCH "LATENT DEFECTS." BUYER ON BEHALF OF ALL BUYER PARTIES HEREBY COVENANTS NOT TO BRING ANY ACTION AGAINST ANY OF THE SELLER PARTIES BASED ON ANY CLAIM RELATED TO THE ASSETS OR THIS AGREEMENT, EXCEPT TO THE EXTENT EXPRESSLY PERMITTED OTHERWISE IN THIS AGREEMENT. IF ANY FACTS, CONDITIONS OR CIRCUMSTANCES CHANGE OR TURN OUT DIFFERENTLY FROM WHAT BUYER OR ANY OF THE BUYER PARTIES BELIEVED, BUYER'S (AND THE BUYER PARTIES') OBLIGATIONS HEREUNDER, IF ANY, SHALL REMAIN IN FULL FORCE AND EFFECT WITH NO RIGHT OR REMEDY AGAINST ANY OF THE SELLER PARTIES WITH RESPECT THERETO NOR ANY RIGHT TO DELAY BUYER'S (OR ANY BUYER PARTIES') PERFORMANCE HEREUNDER OR, EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, TO TERMINATE THIS AGREEMENT. NOTHING CONTAINED IN THIS SECTION 20.2(b) SHALL BE DEEMED OR CONSTRUED TO ABSOLVE OR RELEASE SELLER FROM ANY CLAIMS OR LIABILITIES ARISING DIRECTLY AND SOLELY OUT OF A MATERIAL BREACH OF THE EXPRESS TERMS OF THIS AGREEMENT BY SELLER, WHICH SHALL BE SUBJECT TO THE TERMS OF ARTICLE XVII. NOTWITHSTANDING ANYTHING TO THE CONTRARY SET FORTH IN THIS AGREEMENT, NONE OF THE BUYER PARTIES SHALL HAVE A RIGHT TO PURSUE ANY CLAIM FOR BREACH OF REPRESENTATION OR WARRANTY IF ANY OF THE BUYER PARTIES KNEW OF SUCH BREACH PRIOR TO CLOSING BUT NONETHELESS CONSUMMATED THE CLOSING. WITHOUT LIMITING THE FOREGOING, BUYER SHALL BE DEEMED TO KNOW ANY INFORMATION DISCLOSED TO ANY OF THE BUYER PARTIES IN WRITING UP UNTIL TWO (2) BUSINESS DAYS PRIOR TO THE CLOSING DATE, INCLUDING WITHOUT LIMITATION IN A WRITTEN NOTICE, IN THE PROPERTY INFORMATION OR IN A REPORT OBTAINED BY ANY OF THE BUYER PARTIES.

20.3   _Seller Released from Liability_.   Buyer acknowledges that it will have the opportunity to inspect the Assets and all Seller's information related thereto ("***Seller's Information***") between the date hereof and the Closing Date, and during such period, observe its

physical characteristics and existing conditions and the opportunity to conduct such investigation and study on and of the Assets, the Property and adjacent areas and the Seller's Information as Buyer deems necessary, and Buyer (on behalf of all Buyer Parties) hereby FOREVER RELEASES AND DISCHARGES Seller and the other Seller Parties from all responsibility and liability, including, without limitation, liabilities and responsibilities for the landlord's obligations under any leases or other rental or occupancy agreements, relating to the physical, environmental or legal compliance status of the Property and the Seller's Information, whether arising before or after the Effective Date, and liabilities under the Comprehensive Environmental Response, Compensation and Liability Act Of 1980 (42 U.S.C. Sections 9601 et seq.), as amended (*"CERCLA"*), regarding the condition, valuation, salability or utility of the Property, or its suitability for any purpose whatsoever, including, but not limited to, with respect to the presence in the soil, air, structures and surface and subsurface waters, of hazardous materials or other materials or substances that have been or may in the future be determined to be toxic, hazardous, undesirable or subject to regulation and that may need to be specially treated, handled and/or removed from the Property under current or future federal, state and local laws, regulations or guidelines, and any structural and geologic conditions, subsurface soil and water conditions and solid and hazardous waste and hazardous materials on, under, adjacent to or otherwise affecting the Property (collectively, the "*Specific Matters*"). Buyer (on behalf of all Buyer Parties) further hereby WAIVES AND RELEASES (and by Closing this transaction will be deemed to have WAIVED AND RELEASED) any and all objections and complaints (including, but not limited to, federal, state and local statutory and common law based actions, and any private right of action under any federal, state or local laws, regulations or guidelines to which the Assets is or may be subject, including, but not limited to, CERCLA) concerning the Specific Matters and the physical characteristics and any existing conditions of the Assets, including, without limitation, the landlord's obligations under the any leases or other rental or occupancy agreements, relating to the physical, environmental or legal compliance status of the Property, including, without limitation, the Specific Matters, whether arising before or after the Effective Date. Buyer further hereby assumes the risk of changes in applicable laws and regulations relating to past, present and future characteristics, conditions and environmental conditions on the Property and the risk that adverse physical characteristics and conditions, including, without limitation, the presence of hazardous materials or other contaminants, may not have been revealed by its investigation. Buyer hereby agrees, represents and warrants that it realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and it further agrees, represents and warrants that the foregoing waiver and release has been negotiated and agreed upon in light of that realization and that it nevertheless hereby intends to waive and release all such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which in any way arise out of, are connected with, or relate to, the matters set forth herein. NOTHING CONTAINED IN THIS SECTION 20.3 SHALL BE DEEMED OR CONSTRUED TO ABSOLVE OR RELEASE SELLER FROM ANY CLAIMS OR LIABILITIES GOVERNED BY ARTICLE XVII ARISING DIRECTLY AND SOLELY OUT OF A MATERIAL BREACH OF THE EXPRESS TERMS OF THIS AGREEMENT BY SELLER.

## ARTICLE XXI
## MISCELLANEOUS

21.1 <u>Effectiveness</u>**.**  This Agreement shall become effective on its execution and delivery by each Party on and as of the Effective Date.

21.2 <u>Entire Agreement; Amendment</u>**.**  This Agreement constitutes the entire agreement among the Parties hereto pertaining to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, negotiations and discussions of the Parties, whether oral or written, and there are no warranties, representations or other agreements among the Parties in connection with the subject matter hereof except as specifically set forth herein. No amendment, supplement, modification, waiver or termination of this Agreement shall be binding unless executed in writing by the Party to be bound thereby.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision of this Agreement, whether or not similar, nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.  No Party shall be deemed to have waived the exercise of any right which it holds under this Agreement unless such waiver is made expressly and in writing.  No delay or omission by any Party in exercising any right shall be deemed a waiver of its future exercise.  No waiver made as to any instance involving the exercise of any right shall be deemed a waiver as to any other instance, or any other right.

21.3 <u>Applicable Law</u>**.**  This Agreement shall be given effect and construed by application of the laws of the State of Texas without regard to conflicts of laws.  Any action arising out of, in connection with, or relating to, this Agreement shall be brought in the Bankruptcy Court or, if the Bankruptcy Case has been closed, courts of the State of Texas, except that if it is to be brought in a United States District Court, it shall be brought in the United States District Court for the Northern District of Texas, Dallas Division.  Any action affecting title or the right to possession of the Property shall be filed in the County and State where the Property is located.

21.4 <u>Notices</u>**.**  Any notice to be provided hereunder to a Party or the Title Insurer, as Escrow Agent, shall be in writing, and shall be deemed to have been provided the next Business Day after having been deposited with a national courier service, or on having been sent by immediate electronic communication, in each case if receipt is acknowledged or confirmed or delivery is first refused, to the persons and addresses set forth below, as such address may be changed from time to time by notice to the other Party.  Any notice by one Party amending or terminating this Agreement shall include a notice to the Escrow Agent.

> To Seller:

> with a copy to:   Crowe & Dunlevy, P.C.
> 1919 McKinney Avenue, Suite 100
> Dallas, Texas 75201
> Attn: Vickie Driver
> Telephone: 214-420-2142
> Email Address: vickie.driver@crowedunlevy.com

| | |
|---|---|
| To Buyer: | SH1 Houston LLC |
| | c/o Access Industries Management, LLC |
| | 40 West 57th St., 28th Floor |

To Buyer:          SH1 Houston LLC
                   c/o Access Industries Management, LLC
                   40 West 57th St., 28th Floor
                   New York, NY 10019
                   Attn: Jacob Himmelrich
                   Email Addresses:  jhimmelrich@accind.com and
                   legalnotices@accind.com

with a copy to:    Foley & Lardner LLP
                   111 North Orange Avenue
                   Suite 1800
                   Orlando, Florida 32801
                   Attn:  Michael A. Okaty
                   Telephone:  407-244-3229
                   Email Address:  mokaty@foley.com

To Escrow Agent
and Title Insurer:
                   Escrow Agent:
                   Crowe & Dunlevy
                   Spaces McKinney Avenue
                   1919 McKinney Ave., Suite 100
                   Dallas, Texas 75201
                   Attn:  Vickie Driver
                   Telephone:  214-420-2142
                   Email Address:  vickie.driver@crowedunlevy.com

Any notice by one Party amending or terminating this Agreement or alleging a default under this Agreement shall include a notice to Escrow Agent.  Notice provided by legal counsel for a Party shall be effective as notice given by such Party.

21.5    Waiver of Jury Trial**.  TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, BUYER AND SELLER EACH HEREBY EXPRESSLY, IRREVOCABLY, FULLY AND FOREVER RELEASES, WAIVES AND RELINQUISHES ANY AND ALL RIGHT TO TRIAL BY JURY AND ALL RIGHT TO RECEIVE PUNITIVE, EXEMPLARY AND CONSEQUENTIAL DAMAGES FROM THE OTHER (OR ANY PAST, PRESENT OR FUTURE BOARD MEMBER, TRUSTEE, MEMBER, PARTNER, SHAREHOLDER, DIRECTOR, OFFICER, EMPLOYEE, AGENT, HEIR, REPRESENTATIVE, OR ADVISOR OF THE OTHER) IN ANY CLAIM, DEMAND, ACTION, SUIT, PROCEEDING OR CAUSE OF ACTION IN WHICH BUYER AND SELLER ARE PARTIES, WHICH IN ANY WAY (DIRECTLY OR INDIRECTLY) ARISES OUT OF, RESULTS FROM OR RELATES TO ANY OF THE FOLLOWING, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER BASED ON CONTRACT OR TORT OR ANY OTHER LEGAL BASIS:  THIS AGREEMENT; THE PROPERTY; ANY PAST, PRESENT OR

**FUTURE ACT, OMISSION, CONDUCT OR ACTIVITY WITH RESPECT TO THIS AGREEMENT OR THE PROPERTY; ANY TRANSACTION, EVENT OR OCCURRENCE CONTEMPLATED BY THIS AGREEMENT; THE PERFORMANCE OF ANY OBLIGATION OR THE EXERCISE OF ANY RIGHT UNDER THIS AGREEMENT; OR THE ENFORCEMENT OF THIS AGREEMENT. BUYER AND SELLER EACH AGREES THAT THIS AGREEMENT CONSTITUTES WRITTEN CONSENT THAT TRIAL BY JURY SHALL BE WAIVED IN ANY SUCH CLAIM, DEMAND, ACTION, SUIT, PROCEEDING OR OTHER CAUSE OF ACTION AND AGREES THAT BUYER AND SELLER EACH SHALL HAVE THE RIGHT AT ANY TIME TO FILE THIS AGREEMENT WITH THE CLERK OR JUDGE OF ANY COURT IN WHICH ANY SUCH CLAIM, DEMAND, ACTION, SUIT, PROCEEDING OR OTHER CAUSE OF ACTION MAY BE PENDING AS WRITTEN CONSENT TO WAIVER OF TRIAL BY JURY. FROM TIME TO TIME UPON REQUEST OF EITHER PARTY HERETO, THE OTHER PARTY SHALL CONFIRM, RE-CONFIRM, AND RATIFY, IN WRITING, THE PROVISIONS OF THIS SECTION 21.5, INCLUDING IF ANY APPLICABLE LEGISLATION IS PROMULGATED REGARDING WAIVERS OF THE RIGHT TO TRIAL BY JURY IN THE APPLICABLE JURISDICTION.**

21.6    <u>Construction</u>**.**  All references made in the neuter, masculine or feminine gender shall be deemed to have been made in all such genders; and in the singular or plural number shall be deemed to have been made, respectively, in the plural or singular number as well.

21.7    <u>Schedules</u>**.**  Each schedule, writing or document referred to as being attached as a Schedule is hereby made a part of this Agreement.

21.8    <u>Severability</u>**.**  If any provision, clause or part of this Agreement, or the application thereof under certain circumstances, is held invalid or unenforceable by a final order of a court of competent jurisdiction, then the remainder of this Agreement, or the application of such provision, clause or part under other circumstances, shall not be affected thereby and the Parties hereto agree to replace such invalid or unenforceable term or provision with a valid and enforceable term or provision that will achieve, to the extent possible, the economic, business and other purposes of such invalid or unenforceable term.

21.9    <u>Time of Essence</u>**.**  Time shall be of the essence of this Agreement.

21.10    <u>Counterparts; Headings</u>**.**   This Agreement may be executed in several counterparts, each of which shall be deemed original, but such counterparts shall together constitute but one and the same agreement.  The Table of Contents and Article and Section headings in this Agreement are inserted for convenience of reference only and shall not constitute a part hereof or be used as interpreting the meaning of this Agreement.

21.11    <u>Facsimile or Electronic Signatures</u>.  The exchange of copies of this Agreement and of signature pages by facsimile or electronic transmission shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original

Agreement for all purposes. Signatures of the Parties transmitted by facsimile or e-mail shall be deemed to be their original signatures for all purposes.

21.12 <u>Equal Participation</u>. Each Party hereto hereby acknowledges that all Parties hereto participated equally in the negotiation and drafting of this Agreement and that, accordingly, no court construing this Agreement shall construe it more stringently against one Party than against the other.

21.13 <u>Attorneys' Fees</u>. If either Party hereto institutes any proceeding, claim or action, at law or in equity, in connection with or arising out of the terms, conditions, covenants and agreements contained in this Agreement, the non-prevailing Party in any such action, claim or proceeding shall reimburse the prevailing Party for reasonable attorneys' fees, costs and other expenses incurred in connection with such proceeding or action.

21.14 <u>Assignment</u>. This Agreement and each Party's respective rights hereunder may not be assigned at any time without the prior written consent of the other Party hereto, except that Buyer may, by written notice to Seller, assign, without the consent of Seller, all or any portion of Buyer's rights, obligations and interest in this Agreement to one or more of its Affiliates.

21.15 <u>No Reliance</u>. No third party, other than a successor by operation of law or an assignee permitted by this Agreement (and then, subject to the applicable limitations in this Agreement), is entitled to rely on any of the representations, warranties and agreements contained in this Agreement and no Party to this Agreement assumes any liability to any third party, other than an assignee permitted by this Agreement (and then, subject to the applicable limitations in this Agreement), because of any reliance on the representations, warranties and agreements contained in this Agreement.

21.16 <u>Expenses</u>. Except to the extent otherwise provided herein, each of the Parties hereto shall pay the fees and expenses of their respective counsel, consultants and other expenses incident to the negotiation and preparation of this Agreement and consummation of the transactions contemplated by this Agreement.

*[Signature page to follow]*

IN WITNESS WHEREOF, each Party has executed this Agreement by its duly authorized representatives, to be effective as of the Effective Date.

**SELLER:**

**CINCO RANCH MEMORY CARE LLC**

By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF, each Party has executed this Agreement by its duly authorized representatives, to be effective as of the Effective Date.

**BUYER:**

**SH1 HOUSTON LLC**

By:    ACCESS INDUSRIES MANAGEMENT, LLC, its Manager


By: _____
Name: Alejandro Moreno
Title: Executive Vice President


By: _____
Name: Richard B. Storey
Title: Executive Vice President

## ACCEPTANCE BY ESCROW AGENT

The Undersigned Escrow Agent (a) acknowledges its receipt of the escrow instructions contained in this Agreement (including without limitation the Escrow Instructions attached to this Agreement as ***Schedule 5.2***); and (b) accepts the foregoing escrow instructions and agrees to act in accordance with the terms contained therein and in this Agreement insofar as such terms affect Escrow Agent.

## ESCROW AGENT

By:_____

Name:_____

Title:_____

## SCHEDULE 3.1(a) – the Land

0190 T Hobermaker, Acres 2.708, Unrestricted Reserve "A", Block 1, Autumn Leaves Cinco Ranch Subdivision, located at 24024 Westheimer Parkway, Katy, Texas 77494

4841-4936-2850.5

## SCHEDULE 3.1(e) – Occupancy Agreements

1.    Occupancy Agreement – Resident ID CIN – 1001
2.    Occupancy Agreement – Resident ID CIN – 1003
3.    Occupancy Agreement – Resident ID CIN – 1007
4.    Occupancy Agreement – Resident ID CIN – 1024
5.    Occupancy Agreement – Resident ID CIN – 1027
6.    Occupancy Agreement – Resident ID CIN – 1030
7.    Occupancy Agreement – Resident ID CIN – 1035
8.    Occupancy Agreement – Resident ID CIN – 1040
9.    Occupancy Agreement – Resident ID CIN – 1044
10.   Occupancy Agreement – Resident ID CIN – 1045
11.   Occupancy Agreement – Resident ID CIN – 1047
12.   Occupancy Agreement – Resident ID CIN – 1053
13.   Occupancy Agreement – Resident ID CIN – 1054
14.   Occupancy Agreement – Resident ID CIN – 1056
15.   Occupancy Agreement – Resident ID CIN – 1057
16.   Occupancy Agreement – Resident ID CIN – 1080
17.   Occupancy Agreement – Resident ID CIN – 1083
18.   Occupancy Agreement – Resident ID CIN – 1085
19.   Occupancy Agreement – Resident ID CIN – 1089
20.   Occupancy Agreement – Resident ID CIN – 1091
21.   Occupancy Agreement – Resident ID CIN – 1092
22.   Occupancy Agreement – Resident ID CIN – 1101
23.   Occupancy Agreement – Resident ID CIN – 1104
24.   Occupancy Agreement – Resident ID CIN – 1120
25.   Occupancy Agreement – Resident ID CIN – 1126
26.   Occupancy Agreement – Resident ID CIN – 1133
27.   Occupancy Agreement – Resident ID CIN – 1134
28.   Occupancy Agreement – Resident ID CIN – 1142
29.   Occupancy Agreement – Resident ID CIN – 1156
30.   Occupancy Agreement – Resident ID CIN – 1161

## Schedule 3.4(c) – Legal Proceedings

All legal proceedings (if any) listed in the Seller's Schedule of Assets and Liabilities and Statement of Financial Affairs as filed with the Bankruptcy Court with respect to the Facility are incorporated in this Schedule 3.4(c).

## **SCHEDULE 4.1 – Assigned Service Contracts**

Management Agreement with Jerry Erwin Associates, LLC, D/B/A JEA Senior Living

## **SCHEDULE 7.1 – the Deed**

[Attached]

## SCHEDULE 7.2(c) – the Bill of Sale

[Attached]

## **SCHEDULE 7.2(f) – Form of Assignment of Contracts**

[Attached]

## **SCHEDULE 11.1(f) – Disclosures of Violations of Environmental Laws**

None.

**SCHEDULE 11.1(h) – Rent Rolls**

4841-4936-2850.5

## SCHEDULE 11.2(b) – Buyer's Consents and Approvals

None, except for internal board of manager and member approvals.

## **SCHEDULE 14.1(h) - FIRPTA Affidavit**

[Attached]

4841-4936-2850.5

_____

**PURCHASE AGREEMENT**

**by and between**

**PEARLAND MEMORY CARE LLC**

("*Seller*")

**and**

**SH1 HOUSTON LLC**

("*Buyer*")

**February __, 2020**

_____

**Property: Pearland**

## PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT (this "*Agreement*"), is made as of the _____ day of February, 2020 (the "*Effective Date*"), by and between PEARLAND MEMORY CARE LLC, a Delaware limited liability company, having an address at 545 E. John Carpenter Freeway, Suite 500, Irving, Texas 75062 ("*Seller*"), and SH1 HOUSTON LLC, a Delaware limited liability company, having such address as provided in <u>Section 21.4</u> of this Agreement ("*Buyer*").

## RECITALS

A.       Seller is the owner of that certain thirty-five (35) unit, forty-four (44) bed adult assisted living residential facility located at 11200 Discovery Bay Drive Pearland, Texas 77584, known as "Pearland" (the "*Facility*"). The Facility is operated by Jerry Erwin Associates, LLC (d/b/a JEA Senior Living), a Washington limited liability company ("*Current Manager*"), pursuant to the terms of that certain Management Agreement dated December 1, 2019 by and between Seller and Current Manager.

B.       On May 2, 2019, (the "*Petition Date*"), Seller commenced a voluntary case (the "*Bankruptcy Case*") under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

C.       Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, the Facility and the Assets (as that term is defined below) on the terms and conditions hereinafter set forth.

D.       The Parties intend to effectuate the transactions contemplated by this Agreement through a sale of the Assets pursuant to Sections 105(a), 363(b), 363(f), 363(m), 365(a), 365(b), and 365(f), 1123 and/or 1129 of the Bankruptcy Code; and

E.       Seller's ability to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the foregoing and the respective promises, representations, warranties and covenants herein contained, the parties hereto, intending to be legally bound hereby, do agree as follows:

## ARTICLE I
## DEFINITIONS

1.1       **Definitions**. For purposes of this Agreement the following terms shall have the meanings ascribed below:

"*Affiliate*" shall mean with respect to any Person, any Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person.

"*Agreement*" shall mean this Purchase Agreement including all Exhibits and Schedules attached hereto or referred to herein.

"***Approved Claims***" shall mean all Allowed Administrative Expense Claims, all Secured Tax Claims, all Priority Tax Claims, the Allowed Administrative Convenience Claims and $7,500 for funding the Liquidating Trust, as each such term is defined in the Confirmation Order.

"***Assets***" shall have the meaning set forth in <u>Section 3.1</u>.

"***Assigned Personal Property***" shall have the meaning set forth in <u>Section 7.2(c)</u>.

"***Assigned Service Contracts***" shall mean those certain Contracts that Buyer elects to assume pursuant to and in accordance with <u>Section 4.1</u>, excluding Occupancy Agreements.

"***Assignment of Contracts***" shall have the meaning set forth in <u>Section 7.2(f)</u>.

"***Assumed Liabilities***" has the meaning set forth in <u>Section 3.3</u>.

"***Bankruptcy Code***" means Title 11 of the United States Code, Sections 101 et seq.

"***Bankruptcy Court***" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

"***Bill of Sale***" shall have the meaning set forth in <u>Section 7.2(c)</u>.

"***Broker***" shall have the meaning set forth in <u>Section 19.1</u>.

"***Building Service Equipment***" shall have the meaning set forth in <u>Section 3.1(c)</u>.

"***Business***" shall have the meaning set forth in <u>Section 2.1</u>.

"***Business Day***" shall mean any day other than a Saturday or Sunday, or other day recognized as a holiday by the U.S. Government or the government of the State of Texas, or on which banks or similar financial institutions in the State of Texas are generally closed.

"***Buyer***" shall have the meaning set forth in the Recitals.

"***Buyer Parties***" shall have the meaning set forth in <u>Section 20.2(b)</u>.

"***Cash Balance***" means the amount by which the Closing Balance is greater than the amount of the Credit Certificate

"***Close of Escrow***" shall have the meaning set forth in <u>Section 5.1</u>.

"***Closing***" shall have the meaning set forth in <u>Section 5.1</u>.

"***Closing Balance***" shall have the meaning set forth in <u>Section 6.1(a)</u>.

"***Closing Date***" shall have the meaning set forth in <u>Section 5.1</u>.

"***Condemnation Act***" shall have the meaning set forth in <u>Section 16.2</u>.

"***Confirmation Order***" means that certain Findings of Fact, Conclusions of Law and Order Confirming First Amended Joint Plan of Liquidation of Cinco Ranch Memory Care, LLC and Pearland Memory Care, LLC [Docket No. _____], approving the sale of substantially all the assets of Seller to Buyer or Buyer's designee under all applicable provisions of the Bankruptcy Code, including Sections 105(a), 363(b), 363(f), 363(m), 365(a), 365(b), and 365(f), 1123 and/or 1129.

"***Contract***" shall mean any contract, lease, sublease, indenture, agreement, commitment or other legally binding arrangement to which Seller is a party that relates to the use, operation, maintenance, repair or title to the Assets, including the Service Contracts and the Occupancy Agreements.

"***Credit Amount***" shall have the meaning set forth in Section 6.1.

"***Credit Certificate***" shall have the meaning set forth in Section 15.2(b).

"***Curative Objection***" shall have the meaning set forth in Section 7.2(a).

"***Cure Costs***" means all monetary Liabilities, including pre-petition monetary Liabilities, of Seller that must be paid or otherwise satisfied to cure all of Seller's monetary and other defaults under the Assigned Service Contracts pursuant to Section 365 of the Bankruptcy Code at the time of the assumption thereof and assignment of the Assigned Service Contracts to Buyer as provided hereunder as such amounts are determined by the Bankruptcy Court or approved pursuant to the assignment and assumption procedures provided for in the Bidding Procedures Order.

"***Current Manager***" shall have the meaning set forth in Paragraph A of the Recitals.

"***Damage***" shall have the meaning set forth in Section 16.1.

"***Deed***" shall have the meaning set forth in Section 7.1.

"***Discharge***" shall have the meaning set forth in Section 7.2(a).

"***Effective Date***" shall have the meaning set forth in the Recitals.

"***Environmental Laws***" means all federal, state, or local laws, ordinances, requirements and regulations relating to waste disposal or protecting the environment, including without limitation. (i) the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. §§ 9601 et seq.), as amended ("***CERCLA***"); (ii) the Solid Waste Disposal Act (42 U.S.C. §§ 6901 et seq.), as amended; (iii) the Clean Air Act (42 U.S.C. §§ 7401 et seq.), as amended; (iv) the Clean Water Act (33 U.S.C. § 1251), as amended; (v) the Hazardous Materials Transportation Act (49 U.S.C. §§ 1801 et seq.), as amended; (vi) the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. § 136 et seq.), as amended; (vii) the Safe Drinking Water Act (41 U.S.C. § 300f et seq.), as amended; (viii) the Federal Water Pollution Control Act (33 U.S.C. § 125, et seq.) and (ix) the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.).

"***Equipment***" shall have the meaning set forth in Section 3.1(d).

"***Escrow***" shall have the meaning set forth in <u>Section 5.1</u>.

"***Escrow Account***" shall have the meaning set forth in <u>Section 6.1(a)</u>.

"***Escrow Agent***" shall mean Crowe & Dunlevy.

"***Escrow Instructions***" shall have the meaning set forth in <u>Section 5.2</u>.

"***Exception Documents***" shall have the meaning set forth in <u>Section 7.2(a)</u>.

"***Excluded Assets***" shall have the meaning set forth in <u>Section 3.2</u>.

"***Excluded Contracts***" means all Service Contracts of Seller's other than the Assigned Service Contracts.

"***Excluded Liabilities***" has the meaning set forth in <u>Section 3.4</u>.

"***Excluded Records***" means (a) the general corporate files and records of Seller, insofar as they relate to the business generally and are not required for the future ownership or operation of the Assets, (b) all legal files and records (other than title opinions with respect to any of the Assets and files exclusively related to Assumed Liabilities), (c) Seller's Income Tax files and records, (d) employee files, (e) records relating to the sale of the Assets, including competing bids, (f) proprietary data, (g) copies of records stored for archival and/or back up purposes, and (h) any other files or records to the extent relating to any Excluded Assets or expressly excluded from the Assets pursuant to <u>Section 3.2</u>.

"***Facility***" shall have the meaning set forth in <u>Paragraph A</u> of the Recitals to this Agreement.

"***FIRPTA*** Affidavit" shall have the meaning set forth in <u>Section 14.1(h)</u>.

"***Governmental Authority***" shall mean any federal, state or local government or any court of competent jurisdiction, administrative agency or commission or other governmental or quasi-governmental authority or instrumentality, domestic or foreign.

"***Healthcare Licenses***" shall mean the Memory Care Facility License and all other licenses, permits, certifications, consents and approvals issued by a Governmental Authority to Seller relating to the assisted living, "Memory Care" facility or other health care goods or services provided at the Facility, other than certificates of need or similar approvals.

"***Intangible Property***" shall have the meaning set forth in <u>Section 3.1(l)</u>.

"***Inventory***" shall have the meaning set forth in <u>Section 3.1(h)</u>.

"***Knowledge***" shall mean (a) in the case of Seller, the actual knowledge of Seller, after reasonable inquiry of the manager of the Facility, and (b) in the case of Buyer, the actual knowledge of Buyer after reasonable inquiry with Buyer's management team.

"**_Land_**" shall have the meaning set forth in <u>Section 3.1(a)</u>.

"**_Law_**" or "**_Laws_**" shall mean any applicable law (including decisional law), statute, regulation, code, ordinance or interpretation of any Governmental Authority.

"**_Leased Assets_**" shall have the meaning set forth in <u>Section 7.2(d)</u>.

"**_Liability_**" means any and all debts, indebtedness, liens, losses, damages, adverse claims, liabilities, fines, penalties, duties, responsibilities, taxes, obligations and expenses (including reasonable attorneys' fees and reasonable costs of investigation and defense) of any kind, character, or description, whether known or unknown, direct or indirect, fixed, absolute or contingent, matured or unmatured, accrued or unaccrued, asserted or unasserted, ascertained or ascertainable, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, vested or unvested, executory, determined, determinable, in contract, tort, strict liability, or otherwise, or otherwise due or to become due.

"**_material_**" as used solely in (a) <u>Article XI</u> and (b) <u>Sections 17.2</u> and <u>17.3</u>, shall mean, respectively, (i) the breach of a representation or warranty by Seller or Buyer or failure to perform or comply under the Agreement by Seller or Buyer, as the case may be, or (ii) default by Buyer or Seller, as the case may be, which would or is reasonably likely to cause, individually or in the aggregate with similar matters, a Party to suffer a loss which is in excess of $50,000.

"**_Memory Care Facility License_**" shall mean a license or certification to operate the Facility as a "Memory Care" facility.

"**_Monetary Objection_**" or "**_Monetary Objections_**" shall have the meaning set forth in <u>Section 7.2(a)</u>.

"**_New Operator_**" shall have the meaning set forth in <u>Section 2.2</u>.

"**_Objection Notice_**" shall have the meaning set forth in <u>Section 7.2(a)</u>.

"**_Obligations_**" shall mean any claim, debt, liability, judgment, commitment or obligation of any nature, whether secured, recourse, non-recourse, liquidated, unliquidated, accrued, absolute, fixed, contingent, ascertained, unascertained, known, unknown or otherwise.

"**_Occupancy Agreements_**" shall mean all rental or occupancy agreements and/or leases affecting the Property or any space therein, and the rents payable thereunder to the extent accruing after the Closing Date;

"**_Party_**" shall mean either Buyer or Seller, as the case may be, and "Parties" shall mean both Buyer and Seller.

"**_Permits_**" shall have the meaning set forth in <u>Section 3.1(k)</u>.

"**_Permitted Encumbrances_**" shall have the meaning set forth in <u>Section 7.1</u>.

"*Person*" shall mean any individual, firm, corporation, partnership, limited liability company, trust, joint venture, Governmental Authority or other entity whatsoever.

"*Promissory Note*" means that certain Construction Note dated December 17, 2010, in the original principal amount of Six Million Eight Hundred Twelve Thousand Two Hundred Forty-Two and No/100 dollars ($6,812,242.00), as amended from time to time, executed by Seller, as Borrower, to and in favor of Green Bank, N.A., and payable to Buyer as successor by assignment to Green Bank, N.A. and Veritex Community Bank.

"*Program*" shall mean any payor or reimbursement program of any Governmental Authority, insurance company or health plan organization (including so-called "HMO" and "PPO" health insurance programs and disability insurance plans) in which Seller or the Facility participates.

"*Property*" shall have the meaning set forth in <u>Section 3.1(b)</u>.

"*Property Information*" shall mean copies of each of the following, that, to Seller's Knowledge are in the possession of or are available to Seller or Current Manager: (a) each then-effective certificate of occupancy and any other license issued by any Governmental Authority covering the Facility or Property (including any current licenses necessary for memory care and/or assisted living operations for the Property); (b) all, if any, of Seller's or Current Manager's operating reports and income and expense reports, including accounts payable and accounts receivable reports, of the Facility or Property for the current calendar year, year to date, and for the past three (3) years; (c) all plans and specifications for the Facility; (d) all, if any, guarantees or warranties then in effect and covering the Assets; (e) all, if any, Contracts relating to the Facility to which Seller or Current Manager is a party; (f) an example of an Occupancy Agreements; (g) the most recent survey for the Property; and (h) any written citations and/or violation notices issued by any Governmental Authority to Seller or Current Manager within the one-year period preceding the Effective Date; provided, however, in no event shall Property Information include any documents, materials or information which are subject to attorney/client, work product or similar privilege, which constitute attorney communications with respect to the Assets and/or Seller, or which are subject to a confidentiality agreement that prohibits or restricts disclosure of such documents, materials or information by Seller to Buyer.

"*Purchase Price*" shall have the meaning set forth in <u>Section 6.1</u>.

"*Qualified New Operator*" shall mean any entity selected by Buyer that is an affiliate of a company which is currently managing and operating a memory care facility licensed by and in good standing with the appropriate governmental agency having jurisdiction over the Facility.

"*Records*" shall mean all files, charts and other Resident information in Seller's or Current Manager's possession or control relating to all Residents occupying or using the Facility on the Closing Date (excluding the Occupancy Agreements and any medical or health records), litigation records, maintenance records, employment records (excluding any medical or health records, but including and all non-medical records including evaluations, etc.), administrative compliance records, including, but not limited to, all state surveys and plans of correction,

correspondence and any other material written records, files or data which was utilized in connection with the operation of the Facility or the Business.

"***Rent Roll***" shall have the meaning set forth in <u>Section 11.1(h)</u>.

"***Resident***" shall mean an individual residing at the Facility pursuant to an Occupancy Agreement.

"***Sale Order***" shall mean a final, non-appealable order entered by the Bankruptcy Court authorizing the sale of the Assets as contemplated herein.

"***Seller***" shall have the meaning set forth in the Recitals.

"***Seller Parties***" shall have the meaning set forth in <u>Section 20.1</u>.

"***Seller's Information***" shall have the meaning set forth in <u>Section 20.3</u>.

"***Service Contracts***" shall mean all vendor, equipment leases, service and other Contracts (other than the Occupancy Agreements), including any provider agreements related to any Program, if applicable, in each case related to the Assets and to which Seller is a party as of the date hereof.

"***Survey***" shall have the meaning set forth in <u>Section 7.2(a)</u>.

"***Title Commitment***" shall have the meaning set forth in <u>Section 7.2(a)</u>.

"***Title Insurer***" shall mean the title company selected by Buyer.

"***Title Policy***" shall have the meaning set forth in <u>Section 7.2(a)</u>.

"***Transaction***" shall have the meaning set forth in <u>Section 2.1</u>.

"***Transfer Notices***" shall have the meaning set forth in <u>Section 15.1(i)</u>.

"***Warranties***" shall have the meaning set forth in <u>Section 3.1(g)</u>.

## ARTICLE II
## SALE AND PURCHASE OF ASSETS

2.1 <u>**Agreement to Sell and Purchase**</u>. Subject to the terms and conditions of this Agreement and in consideration of the Purchase Price, on the Closing Date, Seller shall sell, transfer, convey and assign to Buyer and Buyer shall purchase from Seller all of the assets and properties of Seller (other than the Excluded Assets), which are owned, used or held for use by Seller to conduct, or in connection with, the assisted living business currently being conducted by Seller and/or Current Manager at the Facility (the "***Business***") (whether or not located on the Property), including without limitation all of the assets and properties set forth in <u>Section 3.1</u> hereto (collectively, the "***Assets***"), free and clear of any and all liens, claims, charges, pledges,

security interests or other encumbrances of any kind or nature whatsoever, except for the Permitted Encumbrances (the "**Transaction**").

2.2 **Assignability of Certain Assets**. The rights of Buyer to acquire the Assets may be assigned, in whole or in part, to a newly formed Affiliate of, and/or service provider to, Buyer as the licensed operator of the Facility (such assignee, the "**New Operator**"); and, to the extent so assigned by Buyer on or prior to the Closing, shall be acquired by the New Operator. If Buyer changes the New Operator prior to the Closing Date, then (i) it must be a Qualified New Operator and (ii) Buyer shall give Seller written notice of the name of the replacement New Operator, as well as the name of the business organization that is the sponsor of such New Operator, within three (3) Business Days after making the change in New Operator. Subject to the foregoing provisions of this Section 2.2 and the provisions of Section 21.15, this Agreement shall be binding on and inure to the benefit of the parties and their respective successors and assigns in interest hereunder.

# ARTICLE III
## ASSETS AND EXCLUDED ASSETS

3.1 **Assets**. Without limiting the generality of Section 2.1, the Assets to be purchased by Buyer (or New Operator) at the Closing include all of Seller's right, title and interest in all assets and properties owned by Seller and used by Seller or Current Manager in connection with the Business, including without limitation the following (other than the Excluded Assets):

(a) The real property described with particularity on Schedule 3.1(a) attached hereto, together with all of Seller's right, title and interest in any real property contiguous thereto which lies within the dedicated area of any public road or alley, open or closed, to the center line there at, and all rights of ways, use rights, easements, appurtenances, privileges, water, mineral, air, development, advantages and other rights incidental thereto, in each case belonging to the above described real property, all strips and gores, if any, between such real property and any abutting properties, all alleys, roadways, and passages in, on, across, abutting, or adjacent to such real property and all rights of ingress and egress thereto (collectively, the "**Land**");

(b) All buildings and other improvements and fixtures in, on or to the Land (collectively, the "**Improvements**" and together with the Land, the "**Property**"));

(c) All apparatus, computer equipment and software and hardware, machinery, furniture, fixtures, equipment and other items of personal property whether or not located on the Property which is utilized for the operation and maintenance of the Facility (other than any personal property of a Resident), including, but not limited to, all interior and exterior window treatments and floor, wall and ceiling coverings; partitions, doors and hardware; elevators, heating, plumbing and ventilating apparatus; gas, electric and steam fixtures; chutes, ducts and tanks; heaters, incinerators and boilers; air-cooling and air-conditioning equipment; lavatory fixtures; tools, building supplies, salon equipment, lobby decorations, and kitchen appliances owned by Seller on the Closing Date (collectively, the "**Building Service Equipment**"));

(d)     All medical apparatus, furniture, fixtures, equipment owned by Seller on the Closing Date (the "***Medical Equipment***", and collectively with the Building Service Equipment, the "***Equipment***");

(e)     All Occupancy Agreements as provided on <u>Schedule 3.1(e)</u> attached hereto;

(f)     All Assigned Service Contracts;

(g)     All assignable or transferable warranties and guaranties presently in effect from contractors, suppliers or manufacturers of personal property installed in or used in connection with the Property or the Equipment or any work performed or improvements included as a part of the Property (to the extent assignable) (collectively, the "***Warranties***");

(h)     All consumable inventories of every kind and nature whatsoever, including, but not limited to, all pharmacy supplies, medical supplies, prescription and non-prescription drugs or equipment, office supplies, other supplies and foodstuffs, which are located at the Facility and owned by Seller or Current Manager on the Closing Date (collectively, the "***Inventory***");

(i)     All cash and cash equivalents and accounts and trade receivables of the Seller (including any refunds due to Residents);

(j)     Except for Excluded Liabilities, all claims, causes of action and other legal rights and remedies of Seller, whether or not known as of the Closing Date, relating to or in connection with Seller's ownership of the Assets or necessary to preserve for the benefit of Buyer full rights to the Assets, but excluding causes of action and other legal rights and remedies of Seller (i) against Buyer with respect to the transactions contemplated by this Agreement or (ii) relating exclusively to the Excluded Assets;

(k)     All Records;

(l)     All permits, certificates of occupancy, Healthcare Licenses or other licenses, authorizations and governmental approvals held by Seller in connection with the use, ownership, or operation of the Property, excluding the Memory Care Facility License (collectively, the "***Permits***"), to the extent that either (i) the same are assignable by Seller without consent of or fee payable to any third party, or (ii) all required consents are actually obtained and any required fee is actually paid by Seller or Buyer at their respective election, without obligation;

(m)     All goodwill, other intangible personal property relating to the ownership and operation of the Facility and the Business, including all intellectual property used in connection with the Business, including, but not limited to, any patents, trade secrets, mailing lists, customer lists, vendor lists, and Seller's rights that are transferable without consent from or fee payable to a third party, including any telephone facsimile numbers associated with the Facility, on-site management or leasing operations, software, and

website(s) and internet address(es) dedicated to the Facility (collectively, the "***Intangible Property***"); and

(n)     All other assets of the Facility and the Business owned by Seller on the Closing Date, subject to Section 3.2 below.

3.2     **Excluded Assets**.  Notwithstanding the foregoing, nothing herein will be deemed to constitute an agreement to sell, transfer, assign or convey the Excluded Assets to Buyer, and Seller will retain all right, title and interest to, in and under the Excluded Assets.  The term "***Excluded Assets***" means all of the assets of the Seller described below:

(a)     any amounts (including the Purchase Price) paid or payable to the Seller pursuant to this Agreement;

(b)     any shares of capital stock or other equity interest of the Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of the Seller;

(c)     all minute books, stock ledgers, corporate seals and stock certificates of the Seller;

(d)     all Excluded Records;

(e)     all Excluded Contracts, including all rights thereunder;

(f)     all insurance policies and rights to proceeds thereof to the extent related to the Excluded Assets, to the Excluded Liabilities or the operation of the Excluded Assets;

(g)     all rights, claims or causes of action by or in the right of the Seller against any current or former director or officer of the Seller;

(h)     all avoidance actions or similar causes of action arising under sections 544 through 553 of the Bankruptcy Code, including any proceeds thereof, except to the extent related to the Assets;

(i)     any rights, claims or causes of action of the Seller under this Agreement, any other transaction document or confidentiality agreement;

(j)     (i) any attorney-client privilege and attorney work-product protection of the Seller or associated with the Business as a result of legal counsel representing the Seller or the Business, including in connection with the transactions contemplated by this Agreement; (ii) all documents subject to the attorney-client privilege and work-product protection described in the foregoing clause (i); and (iii) all documents maintained by the Seller relating to the drafting, negotiation, execution, delivery and performance of this Agreement, any other transaction document or any agreements with any other bidder in connection with any sale process previously conducted by or in which the Seller was previously involved, including the sale process leading to the entry into this Agreement;

(k)     all bank accounts, safety deposit boxes, lock boxes and securities accounts of the Seller and the contents thereof;

(l)     all outside of the ordinary course of business deposits made or required to be made by the Seller to suppliers or residents after the Petition Date as a result of the filing of the Bankruptcy Case (collectively, the "***Bankruptcy Deposits***"); and

(m)     Seller benefit plans related to the employees of Seller.

3.3     **Assumed Liabilities**.

Upon the terms and subject to the conditions of this Agreement, at the Closing, Buyer will assume and agree to discharge, when due (in accordance with their respective terms and subject to the respective conditions thereof), the following Liabilities (collectively, the "***Assumed Liabilities***"):

(a)     *Generally*.  All Liabilities arising from the ownership or operation of the Assets by Buyer at and after the Closing (including all Liabilities for Taxes arising from the ownership or operation of the Assets by Buyer on or after the Closing Date, as determined pursuant to Section 6.3(a);

(b)     *Assigned Contracts*.  All of Seller's Liabilities under the Assigned Contracts to the extent arising at or after the Closing or arising prior to the Closing to the extent requiring performance at or after the Closing;

(c)     *Occupancy Agreements*. All of Seller's Liabilities under the Occupancy Agreements, to the extent arising at or after the Closing or arising prior to the Closing to the extent requiring performance at or after the Closing;

(d)     *Cure Costs*.  All Cure Costs required to be paid by Buyer pursuant to the Assigned Contracts.

(e)     *Other Assets*.  To the extent not already described in 3.3(a) through Section 3.3(d) above, all Liabilities arising from, related to or associated with the ownership or operation of Assets at or after the Closing.

3.4     **Excluded Liabilities**.  Seller shall retain, and Buyer will not assume and will not be obligated to assume or be obliged to pay, perform or otherwise discharge, any and all Liabilities of Seller other than the Assumed Liabilities (such Liabilities, collectively, the "***Excluded Liabilities***").  Without limiting the generality or effect of the foregoing, Buyer shall not assume, pursuant to this Agreement or otherwise, any of the following:

(a)     any indebtedness of Seller;

(b)     any Liability to the extent arising out of or related to the breach, performance or non-performance by Seller prior to the Closing (in each case, regardless of when any claims arising therefrom or relating thereto mature or are asserted) of any Assigned Service Contract or any Permit;

(c)     any Liability in respect of the pending or threatened proceedings set forth (or that should have been set forth) on Schedule 3.4(c) or Schedule 11.1(f) and the facts and circumstances relating to such matters;

(d)     any income and franchise tax of Seller and any taxes relating to the Excluded Assets;

(e)     all Liabilities arising out of, relating to or with respect to the employment or performance of services for or termination of employment or services for, or potential employment or engagement for the performance of services for, Seller or any predecessor thereof, of any employee for periods on or prior to Closing, including but not limited to, Liabilities arising under the Consolidated Omnibus Budget Reconciliation Act (COBRA);

(f)     all Liabilities under, relating to or with respect to any employee benefit plan with respect to Seller and its Affiliates;

(g)     all Liabilities, including cure costs, arising out of, under or in connection with Contracts that are not Assigned Contracts, and with respect to Assigned Contracts that are Assets, Liabilities in respect of (i) a breach by or default by Seller (or event that with notice or lapse of time would constitute a breach or default) accruing under such Contracts, as applicable, with respect to any period prior to Closing, or (ii) any violation of Applicable Law by Seller;

(h)     any Liability to the extent relating to any Excluded Asset or other asset that is not an Asset and the ownership, operation and conduct of any business in connection therewith or therefrom; and

(i)     any Liability arising from the gross negligence or willful misconduct of Seller prior to, at or after the Closing.

## ARTICLE IV
## OBLIGATIONS

4.1     **Assigned Service Contracts**.  Set forth on Schedule 4.1 is a list of all Assigned Service Contracts which the Buyer or New Operator agrees to assume, or cause New Operator to assume.

4.2     **Cure Costs**.

(a)     Any cure costs related to Occupancy Agreements shall be handled in accordance with Sections 6.3(d) and (e) of this Agreement.

(b)     Any cure costs related to the Assigned Contracts shall be handled in accordance with Section 6.1(c) of this Agreement.

## ARTICLE V
## CLOSING

5.1 **Closing**. The "*Closing*" or "*Close of Escrow*" means the exchange of the Purchase Price and documents as described herein, including the transfer and conveyance of the Assets as provided herein, and will be deemed to have occurred when all conditions precedent to Closing shall have been satisfied or waived and all instruments and documents described in Sections 15.1 and 15.2 shall have been delivered to the other Party or Escrow Agent (as applicable) and released, in each case in accordance with the terms and conditions of this Agreement. The Escrow Agent is to hold such instruments and documents in escrow (the "*Escrow*") and deliver them at Closing to the Parties as provided in Section 15.3. The Closing shall take place at such time or place as may be mutually agreed upon by the Parties but within ten (10) days of entry of the Sale Order by the Bankruptcy Court (the "*Closing Date*").

5.2 **Escrow Instructions**. The Escrow Agent's escrow instructions are as stated in this Agreement. Upon request of the Escrow Agent, Buyer and Seller, as applicable, shall promptly execute and deliver to the Escrow Agent such additional escrow instructions as may reasonably be required by the Escrow Agent to consummate the transactions contemplated by this Agreement and that are not inconsistent with this Agreement. The escrow instructions as set forth in this Agreement, as may be supplemented by any further instructions, are called the "*Escrow Instructions*". Buyer, Seller and Escrow Agent shall be bound by such Escrow Instructions, except that if there is a conflict between such escrow instructions and the remaining provisions of this Agreement, the remaining provisions of this Agreement shall govern and control. **NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN SUCH ESCROW INSTRUCTIONS, TIME IS OF THE ESSENCE OF EACH PROVISION OF THIS AGREEMENT**.

## ARTICLE VI
## PURCHASE PRICE; ALLOCATION; RECORDATION COSTS; PRORATIONS

6.1 **Purchase Price**. Buyer shall pay Seller a credit in the amount of Three Million Seven Hundred Ninety-Nine Thousand Six Hundred Sixty-Seven and No/100 Dollars ($3,799,667.00) against the amount owed by Seller to Buyer pursuant to the Promissory Note (the "*Credit Amount*"), subject to adjustment as expressly set forth in this Section VI, as the purchase price for the Assets (the "*Purchase Price*"). The Purchase Price shall be paid as follows:

(a) At Closing, Buyer shall pay Seller the Purchase Price as a credit against the amounts owed by Seller to Buyer pursuant to the Promissory Note, subject to adjustments as elsewhere expressly set forth in this Article VI (as so adjusted, the "*Closing Balance*"). To the extent the adjustments expressly set forth elsewhere in this Article VI result in an increase in the Purchase Price in excess of the Credit Amount at Closing, the amount of the Cash Balance, including any Cure Costs paid prior to the Closing Date and amounts paid or to be paid by Buyer directly to taxing authorities as part of the Approved Claims, shall be paid by Buyer to Seller by wired funds received by the Escrow Agent not later than the Closing Date in accordance with the written wiring instructions provided to Buyer by the Escrow Agent.

(b) Buyer will pay the Cure Costs by wired funds received by the Escrow Agent not later than the Closing Date, or such earlier date as is required to effectuate the

Closing on the Closing Date, in accordance with written wiring instructions provided to Buyer by the Escrow Agent; provided that, for the avoidance of doubt, Buyer will pay the Cure Costs in cash and in addition to the Purchase Price.

6.2 **Recordation and Closing Costs**. Buyer shall pay for the Title Commitment and the premium associated with Buyer's Title Policy. Except with respect to any title curative matters that Seller has elected or is obligated to satisfy pursuant to the express terms of this Agreement, which will be Seller's responsibility to the extent provided herein, Buyer shall pay for ALTA coverage and any endorsements Buyer requests. Buyer shall pay for any cost of updating the Survey and/or any revisions, modifications or re-certifications thereto. Buyer shall pay the cost of any escrow fee charged by Escrow Agent for conducting the Closing. Buyer shall pay the costs for any documentary transfer taxes. Buyer shall pay all fees for recording the Deed in the real property records of Brazoria County. Any real estate sales commissions payable to any real estate broker, agent, finder or consultant shall be paid in accordance with Section 19.1. Seller and Buyer shall each be responsible for its own legal fees and the amount of net adjustments (as described below), if any, and Buyer shall be responsible for the cost of any appraisers engaged by Buyer.

6.3 **Prorations**. The following prorations shall be made between Seller and Buyer at the Closing, computed as of the Closing Date, with the Buyer being treated as the owner of the Assets on the Closing Date. To the extent required to give effect to the prorations and provisions set forth herein, this Section 6.3 shall survive the Closing.

(a) Insurance Premiums. All insurance policies relating to the Property currently maintained by Seller shall be terminated on the Closing Date and Buyer shall thereafter maintain its own policies on the Property. If and to the extent Seller is entitled to any refund on the premiums paid by Seller, such refunds shall be paid to and remain the property of Seller.

(b) Rents. Rents and other payments received from or on behalf of the Residents shall be prorated as of the day immediately preceding the Closing Date. Unapplied deposits received from or on behalf of the Residents under Occupancy Agreements in effect at Closing shall be transferred or credited to Buyer at Closing. If applicable, Buyer shall receive from Seller a credit for any rent under an Occupancy Agreement that is paid from Residents or from any Program to or on behalf of Seller and collected by or on behalf of Seller before the Closing the extent that same applies to any period from and after the Closing. With respect to any rents or any payments under any Program, if applicable, or otherwise due prior to the Closing but unpaid as of the Closing Date, Buyer shall from and after the Closing use commercially reasonable efforts to collect such amounts, and Buyer shall remit to Seller such rents when received.

(c) Post-Closing Rents. To the extent that Seller or any Person acting for or on behalf of Seller receives after the Closing any rent or other payment payable under or pursuant to an Occupancy Agreement, including without limitation from any Program, if applicable, that relates to the period after the Closing Date, Seller shall immediately pay such amount (to the extent applicable to the period occurring after the Closing Date) to Buyer or Buyer's designee.

(d)     Adjustment to Prorations. In the event that any prorations, apportionments or computations made under Sections 6.3(a) through (c) above shall require final adjustment, then the Parties shall use good faith and diligent efforts to make the appropriate adjustments promptly when accurate information becomes available and either Party shall be entitled to an adjustment to correct the same provided that it makes written demand on the one from whom it is entitled to such adjustment within six (6) months of the Closing Date.

6.4     **Adjustments to Purchase Price**.  The Purchase Price shall be increased by the amount necessary to satisfy the Approved Claims.  Forty-five (45) days after the Closing Date, Buyer and the Liquidating Trustee (as identified in the Confirmation Order) shall reconcile any amounts related to the Approved Claims.

## ARTICLE VII
## TITLE AND POSSESSION

7.1     **Deed**. At Closing, Seller shall convey the Property to Buyer in fee simple, by a Special Warranty Deed in the form attached to this Agreement as Schedule 7.1 hereto (the "***Deed***"), subject only to the operation and effect of the following:

(a)     Any restrictions or regulations affecting the Property by virtue of any zoning, or other law or regulation of any Governmental Authority having jurisdiction over the same, whether now or hereafter in effect;

(b)     Liens securing payment of any real estate taxes and assessments not yet due and payable as of the Closing Date, subject to adjustment as herein provided; and

(c)     Matters that are or become Permitted Encumbrances pursuant to the terms of Section 7.2 hereof.

The items listed in clauses (a) through (c) are, collectively, the "***Permitted Encumbrances***."

7.2     **Title**.

(a)     Title Commitment. Buyer acknowledges receipt from Seller of its existing survey for the Property, which Buyer shall have the right at its expense to update or replace with a current ALTA survey of the Property (the "***Survey***").  Within (2) days after the Effective Date Buyer shall obtain and cause Title Insurer to issue (with a copy provided to Seller), an ALTA title insurance commitment for the Property, issued by the Escrow Agent on behalf of Title Insurer (a "***Title Commitment***") committing the Title Insurer to issue to Buyer a title insurance policy ("***Title Policy***") insuring in Buyer the fee simple interest in the Property subject only to the Permitted Encumbrances, in the amount of not less than the Purchase Price. The Title Commitment shall be delivered with legible copies of all recorded exceptions to title referred to therein to the extent reasonably available (collectively, the "***Exception Documents***").   Buyer shall have the right to review and approve or disapprove the Title Commitment and the Survey, and give Seller

written notice of any disapproved exception or other matter in the Title Commitment or the Survey (an "*Objection Notice*") specifying the Exception Documents or other matters to which Buyer objects, provided such Objection Notice is issued to Seller on or before the date that is three (3) Business Days after receipt of the Title Commitment. Buyer's failure to disapprove any Exception Document or other matter reflected in the Title Commitment or the Survey by a timely issued Objection Notice shall be deemed approval by Buyer thereof. Notwithstanding the foregoing, Buyer shall not have the right to disapprove in an Objection Notice any matters created by, through, under or at the direction of Buyer. Notwithstanding anything to the contrary contained in this Agreement, Seller shall be obligated to obtain entry of the Sale Order ordering the sale of the assets free and clear of any of Monetary Objections (collectively, "*Discharge*") prior to Closing. "*Monetary Objection*" or "*Monetary Objections*" shall mean (a) any mortgage, deed of trust, assignment of rents or leases, security agreement, UCC financing statement or similar security instrument executed, assumed or otherwise authorized by Seller encumbering all or any part of Seller's interest in the Assets, (b) any mechanic's, materialman's or other statutory lien filed against or otherwise encumbering any of the Assets to the extent arising from a matter contracted for by Seller, Current Manager or any of their Affiliates or agents, (c) the lien of ad valorem real or personal property taxes, assessments or governmental charges affecting all or any portion of the Assets that are delinquent, and (d) any judgment of record against Seller that has resulted in a lien binding upon title to the Assets in the applicable jurisdiction in which the Property or Seller is located. Except only for any Monetary Objection and any Objection Notice matter that Seller has expressly elected in a written notice to Discharge on or before the Closing (a "*Curative Objection*"), all other title insurance exception matters disclosed in or by the Title Commitment and/or the Survey shall be deemed a Permitted Encumbrance to the extent Buyer does not elect timely to terminate this Agreement.

(b)  Title. Seller shall transfer fee simple, good and marketable title to the Property to Buyer, subject only to the Permitted Encumbrances, which title shall be insurable by the Title Insurer. Seller shall Discharge all Monetary Objections and Curative Objections at or prior to Closing, or extend the Closing Date one time for such time as is reasonably necessary to Discharge all Monetary Objections and Curative Objections, not to exceed thirty (30) days.

(c)  Bill of Sale. At Closing, Seller shall sell, assign, convey, transfer, and set over to Buyer (or New Operator) good and marketable title to all of the following assets (subject to any leases thereof as herein disclosed to Buyer): the Equipment, Warranties, Inventory, Permits, Intangible Property, Records and other Assets being sold hereunder (other than the Property, the Occupancy Agreements, the Assigned Service Contracts and the Excluded Assets) (the "*Assigned Personal Property*") by a bill of sale in substantially the form attached hereto as Schedule 7.2(c) (the "*Bill of Sale*").

(d)     _Leased Assets_.  All Assets which Seller or its Affiliates lease and use in the conduct of the operations of the Facility will be provided by Seller after the Effective Date (the "**_Leased Assets_**").   Seller shall not assign any Leased Assets to Buyer at Closing without Buyer's written approval prior as part of the Assigned Service Contracts.

(e)     _Possession and Burden of Risk_. At Closing, possession of the Assigned Personal Property shall be delivered in substantially the same condition as the condition on the date hereof. Subject to Article XVI, until Closing, Seller shall bear the risk of any damage to or destruction of any Assigned Personal Property.

(f)     _Assignment of Contracts_. At Closing, Seller and/or Current Manager (on the one hand) and Buyer and/or New Operator (on the other hand) shall execute and deliver an Assignment of Contracts substantially in the form attached hereto as Schedule 7.2(f) (the "**_Assignment of Contracts_**"), by which Seller shall assign to Buyer or New Operator all of Seller's right, title and interest in and to the Occupancy Agreements and the Assigned Service Contracts.

## ARTICLE VIII
## INTENTIONALLY OMITTED

## ARTICLE IX
## CHANGE OF OWNERSHIP OF THE FACILITY

9.1     **Licensure Approvals**. Seller has advised Buyer that Seller currently maintains all valid and unexpired Healthcare Licenses (if any)  required to operate the Business at the Facility in accordance with all Laws.

## ARTICLE X
## INTENTIONALLY OMITTED

## ARTICLE XI
## REPRESENTATIONS AND WARRANTIES

11.1     **Seller's Representations**. To induce Buyer to enter into this Agreement, Seller hereby represents and warrants to Buyer as of the date of this Agreement and re-states as of the Closing Date, as follows:

(a)     Seller has been duly organized, and is validly existing as a limited liability company, is in good standing in the State of Delaware, and is qualified, to the extent necessary, to do business in the State of Texas.

(b)     Seller has full power and authority to enable it to own, license, possess, lease or otherwise hold its properties and assets and to carry on the Business at the Facility and, with respect to Seller and Current Manager, to operate the Facility, as presently conducted.

(c)      (i) Seller has the full right, power and authority to execute this Agreement and to consummate the sale of the Assets as contemplated by this Agreement, (ii) the Person executing this Agreement on behalf of Seller is authorized to do so, and (iii) Seller has duly executed and delivered this Agreement, and this Agreement constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, subject to Laws relating to bankruptcy, insolvency and creditor's rights.

(d)      Except as disclosed in the Title Commitment or provided to Seller with the Property Information, to Seller's Knowledge, Seller has not received (i) any written notice from any Governmental Authority that any special assessments are pending, contemplated or levied, in each case against the Property nor (ii) any written notice of any proposed reassessments of the Property from the local taxing agencies that would, in the reasonable judgment of Seller, materially increase real property taxes or assessments against the Property.

(e)      To Seller's Knowledge, Seller has received all Healthcare Licenses required to operate the Facility.

(f)      To Seller's Knowledge, Seller has not received any written notice from any Governmental Authority of any litigation, action, proceeding, claim, investigation, injunction, decree or violation of Environmental Laws, rules, regulations and other requirements relating to the Assets, including, without limitation, any notice that hazardous or toxic substances, materials or wastes, pollutants or contaminants (including, without limitation, mold, fungus, radon, petroleum and petroleum products, asbestos and PCBs) have been released, spilled, leaked, discharged, disposed of, pumped, poured, emitted, emptied, dumped or allowed to escape or threaten to release on, at, under or from the Property in violation of Environmental Laws, except as set for on Schedule 11.1(f) attached hereto.

(g)      Seller is not a "disregarded entity" as defined in Income Tax Regulation §1.1445-2(b)(2)(iii), nor is Seller a "foreign person" within the meaning of Sections 1445(f)(3) and 7701(a)(30) of the Internal Revenue Code of 1986, as amended.

(h)      The Resident roll attached hereto as Schedule 11.1(h) the ("***Rent Roll***") is (in all material respects) a complete and accurate schedule of all Residents and Occupancy Agreements, including all rents and other payments owed and deposits paid pursuant to their respective Occupancy Agreements as of the date indicated. Except as noted on the Rent Roll, Seller has not accepted any advance payment of more than thirty (30) days from any Resident.

(i)      Except for the Occupancy Agreements and the Assigned Service Contracts, there are no Contracts, subcontracts, licenses, agreements or other contracts affecting the Property that will be binding upon Buyer or the Property after Closing. There are no tenants, subtenants, residents or other occupants of the Property other than the Residents identified on the Rent Roll.  The Occupancy Agreements are in full force and effect and constitute legally valid and binding obligations of Seller and, to Seller's Knowledge, of the Residents under such Occupancy Agreements.  Seller and any other

party thereto is not in breach or default under any one or more of the Occupancy Agreements in any material respect (other than rent delinquencies shown on the rent delinquency report Seller has delivered to Buyer) and, to Seller's Knowledge, no event has occurred nor circumstance exists, which with notice or lapse of time, or both, would constitute a material breach or default under any one or more of the Occupancy Agreements. All obligations of Seller which are to be performed on or before the Closing Date and all tenant improvement work required with respect to the Occupancy Agreements have been (or shall have been as of Closing) performed and completed and paid for in full by Seller. No right or claim of set-off against rent has been asserted in writing by any of the Residents which remains outstanding.

(j)      To Seller's knowledge, Seller has filed all tax returns that it was required to file for any taxable period beginning before the Closing Date for which the statutory period of limitations for the assessment of tax, interest, penalties or other charges has not yet expired ("***Tax Returns***") and all taxes or other amounts owed by Seller for such taxable periods (whether or not shown as due on such Tax Returns) which could give rise to a lien or claim against any of the Assets, Buyer or New Operator have been paid.

(k)      To Seller's Knowledge, there is no suspension, ban or limitation upon the admission of residents to the Facility (i) by any Governmental Authority having jurisdiction over the licensure of the Facility or (ii) pursuant to Law.

11.2    **Buyer's Representations**. To induce Seller to enter into this Agreement, Buyer hereby represents and warrants to Seller as of the date of this Agreement and the Closing Date, as follow:

(a)      Buyer has been duly organized and is validly existing in the state of its organization, is in good standing in the state of its organization and it, or any assignee of Buyer that will acquire title to any of the Assets, will be qualified to do business, and will be in good standing, in its state of formation, and will be qualified to do business and in good standing in the State of Texas at the time of Closing. Buyer has the full right and authority to consummate or cause to be consummated the sale and purchase of the Assets, and to make or cause to be made the transfers and assignments contemplated herein. The person signing this Agreement on behalf of Buyer is authorized to do so.

(b)      Buyer has the full right, power and authority to execute this Agreement and to consummate the acquisition of the Assets and the other transactions contemplated by this Agreement. Buyer has duly executed and delivered this Agreement, and this Agreement constitutes the legal, valid and binding obligation of Buyer, enforceable against it in accordance with its terms, subject to Laws relating to bankruptcy, insolvency and creditor's rights. The execution and delivery by Buyer of this Agreement and the other documents contemplated hereby do not, and the consummation of transactions contemplated by this Agreement and compliance by Buyer with the terms hereof, do not, and will not, conflict with, or result in any violation of or default under (with or without notice or lapse of time, or both), or result in the creation of any lien or encumbrance upon any of the assets or properties of Buyer under, any provision of (i) the organizational documents of Buyer, or (ii) any contract to which Buyer is a party or by which any of its

assets or properties is bound. Except as provided for in <u>Schedule 11.2(b)</u>, no consent of, or registration, declaration or filing with any Governmental Authority or other Person, is required to be obtained or made by or with respect to Buyer, in connection with the execution, delivery and performance of this Agreement or the consummation of the transactions contemplated hereby.

(c)     To Buyer's Knowledge, there is no agreement to which Buyer is a party or which is binding upon Buyer which is in conflict with this Agreement.

(d)     There is no action or proceeding pending, or, to Buyer's Knowledge, threatened against Buyer which would challenge or have a negative effect upon Buyer's ability to perform its obligations under this Agreement.

11.3     **Representations and Warranties**. All representations and warranties made by each Party in this Agreement shall be true and accurate to the best of Buyer and Seller's knowledge as of the time of Closing; provided, however, that if up until two (2) Business Days prior to the Closing Date Buyer or any Buyer Party obtains actual knowledge of any breach of or the inaccuracy of any representation or warranty made by Seller and with such knowledge Buyer proceeds to close the Transaction, then Buyer shall be deemed to have waived at Closing any right to claim a breach thereof.

**ARTICLE XII**
**INTERIM OPERATIONS AND UNDERTAKINGS**

12.1     **Conduct of Business Pending Closing**. From the date of this Agreement until the Closing Date, Seller shall:

(a)     Maintain the Assets in compliance with all Laws;

(b)     Maintain the general character of the Facility and conduct its business at the Facility in the ordinary and usual manner consistent with its current operations;

(c)     Maintain the License and the Permits in the ordinary and usual manner consistent with its current operations;

(d)     Maintain the Assets substantially in their present condition (ordinary wear and tear and casualty excepted) and in a manner consistent with Seller's maintenance of the Assets during Seller's period of ownership;

(e)     Maintain in full force and effect substantially the same liability and casualty insurance coverage that Seller now maintains in effect with respect to the Property and its operations thereat;

(f)     Subject to <u>Article XVI</u>, subject to the Seller's ability to fund such repairs, make all necessary repairs to, and replacement of the Assets as are reasonably necessary for the continued operation of the Business and of the Facility;

(g)     Continue to operate the Business in a manner substantially similar to the manner in which Seller operates the Business as of the Effective Date;

(h)     Maintain food and medical supplies and other inventory at the Facility as required by any Law and consistent with its current operations;

(i)     Intentionally omitted;

(j)     Comply with all Laws applicable to the Property; and

(k)     Continue to perform in all material respects all Obligations of Seller under all Occupancy Agreements.

12.2     **Prohibited Actions Pending Closing**. Unless otherwise expressly provided for herein or approved by Buyer in writing, from the date of this Agreement until the Closing Date, Seller shall not, directly or indirectly:

(a)     Induce, solicit or entice in any targeted respect (excluding general advertising to the public) any Residents to transfer or discontinue any relationships with Seller prior to the Closing Date or with New Operator after the Closing Date (provided that the foregoing shall not restrict Seller from enforcing any applicable terms of any Occupancy Agreement, including any that would result in a discontinued relationship);

(b)     Intentionally omitted;

(c)     Induce, solicit or entice any Person to terminate or discontinue a relationship with Seller or Current Manager prior to the Closing Date or with New Operator after the Closing Date.

(d)     Except for the Excluded Assets, remove any material item (equal to or greater than $25,000) of Assigned Personal Property from the Facility unless the same is replaced by property of substantially equal or greater value, or unless the removal is authorized by Buyer, in the exercise of its reasonable discretion, or pursuant to the provisions of this Agreement;

(e)     Interfere with or disrupt Buyer's or New Operator's relationship with any Resident following the Closing;

(f)     Except as reflected on the Rent Roll, accept any advance payment for more than thirty (30) days in advance of the date payable under an Occupancy Agreement, any rent or Residents' occupancy fees under any Occupancy Agreement unless such amount will be paid by Seller to Buyer or, at Buyer's option, New Operator, at Closing;

(g)     Make any capital improvements to the Property in excess of $25,000 in the aggregate or incur any future obligations impacting the Property in excess of $25,000 in the aggregate without Buyer's written consent;

(h)     Sell or otherwise dispose of, or agree to sell or dispose of any of the Assets, except in the ordinary course of business as permitted by this Agreement;

(i)     Enter into, renew, extend, terminate, or modify any material Contracts (equal to or greater than $25,000), that relate to the Assets without the consent of Buyer, provided that the forgoing shall not limit Seller's right to exercise remedies for any breach of the subject Contract by a party thereto; and

(j)     Take any action prior to the Closing Date that would breach any of the representations and warranties contained in this Agreement.

12.3    **Notice**. From the date of this Agreement to the Closing Date, after Seller's receipt of written notice of (i) any default under any material Contract (equal to or greater than $25,000), (ii) any violation or non-compliance with any Law related to the Assets, (iii) any legal action by any Governmental Authority with respect to the Assets, or (iv) any claim made by any Governmental Authority or third party in writing relating to any violation of Environmental Laws in connection with the Property, Seller shall deliver to Buyer a copy of all non-privileged correspondence, notice or legal pleading in connection therewith, together with a certificate of Seller specifying the nature and period of the existence thereof and what actions Seller has taken and proposes to take with respect thereto.

12.4    **Access**. From the date of this Agreement until the Closing, subject to compliance with the privacy rights of Residents with respect to the Facility, Seller shall afford Buyer and its independent certified public accountants, counsel and other representatives, access at all reasonable times on Business Days, upon forty-eight (48) hours prior notice to Seller, to the Property in order that Buyer may have full opportunity to make such investigations as it shall reasonably desire concerning the Assets and the Business; *provided however*, that such investigation (i) shall not affect or diminish the representations and warranties of Seller contained in this Agreement, (ii) shall be conducted in a manner to limit interference with the business or operations of Seller or Current Manager; (iii) and shall not include any invasive testing or sampling of any element of the Property without the prior written consent of Seller, other than a Phase One Environmental level of sampling and testing. Buyer's agents and employees shall notify Seller by email in accordance with Section 21.4 hereof at least forty-eight (48) hours before accessing the Property. Notwithstanding the foregoing provisions of this Section, in no event shall Buyer or New Operator have a right (x) to access any documents, materials or information which are subject to attorney/client, work product or similar privilege, which constitute attorney communications with respect to the Assets and/or Seller, or which are subject to a confidentiality agreement that prohibits disclosure of such documents, materials or information by Seller to Buyer or (y) to question, interview or meet with any Resident or Employee without the prior written approval of Seller (which approval may not be unreasonably denied, conditioned, or delayed).

## ARTICLE XIII
## INTENTIONALLY OMITTED

## ARTICLE XIV
## CONDITIONS PRECEDENT

14.1    **Conditions Precedent to Buyer's Obligations**. The obligation of Buyer under this Agreement to Close is subject to the fulfillment or satisfaction, prior to or at the Closing, of each of the following conditions precedent (any of which may be waived in writing in whole or in part by Buyer in its sole discretion):

(a)    Seller's representations and warranties contained in this Agreement shall be true in all material respects on and as of the Effective Date and on the Closing Date, except for those representations and warranties that are already qualified by materiality which shall be true in all respects;

(b)    Seller shall have performed and compiled in all material respects with all agreements and conditions contained in this Agreement that are required to be performed or complied with by it prior to or at the Closing;

(c)    Buyer or Escrow Agent shall have received all of Seller's deliveries described in Section 15.1;

(d)    Buyer shall have received all of the Property Information and other documents required to be delivered by Seller hereunder within the time periods required herein;

(e)    Except for the disclosures on Schedule 11.1(f), no suit, action, proceeding, or investigation shall have been instituted or threatened by any Governmental Authority, and no injunction shall have been issued and then outstanding, that in each case, seeks to or does restrain, prohibit or otherwise challenge the legality or validity of the transactions contemplated by this Agreement;

(f)    Buyer shall have received an updated Rent Roll, dated no later than as of Closing;

(g)    On the Closing Date, Title Insurer shall deliver to Buyer the Title Policy, together with any available endorsements thereto that Title Insurer, prior to the Closing Date, confirmed in writing that it would issue without condition or requirement other than the satisfaction of any condition or requirement that is otherwise expressly required by this Agreement;

(h)    Buyer shall have received an affidavit in the form attached hereto as Schedule 14.1(h) (the "***FIRPTA Affidavit***"), executed by Seller;

(i)    Seller shall have obtained entry of the Sale Order in form acceptable to the Buyer; and

(j)    Buyer shall not have terminated this Agreement prior to the Closing Date.

14.2    **Conditions Precedent to Seller's Obligations**. The obligation of Seller under this Agreement to Close is subject to the fulfillment or satisfaction, prior to or at the Closing, of

each of the following conditions precedent (any of which may be waived in writing in whole or in part by Seller in its sole discretion):

(a)    Buyer's representations and warranties contained in this Agreement shall be true in all material respects on and as of the Effective Date and on the Closing Date, except for those representations and warranties that are already qualified by materiality which shall be true in all respects;

(b)    Buyer shall have performed and complied in all material respects with all agreements and conditions contained in this Agreement that are required to be performed or complied with by it prior to or at the Closing;

(c)    Seller or Escrow Agent shall have received all of Buyer's deliveries described in Section 15.2; and

(d)    Seller or Escrow Agent shall have received the balance of the Purchase Price required under Section 6.1(b).

14.3    **Waiver of Conditions Precedent**. Except as otherwise provided herein, so long as a Party is not in default under this Agreement (in which case the terms of Section 17 shall apply), if any condition to that Party's obligations to proceed with the Closing has not been satisfied as of the Closing Date, then (x) the Seller shall have a one-time right to extend the Closing Date for up to thirty (30) days in order to allow additional time and effort for the satisfaction of such condition, by giving written notice of such extension to Buyer before the Closing Date, and (y) if Seller fails to so extend the Closing Date or the condition remains unsatisfied after such extension of the Closing Date by Seller, then the Party having the benefit of such condition may, in its sole discretion, and as it sole remedy either: (i) terminate this Agreement by delivering written notice to the other Party on or before the Closing Date, and the Parties shall have no further obligations to one another except those that specifically survive Closing as provided in this Agreement, or (ii) elect to proceed with the Closing on the Closing Date or such other date as mutually agreed upon by the Parties, notwithstanding the non-satisfaction of such condition.  If the Party having the benefit of such condition elects to proceed with the Closing notwithstanding the non-satisfaction of such condition, then the non-satisfied condition shall be deemed to have been waived by the Party having the benefit of said condition.

## ARTICLE XV
## DELIVERIES AT CLOSING

15.1    **Seller's Deliveries**. Prior to the Closing, Seller shall  deliver duly executed (as applicable) copies (or in the case of 15.1(a), an original)) of the following to the Escrow Agent for delivery to Buyer or New Operator (as applicable) pursuant to Section 15.3:

(a)    the Deed referenced in Section 7.1 conveying the Property;

(b)    the Bill of Sale referenced in Section 7.2(c);

(c)      the Assignment of Contracts referenced in <u>Section 7.2(e)</u>;

(d)      an updated Rent Roll and a schedule of rent or Resident occupancy payment arrearages, each certified by Seller as being true and correct in all material respects as of Closing;

(e)      a closing statement setting forth the prorations and adjustments to be made pursuant to the provisions of this Agreement, in a form prepared by Escrow Agent that is consistent with the terms of this Agreement;

(f)      the FIRPTA Affidavit;

(g)      The originals or copies of the Occupancy Agreements and Assigned Service Contracts, to the extent in Seller's possession or control and not already provided to Purchaser or Current Manager;

(h)      copies of any and all keys, locks and safe combinations in Seller's possession, custody or control;

(i)      A written notice of the sale by Seller and acquisition by Buyer of the Property, which shall be transmitted to all Residents and to other parties affected by the sale and purchase of the Assets (the "***Transfer Notices***") (such notice shall (i) inform the addressees of the sale and transfer of the Property to Buyer and contain appropriate instructions relating to the payment of future rentals and the giving of future notices; (ii) specify that unapplied security deposits under the Occupancy Agreements have been delivered to the Buyer and that the Buyer is responsible for the refund thereof and such notice shall be in form and substance adequate under local law to relieve Seller of all liability for return of such deposits);

(j)      evidence of the authority of any individuals to execute any instruments executed and delivered by Seller at Closing to the extent reasonably required by the Title Insurer;

(k)      Written evidence, reasonably satisfactory to Buyer, of Seller's notification to the Texas Health and Human Services Commission of Buyer's purchase of the Facility and the transactions contemplated hereunder; and

(l)      any and all other customary materials and documents anticipated to be signed and delivered by Seller at the Closing or which are reasonably requested by Buyer or Escrow Agent and consistent with this Agreement.

15.2   **Buyer's Deliveries**. Prior to the Closing, Buyer shall (or shall cause New Operator to) deliver duly executed (as applicable) copies of the following to the Escrow Agent for delivery to Seller pursuant to <u>Section 15.3</u>:

(a)      the Assignment of Contracts referenced in <u>Section 15.1(c)</u>;

(b)   the Closing Balance, consisting of a certificate executed by Buyer evidencing the credit of the Credit Amount against the amount owed by Seller pursuant to the Promissory Note (the "***Credit Certificate***") and, to the extent there is a Cash Balance, a cash payment equal to the Cash Balance;

(c)   a Preliminary Change of Ownership form executed by Buyer or New Operator (as applicable);

(d)   a closing statement setting forth the prorations and adjustments to be made pursuant to the provisions of this Agreement in a form prepared by Escrow Agent that is consistent with the terms of this Agreement;

(e)   the Transfer Notices;

(f)   evidence of the authority of any individuals to execute any instruments executed and delivered by Buyer or New Operator at Closing to the extent reasonably required by the Title Insurer;

(g)   any and all other customary materials and documents anticipated to be signed and delivered by Buyer at the Closing or which are reasonably requested by Seller or Escrow Agent and consistent with this Agreement.

15.3   **Close of Escrow**. Provided that all conditions to Closing set forth in this Agreement have been satisfied or, as to any condition not satisfied, waived by the Party or Parties intended to be benefited thereby, on the Closing Date, the Escrow Agent shall conduct the Closing by recording or distributing the following documents and funds in the following order and manner:

(a)   Record the Deed in the Official Records after calculating and inserting the amount for the documentary transfer tax in the Deed (provided Buyer, at its discretion, may authorize a "gap closing" in which event the Deed shall be required to be insured by the Title Insurer prior to its recordation);

(b)   Deliver to Seller the Credit Certificate and any Cash Balance pursuant to written wire transfer instructions delivered by Seller to the Escrow Agent;

(c)   Disburse and deliver the remaining funds in accordance with the closing statements approved by the Parties; and

(d)   Deliver one complete set of signed counterparts of the documents described in Section 15.1 to Buyer and one complete set of signed counterparts of the documents described in Section 15.2 to Seller, and deliver to Buyer and Seller, respectively, such other documents that have been deposited in Escrow for delivery to the applicable Parties at Closing pursuant to this Agreement.

15.4   **Termination of Escrow**. If the Closing does not take place on or before the Closing Date or such later or other date as the Parties may agree upon in writing, then the

Escrow shall terminate, and all funds (provided that if the Closing does not take place due to a default by or failure of Buyer to Close, then the terms of Article XVII shall apply with respect to the return or release of the Deposit) and documents deposited into Escrow shall be returned to the respective Parties; provided, however, that each of the Parties reserves and retains all rights and remedies arising out of a breach of this Agreement by the other Party, subject to the other terms and limitations contained in this Agreement, including those set forth in Article XVII of this Agreement.

## ARTICLE XVI
## CASUALTY AND CONDEMNATION

16.1    **Casualty**. If, prior to Closing, all or any portion of the Property or the Assets is damaged by a casualty event ("***Damage***"), then the following procedures shall apply:

(a)    $150,000 or Less.  If the estimated aggregate cost to repair the Damage or replace the Property or Asset(s) so damaged is equal to or less than $150,000, then Buyer shall: (1) proceed with the Closing and take the Property without any adjustment of the Purchase Price, other than a credit from Seller for any deductible or other uninsured loss applicable to an insurance claim for property damage restoration costs arising from such Damage that is reasonably expected to be suffered by Buyer from and after the Closing; and (2) receive an assignment from Seller of all insurance proceeds payable to Seller in connection with such Damage, less all actual reasonable costs of protecting or repairing the Property from such Damage incurred by Seller prior to the Closing.

(b)    Greater than $150,000.  If the estimated aggregate cost to repair the Damage or replace the Property or Asset(s) so damaged is greater than $150,000 then Buyer may elect to either:  (1) terminate this Agreement by written notice to Seller within ten (10) Business Days after first receiving notice of such Damage, and the parties hereto shall have no further rights or obligations under this Agreement, except those obligations by their terms survive the termination of this Agreement, or (2) proceed with the purchase of the Property without any adjustment of the Purchase Price, other than a credit from Seller for any deductible or other uninsured loss applicable to an insurance claim for property damage restoration costs arising from such Damage that is reasonably expected to be suffered by Buyer from and after the Closing, by giving written notice to Seller within ten (10) Business Days after first receiving notice of such Damage, in which case Buyer shall receive an assignment from Seller of all insurance proceeds payable to Seller in connection with such Damage, less all actual reasonable costs of protecting or repairing the Property from such Damage incurred by Seller prior to the Closing.  If Buyer fails to make an election within the time periods stated in this Section 16.1(b), Buyer shall be deemed to have elected the option in clause (2) above.  If necessary or appropriate (as reasonably determined by Buyer) for Buyer to evaluate its options or enforce its rights under this Section 16.1(b), Seller shall provide to Buyer, on written request, a copy of Seller's property insurance policy(ies) (or other applicable insurance policy(ies)) with respect to the Property.

16.2    **Condemnation**. If any portion of the Property shall be taken or appropriated or threatened in writing to be taken or appropriated by a public or quasi public authority exercising

the power of eminent domain (a "***Condemnation Act***"), then Seller shall promptly notify Buyer thereof and the following procedures shall apply:

(a)      For the purposes of this Section 16.2, "material adverse effect" shall include, but not be limited to, any reduction in the number of rentable Units or amount of any of the rentable square footage of the Facility, or the reduction in the number of parking spaces at the Property below that required by Law, or the material and adverse restriction or impediment to a public road that provides access to the Property as of the Effective Date.

(b)      $150,000 or Less and No Material Adverse Effect.  If the value of the portion of the Property that is to be taken pursuant to such Condemnation Act is equal or less than $150,000 and if the Condemnation Act will not result in a material and adverse effect, each as reasonably determined by Buyer, then Buyer shall: (1) proceed with the Closing and take the Property without any adjustment of the Purchase Price and (2) receive an assignment from Seller of all awards or payments made in connection with such Condemnation Act, less all actual reasonable costs incurred by Seller in the processing and collection thereof.

(c)      Greater than $150,000 or Otherwise Materially Adverse.  If the value of the portion of the Property that is to be taken pursuant to such Condemnation Act is greater than $150,000 or if the Condemnation Act will result in a material and adverse effect, each as reasonably determined by Buyer, then Buyer may elect to either:  (1) terminate this Agreement by written notice to Seller within ten (10) Business Days after first receiving notice of such Condemnation Act, and the parties hereto shall have no further rights or obligations under this Agreement, except those obligations which, by their terms, survive the termination of this Agreement, or (2) proceed with the purchase of the Property without any adjustment of the Purchase Price by giving written notice to Seller within ten (10) Business Days after first receiving notice of such Condemnation Act, in which case Buyer shall receive an assignment from Seller of all awards or payments made in connection with such Condemnation Act, less all actual reasonable costs incurred by Seller in the processing and collection thereof.  If Buyer fails to make an election within the time periods stated in this Section 16.2(c), Buyer shall be deemed to have elected the option in clause (2) above.

## ARTICLE XVII
## DEFAULT

17.1      **Rights**.  On any default by a Party prior to Closing, the non-defaulting Party may, by notifying the defaulting Party, either postpone Closing for as long as is necessary for such default to be cured (but not beyond the 15th day following the original scheduled Closing Date), or declare such default and exercise its rights under this Article XVII.

17.2      **Buyer Default**. IF BUYER FAILS TO CONSUMMATE THE PURCHASE OF THE PROPERTY PURSUANT TO THIS AGREEMENT OR OTHERWISE DEFAULTS IN A MATERIAL WAY ON ITS OBLIGATIONS HEREUNDER AT OR PRIOR TO CLOSING FOR ANY REASON EXCEPT A SELLER DEFAULT (AND WITH RESPECT TO ANY

SUCH DEFAULT BY BUYER THAT OCCURS PRIOR TO THE DATE OF CLOSING, SELLER PROVIDES NOTICE OF SUCH DEFAULT TO BUYER AND SUCH DEFAULT REMAINS UNCURED ON THE EARLIER TO OCCUR OF THE CLOSING DATE AND THE DATE THAT IS FIVE DAYS AFTER BUYER'S RECEIPT OF NOTICE OF SUCH DEFAULT FROM SELLER), THEN SELLER SHALL BE ENTITLED, AS ITS SOLE AND EXCLUSIVE REMEDY (EXCEPT AS PROVIDED IN THIS SECTION 17.2 OR THE ENFORCEMENT OF ANY OBLIGATIONS OF BUYER THAT EXPRESSLY SURVIVE TERMINATION OF THIS AGREEMENT) TO TERMINATE THIS AGREEMENT IN FULL SATISFACTION OF CLAIMS AGAINST BUYER HEREUNDER WITH RESPECT TO SUCH DEFAULT. NOTWITHSTANDING THE FOREGOING, NOTHING CONTAINED IN THIS SECTION 17.2 SHALL LIMIT OR BE DEEMED OR CONSTRUED TO LIMIT BUYER'S OBLIGATIONS UNDER SECTIONS 17.4, 19.1 AND 21.13 OF THIS AGREEMENT.

17.3    **Seller Default**. IF SELLER FAILS TO CONSUMMATE THE SALE OF THE PROPERTY PURSUANT TO THIS AGREEMENT OR OTHERWISE DEFAULTS IN A MATERIAL WAY ON ITS OBLIGATIONS HEREUNDER AT OR PRIOR TO CLOSING FOR ANY REASON EXCEPT A BUYER DEFAULT (AND WITH RESPECT TO ANY SUCH DEFAULT BY SELLER THAT OCCURS PRIOR TO THE DATE OF CLOSING, BUYER PROVIDES PROMPT WRITTEN NOTICE OF SUCH DEFAULT TO SELLER AND SUCH DEFAULT REMAINS UNCURED ON THE EARLIER TO OCCUR OF THE CLOSING DATE AND THE DATE THAT IS FIVE DAYS AFTER SELLER'S RECEIPT OF NOTICE OF SUCH DEFAULT FROM BUYER), THEN BUYER SHALL ELECT, AS ITS SOLE AND EXCLUSIVE REMEDY (EXCEPT AS PROVIDED IN THIS SECTION 17.3, INCLUDING SECTIONS 17.4, 19.1 AND 21.13 HEREOF) EITHER TO (A) TERMINATE THIS AGREEMENT OR (B) WAIVE SAID FAILURE OR BREACH AND PROCEED TO CLOSING WITHOUT ANY REDUCTION IN THE PURCHASE PRICE. NOTWITHSTANDING THE FOREGOING, NOTHING CONTAINED IN THIS SECTION 17.3 SHALL LIMIT OR BE DEEMED OR CONSTRUED TO LIMIT SELLER'S OBLIGATIONS UNDER SECTIONS 17.4, 19.1 AND 21.13 OF THIS AGREEMENT.

17.4    **Other Expenses**.  If this Agreement is terminated due to the default of a Party, then the defaulting Party shall pay Escrow Agent any escrow cancellation fees or charges and any fees or charges due to Title Insurer for preparation and/or cancellation of the Title Commitment.

**ARTICLE XVIII**
**FURTHER ASSURANCES**

18.1    **Further Assurances**. From and after the Closing, Seller, on the one hand, and Buyer, on the other hand, agree to execute and deliver such further documents and instruments and to do such other acts and things (including the making of filings and reprorating items covering pre-Closing periods but which become available after Closing), as Buyer or Seller, as the case may be, may reasonably request in order to effectuate the transactions contemplated by this Agreement.

4842-7481-3108.4

18.2 **Access to the Records**. From and after the Closing Date, subject to applicable privacy rights of Residents, Buyer shall allow Seller and its agents and representatives to have reasonable access to (upon reasonable prior notice and during normal business hours), and to make copies of the Records, to the extent reasonably necessary to enable Seller to among other things investigate and defend malpractice, employee or other claims, to file or defend cost reports and tax returns, to complete/revise, as needed, any patient assessments which may be required for Seller to seek reimbursement for services rendered prior to the Closing Date, to verify accounts receivable collections due Seller, and to enable Seller to complete, in accordance with Seller's policies and procedures, any and all post-Closing Date accounting, reconciliation and closing procedures, including, but not limited to, a month end close out of all accounts, including but not limited to accounts payable and billing. Seller agrees not to use or disclose any of the information obtained from Buyer except solely for the purposes described herein and further agree to maintain this information confidential. Likewise, from and after the Closing Date, Seller shall allow Buyer and its agents reasonable access to the Records, to the extent Buyer reasonably requires such access in connection with, without limitation, accounting, billing, tax filings or securities filings, and other filings, and appeals. Buyer agrees not to use or disclose any of the information obtained from Seller except solely for the purposes described herein and further agrees to maintain this information as confidential.

18.3 **Survival**. The provisions of this Article XVIII shall survive Closing without limitation.

## ARTICLE XIX
## COMMISSIONS

19.1 **Commissions**. Each Party represents to the other that, in connection with the Transaction, the Party so representing has not dealt with any real estate broker, agent, finder or consultant. Each Party shall indemnify and hold harmless the other against and from any inaccuracy in such Party's representation. Each Party shall be responsible for the fees of their respective advisors and consultants.

19.2 **Survival**. The provisions of this Article XIX shall survive Closing.

## ARTICLE XX
## DISCLAIMERS AND RELEASE

20.1 **Disclaimers by Seller**. Except as expressly set forth in this Agreement (and then, subject to the applicable limitations set forth in this Agreement), it is understood and agreed that Seller, Current Manager and their respective agents, representatives, beneficiaries, trustees and heirs (collectively, with Seller, the "***Seller Parties***") have not at any time made and are not now making, and they specifically disclaim, any warranties, representations or guaranties of any kind or character, express or implied, with respect to the Assets, including, but not limited to, warranties, representations or guaranties as to (1) matters of title, (2) environmental matters relating to the Property or any portion thereof, including, without limitation, the presence of hazardous materials in, on, under or in the vicinity of the Property, (3) geological conditions, including, without limitation, subsidence, subsurface conditions, water table, underground water reservoirs, limitations regarding the withdrawal of water, and geologic faults and the resulting

damage of past and/or future faulting, (4) whether, and to the extent to which the Property or any portion thereof is affected by any stream (surface or underground), body of water, wetlands, flood prone area, flood plain, floodway or special flood hazard, (5) drainage, (6) soil conditions, including the existence of instability, past soil repairs, soil additions or conditions of soil fill, or susceptibility to landslides, or the sufficiency of any undershoring, (7) the presence of endangered species or any environmentally sensitive or protected areas, (8) zoning or entitlements to which the Property or any portion thereof may be subject or the extent to which building or other entitlements for the Property or any portion thereof may be obtained or any conditions that may be imposed in connection therewith, (9) the availability of any utilities to the Property or any portion thereof including, without limitation, water, sewage, gas and electric, (10) usages of adjoining property, (11) access to the Property or any portion thereof, (12) the value, compliance with the plans and specifications, size, location, age, use, design, quality, description, suitability, structural integrity, operation, title to, or physical or financial condition of the Assets or any portion thereof, or any income, expenses, charges, liens, encumbrances, rights or claims on or affecting or pertaining to the Assets or any part thereof, (13) the condition or use of the Assets or compliance of the Assets with any or all past, present or future federal, state or local ordinances, rules, regulations or laws, building, fire or zoning ordinances, codes or other similar laws, (14) the existence or non-existence of underground storage tanks, surface impoundments, or landfills, (15) any improvements to the Property, (16) any other matter affecting the stability and integrity of the Property, (17) the potential for further development of the Property, (18) the merchantability of the Assets or fitness of the Property for any particular purpose, (19) the truth, accuracy or completeness of any information relating to the Assets, (20) tax consequences, (21) requirements or conditions of approval applicable to the Assets or any requirements or conditions for the development, use, sale or occupancy of the Property, or (22) any other matter or thing with respect to the Assets.

20.2     **Sale "As Is, Where Is"**.  Buyer (on behalf of itself and the Buyer Parties) acknowledges and agrees that upon Closing, Seller shall sell and convey to Buyer and Buyer shall accept the Assets "**AS IS, WHERE IS, WITH ALL FAULTS**" except to the extent expressly provided otherwise in this Agreement.  Except as expressly set forth in this Agreement, Buyer has not relied and will not rely on, and the Seller Parties have not made and are not liable for or bound by, any express or implied warranties, guarantees, statements, representations or information pertaining to the Assets or relating thereto (including, specifically, information packages distributed with respect to the Assets) made or furnished by Seller, any of the other Seller Parties or any operator, property manager, broker (including, but not limited to, Broker), agent or third party representing or purporting to represent Seller, to whomever made or given, directly or indirectly, orally or in writing. The Parties agree that all understandings and agreements heretofore made between them or their respective agents or representatives are merged in this Agreement, which alone fully and completely expresses their agreement, and that this Agreement has been entered into after full investigation, or with the Parties satisfied with the opportunity afforded for full investigation, neither party relying upon any statement or representation by the other unless such statement or representation is specifically embodied in this Agreement, and then, subject to the limitations in this Agreement applicable thereto.

(a)     Buyer's Investigation.  Buyer represents that it is a knowledgeable, experienced and sophisticated buyer of real estate, facilities and assets similar to the

Property, Facility and other Assets and that, it is relying solely on its own expertise and that of Buyer's consultants in purchasing the Assets and shall make an independent verification of the accuracy of any documents and information provided by Seller, including any information relating to the Assets. Buyer will conduct such inspections and investigations of the Assets as Buyer deems necessary, including, but not limited to, any requirements or conditions for the development, sale, use or occupancy of the Property and the physical and environmental conditions thereof, and shall rely upon same. Buyer acknowledges that Seller has afforded Buyer a full opportunity to conduct such investigations of the Assets as Buyer deemed necessary to satisfy itself as to such requirements and conditions, the condition of the Assets and the existence or non-existence with respect to any hazardous materials on or discharged from the Property, and, Buyer will rely solely upon same and not upon any information provided by or on behalf of Seller or any other Seller Parties with respect thereto, other than such representations, warranties and covenants of Seller as are expressly set forth in this Agreement (and then, subject to the limitation in this Agreement applicable thereto). Upon Closing, Buyer shall assume the risk that adverse matters, including, but not limited to, adverse physical or construction defects or adverse environmental, health or safety conditions, may not have been revealed by Buyer's inspections and investigations. Buyer waives any and all rights or remedies it may have or be entitled to, to the extent deriving from disparity in size or from any significant disparate bargaining position in relation to Seller.

(b) BUYER'S ACKNOWLEDGEMENT. WITHOUT LIMITATION, BUYER (FOR ITSELF, NEW OPERATOR AND THEIR RESPECTIVE AGENTS, EMPLOYEES, OFFICERS, CONTRACTORS, SUCCESSORS AND ASSIGNS, COLLECTIVELY, THE "***BUYER PARTIES***"), ACKNOWLEDGES AND AGREES THAT, EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT, THE ASSETS WILL BE PURCHASED BY BUYER AND SOLD AND DELIVERED BY SELLER IN AN "AS IS" CONDITION AND ON A "WHERE-IS" BASIS "WITH ALL FAULTS INCLUDING, BUT NOT LIMITED TO, BOTH LATENT AND PATENT DEFECTS." BUYER ON BEHALF OF ALL BUYER PARTIES, ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NO WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, OF ANY KIND WHATSOEVER, HAVE BEEN, ARE OR AT ANY TIME WILL BE MADE BY THE SELLER PARTIES OR ANY OTHER PERSON, AND BUYER ON BEHALF OF ALL BUYER PARTIES WAIVES ALL SUCH WARRANTIES, OTHER THAN AS SET FORTH EXPRESSLY IN THIS AGREEMENT, INCLUDING WITH RESPECT TO THE CONDITION (PHYSICAL OR OTHERWISE) AND USE OF THE ASSETS INCLUDING, BUT NOT LIMITED TO, (i) WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, (ii) WARRANTIES WITH RESPECT TO THE CONDITION OF THE ASSETS, THEIR COMPLIANCE WITH ANY ZONING OR OTHER RULES, REGULATIONS, LAWS OR STATUTES APPLICABLE TO THE ASSETS, (iii) WARRANTIES WITH RESPECT TO THE USES PERMITTED ON, THE DEVELOPMENT REQUIREMENTS OR CONDITIONS FOR, OR ANY OTHER MATTER OR THING RELATING TO THE PROPERTY OR ANY PORTION THEREOF, INCLUDING

SOIL, COMPACTION, DRAINAGE, SEISMIC, HAZARDOUS MATERIALS, COMPLIANCE WITH ENVIRONMENTAL REQUIREMENTS, UTILITIES, ACCESS, COMPLIANCE WITH RENT CONTROL ORDINANCES, AND THE ECONOMIC OR OTHER RETURN THAT MAY BE DERIVED FROM OWNERSHIP, DEVELOPMENT, IMPROVEMENT OR USE OF THE PROPERTY, OR (iv) WARRANTIES WITH RESPECT TO ANY IMPROVEMENTS TO THE PROPERTY OR ANY WORK THERETO. BUYER ON BEHALF OF ALL BUYER PARTIES ALSO ACKNOWLEDGES THAT SOME DEFECTS MAY NOT BECOME APPARENT TO BUYER, THE BUYER PARTIES OR SELLER PRIOR TO THE CLOSING DATE AND HEREBY RELEASES THE SELLER PARTIES FROM BLAME AND ALL LIABILITY FOR SUCH "LATENT DEFECTS." BUYER ON BEHALF OF ALL BUYER PARTIES HEREBY COVENANTS NOT TO BRING ANY ACTION AGAINST ANY OF THE SELLER PARTIES BASED ON ANY CLAIM RELATED TO THE ASSETS OR THIS AGREEMENT, EXCEPT TO THE EXTENT EXPRESSLY PERMITTED OTHERWISE IN THIS AGREEMENT. IF ANY FACTS, CONDITIONS OR CIRCUMSTANCES CHANGE OR TURN OUT DIFFERENTLY FROM WHAT BUYER OR ANY OF THE BUYER PARTIES BELIEVED, BUYER'S (AND THE BUYER PARTIES') OBLIGATIONS HEREUNDER, IF ANY, SHALL REMAIN IN FULL FORCE AND EFFECT WITH NO RIGHT OR REMEDY AGAINST ANY OF THE SELLER PARTIES WITH RESPECT THERETO NOR ANY RIGHT TO DELAY BUYER'S (OR ANY BUYER PARTIES') PERFORMANCE HEREUNDER OR, EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, TO TERMINATE THIS AGREEMENT. NOTHING CONTAINED IN THIS SECTION 20.2(b) SHALL BE DEEMED OR CONSTRUED TO ABSOLVE OR RELEASE SELLER FROM ANY CLAIMS OR LIABILITIES ARISING DIRECTLY AND SOLELY OUT OF A MATERIAL BREACH OF THE EXPRESS TERMS OF THIS AGREEMENT BY SELLER, WHICH SHALL BE SUBJECT TO THE TERMS OF ARTICLE XVII. NOTWITHSTANDING ANYTHING TO THE CONTRARY SET FORTH IN THIS AGREEMENT, NONE OF THE BUYER PARTIES SHALL HAVE A RIGHT TO PURSUE ANY CLAIM FOR BREACH OF REPRESENTATION OR WARRANTY IF ANY OF THE BUYER PARTIES KNEW OF SUCH BREACH PRIOR TO CLOSING BUT NONETHELESS CONSUMMATED THE CLOSING. WITHOUT LIMITING THE FOREGOING, BUYER SHALL BE DEEMED TO KNOW ANY INFORMATION DISCLOSED TO ANY OF THE BUYER PARTIES IN WRITING UP UNTIL TWO (2) BUSINESS DAYS PRIOR TO THE CLOSING DATE, INCLUDING WITHOUT LIMITATION IN A WRITTEN NOTICE, IN THE PROPERTY INFORMATION OR IN A REPORT OBTAINED BY ANY OF THE BUYER PARTIES.

20.3 **Seller Released from Liability**. Buyer acknowledges that it will have the opportunity to inspect the Assets and all Seller's information related thereto ("***Seller's Information***") between the date hereof and the Closing Date, and during such period, observe its physical characteristics and existing conditions and the opportunity to conduct such investigation and study on and of the Assets, the Property and adjacent areas and the Seller's Information as Buyer deems necessary, and Buyer (on behalf of all Buyer Parties) hereby FOREVER RELEASES AND DISCHARGES Seller and the other Seller Parties from all responsibility and

liability, including, without limitation, liabilities and responsibilities for the landlord's obligations under any leases or other rental or occupancy agreements, relating to the physical, environmental or legal compliance status of the Property and the Seller's Information, whether arising before or after the Effective Date, and liabilities under the Comprehensive Environmental Response, Compensation and Liability Act Of 1980 (42 U.S.C. Sections 9601 et seq.), as amended ("*CERCLA*"), regarding the condition, valuation, salability or utility of the Property, or its suitability for any purpose whatsoever, including, but not limited to, with respect to the presence in the soil, air, structures and surface and subsurface waters, of hazardous materials or other materials or substances that have been or may in the future be determined to be toxic, hazardous, undesirable or subject to regulation and that may need to be specially treated, handled and/or removed from the Property under current or future federal, state and local laws, regulations or guidelines, and any structural and geologic conditions, subsurface soil and water conditions and solid and hazardous waste and hazardous materials on, under, adjacent to or otherwise affecting the Property (collectively, the "*Specific Matters*"). Buyer (on behalf of all Buyer Parties) further hereby WAIVES AND RELEASES (and by Closing this transaction will be deemed to have WAIVED AND RELEASED) any and all objections and complaints (including, but not limited to, federal, state and local statutory and common law based actions, and any private right of action under any federal, state or local laws, regulations or guidelines to which the Assets is or may be subject, including, but not limited to, CERCLA) concerning the Specific Matters and the physical characteristics and any existing conditions of the Assets, including, without limitation, the landlord's obligations under the any leases or other rental or occupancy agreements, relating to the physical, environmental or legal compliance status of the Property, including, without limitation, the Specific Matters, whether arising before or after the Effective Date. Buyer further hereby assumes the risk of changes in applicable laws and regulations relating to past, present and future characteristics, conditions and environmental conditions on the Property and the risk that adverse physical characteristics and conditions, including, without limitation, the presence of hazardous materials or other contaminants, may not have been revealed by its investigation. Buyer hereby agrees, represents and warrants that it realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and it further agrees, represents and warrants that the foregoing waiver and release has been negotiated and agreed upon in light of that realization and that it nevertheless hereby intends to waive and release all such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which in any way arise out of, are connected with, or relate to, the matters set forth herein. NOTHING CONTAINED IN THIS SECTION 20.3 SHALL BE DEEMED OR CONSTRUED TO ABSOLVE OR RELEASE SELLER FROM ANY CLAIMS OR LIABILITIES GOVERNED BY ARTICLE XVII ARISING DIRECTLY AND SOLELY OUT OF A MATERIAL BREACH OF THE EXPRESS TERMS OF THIS AGREEMENT BY SELLER.

**ARTICLE XXI**
**MISCELLANEOUS**

21.1 **Effectiveness**. This Agreement shall become effective on its execution and delivery by each Party on and as of the Effective Date.

21.2 **Entire Agreement; Amendment**. This Agreement constitutes the entire agreement among the Parties hereto pertaining to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, negotiations and discussions of the Parties, whether oral or written, and there are no warranties, representations or other agreements among the Parties in connection with the subject matter hereof except as specifically set forth herein. No amendment, supplement, modification, waiver or termination of this Agreement shall be binding unless executed in writing by the Party to be bound thereby. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision of this Agreement, whether or not similar, nor shall such waiver constitute a continuing waiver unless otherwise expressly provided. No Party shall be deemed to have waived the exercise of any right which it holds under this Agreement unless such waiver is made expressly and in writing. No delay or omission by any Party in exercising any right shall be deemed a waiver of its future exercise. No waiver made as to any instance involving the exercise of any right shall be deemed a waiver as to any other instance, or any other right.

21.3 **Applicable Law**. This Agreement shall be given effect and construed by application of the laws of the State of Texas without regard to conflicts of laws. Any action arising out of, in connection with, or relating to, this Agreement shall be brought in the Bankruptcy Court or, if the Bankruptcy Case has been closed, courts of the State of Texas, except that if it is to be brought in a United States District Court, it shall be brought in the United States District Court for the Northern District of Texas, Dallas Division. Any action affecting title or the right to possession of the Property shall be filed in the County and State where the Property is located.

21.4 **Notices**. Any notice to be provided hereunder to a Party or the Title Insurer, as Escrow Agent, shall be in writing, and shall be deemed to have been provided the next Business Day after having been deposited with a national courier service, or on having been sent by immediate electronic communication, in each case if receipt is acknowledged or confirmed or delivery is first refused, to the persons and addresses set forth below, as such address may be changed from time to time by notice to the other Party. Any notice by one Party amending or terminating this Agreement shall include a notice to the Escrow Agent.

To Seller:

with a copy to:    Crowe & Dunlevy, P.C.
1919 McKinney Avenue, Suite 100
Dallas, Texas 75201
Attn: Vickie Driver
Telephone: 214-420-2142
Email Address: vickie.driver@crowedunlevy.com

To Buyer:    SH1 Houston LLC
c/o Access Industries Management, LLC
40 West 57th St., 28th Floor
New York, NY 10019
Attn: Jacob Himmelrich

Email Addresses: jhimmelrich@accind.com and
legalnotices@accind.com

with a copy to:
Foley & Lardner LLP
111 North Orange Avenue
Suite 1800
Orlando, Florida 32801
Attn: Michael A. Okaty
Telephone: 407-244-3229
Email Address: mokaty@foley.com

To Escrow Agent
and Title Insurer:
Escrow Agent:
Crow & Dunlevy
Spaces McKinney Avenue
1919 McKinney Ave., Suite 100
Dallas, Texas 75201
Attn: Vickie Driver
Telephone: 214-420-2142
Email Address: vickie.driver@crowedunlevy.com

Any notice by one Party amending or terminating this Agreement or alleging a default under this
Agreement shall include a notice to Escrow Agent. Notice provided by legal counsel for a Party
shall be effective as notice given by such Party.

21.5 **Waiver of Jury Trial**. TO THE FULLEST EXTENT PERMITTED UNDER
APPLICABLE LAW, BUYER AND SELLER EACH HEREBY EXPRESSLY,
IRREVOCABLY, FULLY AND FOREVER RELEASES, WAIVES AND
RELINQUISHES ANY AND ALL RIGHT TO TRIAL BY JURY AND ALL RIGHT TO
RECEIVE PUNITIVE, EXEMPLARY AND CONSEQUENTIAL DAMAGES FROM
THE OTHER (OR ANY PAST, PRESENT OR FUTURE BOARD MEMBER, TRUSTEE,
MEMBER, PARTNER, SHAREHOLDER, DIRECTOR, OFFICER, EMPLOYEE,
AGENT, HEIR, REPRESENTATIVE, OR ADVISOR OF THE OTHER) IN ANY
CLAIM, DEMAND, ACTION, SUIT, PROCEEDING OR CAUSE OF ACTION IN
WHICH BUYER AND SELLER ARE PARTIES, WHICH IN ANY WAY (DIRECTLY
OR INDIRECTLY) ARISES OUT OF, RESULTS FROM OR RELATES TO ANY OF
THE FOLLOWING, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER
ARISING AND WHETHER BASED ON CONTRACT OR TORT OR ANY OTHER
LEGAL BASIS: THIS AGREEMENT; THE PROPERTY; ANY PAST, PRESENT OR
FUTURE ACT, OMISSION, CONDUCT OR ACTIVITY WITH RESPECT TO THIS
AGREEMENT OR THE PROPERTY; ANY TRANSACTION, EVENT OR
OCCURRENCE CONTEMPLATED BY THIS AGREEMENT; THE PERFORMANCE
OF ANY OBLIGATION OR THE EXERCISE OF ANY RIGHT UNDER THIS
AGREEMENT; OR THE ENFORCEMENT OF THIS AGREEMENT. BUYER AND
SELLER EACH AGREES THAT THIS AGREEMENT CONSTITUTES WRITTEN
CONSENT THAT TRIAL BY JURY SHALL BE WAIVED IN ANY SUCH CLAIM,
DEMAND, ACTION, SUIT, PROCEEDING OR OTHER CAUSE OF ACTION AND

**AGREES THAT BUYER AND SELLER EACH SHALL HAVE THE RIGHT AT ANY TIME TO FILE THIS AGREEMENT WITH THE CLERK OR JUDGE OF ANY COURT IN WHICH ANY SUCH CLAIM, DEMAND, ACTION, SUIT, PROCEEDING OR OTHER CAUSE OF ACTION MAY BE PENDING AS WRITTEN CONSENT TO WAIVER OF TRIAL BY JURY. FROM TIME TO TIME UPON REQUEST OF EITHER PARTY HERETO, THE OTHER PARTY SHALL CONFIRM, RE-CONFIRM, AND RATIFY, IN WRITING, THE PROVISIONS OF THIS <u>SECTION 21.5</u>, INCLUDING IF ANY APPLICABLE LEGISLATION IS PROMULGATED REGARDING WAIVERS OF THE RIGHT TO TRIAL BY JURY IN THE APPLICABLE JURISDICTION.**

21.6 <u>**Construction**</u>. All references made in the neuter, masculine or feminine gender shall be deemed to have been made in all such genders; and in the singular or plural number shall be deemed to have been made, respectively, in the plural or singular number as well.

21.7 <u>**Schedules**</u>. Each schedule, writing or document referred to as being attached as a Schedule is hereby made a part of this Agreement.

21.8 <u>**Severability**</u>. If any provision, clause or part of this Agreement, or the application thereof under certain circumstances, is held invalid or unenforceable by a final order of a court of competent jurisdiction, then the remainder of this Agreement, or the application of such provision, clause or part under other circumstances, shall not be affected thereby and the Parties hereto agree to replace such invalid or unenforceable term or provision with a valid and enforceable term or provision that will achieve, to the extent possible, the economic, business and other purposes of such invalid or unenforceable term.

21.9 <u>**Time of Essence**</u>. Time shall be of the essence of this Agreement.

21.10 <u>**Counterparts; Headings**</u>. This Agreement may be executed in several counterparts, each of which shall be deemed original, but such counterparts shall together constitute but one and the same agreement. The Table of Contents and Article and Section headings in this Agreement are inserted for convenience of reference only and shall not constitute a part hereof or be used as interpreting the meaning of this Agreement.

21.11 <u>**Facsimile or Electronic Signatures**</u>. The exchange of copies of this Agreement and of signature pages by facsimile or electronic transmission shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes. Signatures of the Parties transmitted by facsimile or e-mail shall be deemed to be their original signatures for all purposes.

21.12 <u>**Equal Participation**</u>. Each Party hereto hereby acknowledges that all Parties hereto participated equally in the negotiation and drafting of this Agreement and that, accordingly, no court construing this Agreement shall construe it more stringently against one Party than against the other.

21.13 <u>**Attorneys' Fees**</u>. If either Party hereto institutes any proceeding, claim or action, at law or in equity, in connection with or arising out of the terms, conditions, covenants and

agreements contained in this Agreement, the non-prevailing Party in any such action, claim or proceeding shall reimburse the prevailing Party for reasonable attorneys' fees, costs and other expenses incurred in connection with such proceeding or action.

21.14 **Assignment**. This Agreement and each Party's respective rights hereunder may not be assigned at any time without the prior written consent of the other Party hereto, except that Buyer may, by written notice to Seller, assign, without the consent of Seller, all or any portion of Buyer's rights, obligations and interest in this Agreement to one or more of its Affiliates.

21.15 **No Reliance**. No third party, other than a successor by operation of law or an assignee permitted by this Agreement (and then, subject to the applicable limitations in this Agreement), is entitled to rely on any of the representations, warranties and agreements contained in this Agreement and no Party to this Agreement assumes any liability to any third party, other than an assignee permitted by this Agreement (and then, subject to the applicable limitations in this Agreement), because of any reliance on the representations, warranties and agreements contained in this Agreement.

21.16 **Expenses**. Except to the extent otherwise provided herein, each of the Parties hereto shall pay the fees and expenses of their respective counsel, consultants and other expenses incident to the negotiation and preparation of this Agreement and consummation of the transactions contemplated by this Agreement.

[*Signature page to follow*]

IN WITNESS WHEREOF, each Party has executed this Agreement by its duly authorized representatives, to be effective as of the Effective Date.

**SELLER**:

**PEARLAND MEMORY CARE LLC**

By: _____
Name: _____
Title: _____

Signature Page to Purchase Agreement (Pearland)

IN WITNESS WHEREOF, each Party has executed this Agreement by its duly authorized representatives, to be effective as of the Effective Date.

**BUYER**:

**SH1 HOUSTON LLC**

By:   ACCESS INDUSTRIES MANAGEMENT, LLC, its Manager

By: _____
Name: Alejandro Moreno
Title:  Executive Vice President

By: _____
Name: Richard B. Storey
Title:  Executive Vice President

Signature Page to Purchase Agreement (Pearland)

## ACCEPTANCE BY ESCROW AGENT

The Undersigned Escrow Agent (a) acknowledges its receipt of the escrow instructions contained in this Agreement (including without limitation the Escrow Instructions attached to this Agreement as Schedule 5.2); and (b) accepts the foregoing escrow instructions and agrees to act in accordance with the terms contained therein and in this Agreement insofar as such terms affect Escrow Agent.

### ESCROW AGENT

By: _____

Name: _____

Title: _____

**SCHEDULE 3.1(a) – the Land**

A0344 WM Morris Block 1 Tract 1 (Autumn Owned Leaves) Acres 2.615, located at 11200 Discovery Bay Drive Pearland, Texas 77584

## SCHEDULE 3.1(e) – Occupancy Agreements

1.  Occupancy Agreement – Resident ID PEA – 1024
2.  Occupancy Agreement – Resident ID PEA – 1077
3.  Occupancy Agreement – Resident ID PEA – 1080
4.  Occupancy Agreement – Resident ID PEA – 1086
5.  Occupancy Agreement – Resident ID PEA – 1102
6.  Occupancy Agreement – Resident ID PEA – 1105
7.  Occupancy Agreement – Resident ID PEA – 1109
8.  Occupancy Agreement – Resident ID PEA – 1111
9.  Occupancy Agreement – Resident ID PEA – 1112
10. Occupancy Agreement – Resident ID PEA – 1113
11. Occupancy Agreement – Resident ID PEA – 1124
12. Occupancy Agreement – Resident ID PEA – 1125
13. Occupancy Agreement – Resident ID PEA – 1129
14. Occupancy Agreement – Resident ID PEA – 1131
15. Occupancy Agreement – Resident ID PEA – 1132
16. Occupancy Agreement – Resident ID PEA – 1134
17. Occupancy Agreement – Resident ID PEA – 1137
18. Occupancy Agreement – Resident ID PEA – 1139
19. Occupancy Agreement – Resident ID PEA – 1140
20. Occupancy Agreement – Resident ID PEA – 1142
21. Occupancy Agreement – Resident ID PEA – 1145
22. Occupancy Agreement – Resident ID PEA – 1146
23. Occupancy Agreement – Resident ID PEA – 1147
24. Occupancy Agreement – Resident ID PEA – 1149
25. Occupancy Agreement – Resident ID PEA – 1152
26. Occupancy Agreement – Resident ID PEA – 1154
27. Occupancy Agreement – Resident ID PEA – 1156
28. Occupancy Agreement – Resident ID PEA – 1157
29. Occupancy Agreement – Resident ID PEA – 1158
30. Occupancy Agreement – Resident ID PEA – 1159
31. Occupancy Agreement – Resident ID PEA – 1160

**Schedule 3.4(c) – Legal Proceedings**

All legal proceedings (if any) listed in the Seller's Schedule of Assets and Liabilities and Statement of Financial Affairs as filed with the Bankruptcy Court with respect to the Facility are incorporated in this Schedule 3.4(c).

**SCHEDULE 4.1 – Assigned Service Contracts**

Management Agreement with Jerry Erwin Associates, LLC, d/b/a JEA Senior Living.

**SCHEDULE 7.1 – the Deed**

[Attached]

## SCHEDULE 7.2(c) – the Bill of Sale

[Attached]

**SCHEDULE 7.2(f) – Form of Assignment of Contracts**

[Attached]

**SCHEDULE 11.1(f) – Disclosures of Violations of Environmental Laws**

None.

**SCHEDULE 11.1(h) – Rent Rolls**

[Attached]

**SCHEDULE 11.2(b) – Buyer's Consents and Approvals**

None, except for internal board of manager and member approvals.

## SCHEDULE 14.1(h) - FIRPTA Affidavit

[Attached]